**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **Securities and Exchange Commission,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **CASE NO.** |
| ) | |
| **Stephen D. Ferrone, Douglas A. McClain,** ) | |
| **Jr., Douglas A. McClain, Sr.** ) | |
| **James T. Miceli, Immunosyn** ) | |
| **Corporation, Argyll Biotechnologies,** ) | |
| **LLC, Argyll Equities, LLC, and Padmore** ) | |
| **Holdings, Ltd.,** ) | |
| | |
| **Defendants.** | |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "SEC"), for its Complaint, alleges as follows:

## SUMMARY

1.     From 2006 through 2010, Immunosyn Corporation ("Immunosyn"), a public biopharmaceutical company, made materially misleading statements about the status of regulatory approvals for Immunosyn's sole product, a drug that it refers to as "SF-1019."

2.     According to Immunosyn, SF-1019, which is derived from goat blood, has the potential to treat a variety of ailments, including human immunodeficiency virus, commonly known as "HIV," Chronic Inflammatory Demyelinating Polyneuropathy, diabetic neuropathy, and diabetic ulcers.

3.     From late 2006 through early 2010, Immunosyn repeatedly stated in public filings with the SEC that – according to Argyll Biotechnologies LLC ("Argyll" or "Argyll

Biotechnologies"), which has been Immunosyn's controlling shareholder at all relevant times – Argyll planned to commence the regulatory approval process for human clinical trials in the U.S.

4.     In fact, persons affiliated with Argyll had already twice submitted applications to the U.S. Food and Drug Administration ("FDA") for approval of SF-1019, and twice the FDA immediately responded with a full clinical hold on the applications, putting an immediate halt to any possible human clinical trials.

5.     From December 2006 until December 2009, Immunosyn did not make any disclosure of these clinical holds.  In December 2009, after the SEC questioned Immunosyn's executive officers about Immunosyn's non-disclosure, Immunosyn made some belated disclosure of the full clinical holds.  Immunosyn made some additional belated disclosure of these clinical holds in April 2010.

6.     In its public filings, Immunosyn stated that Argyll was responsible for all research and product development, clinical testing, regulatory approvals, production and product support for SF-1019, and that Argyll formed Immunosyn to work as Argyll's sales, marketing, and distribution channel for SF-1019.

7.     Immunosyn's Chief Executive Officer, Stephen Ferrone ("Ferrone"), and Immunosyn's Chief Financial Officer ("CFO"), Douglas McClain, Jr. ("McClain Jr.") – who was also the President of Argyll and a 50% shareholder in Argyll during the same period in which he was Immunosyn's CFO -- signed and certified public filings by Immunosyn that misleadingly stated that Argyll planned to commence the regulatory approval process for SF-1019 while omitting to state that the FDA had already issued full clinical holds on the two regulatory approval applications for SF-1019 that had been submitted.   During the relevant period, Immunosyn has had few employees other than Ferrone and McClain Jr.

8.     While knowing that Immunosyn was making misrepresentations about SF-1019, McClain Jr., as well as Argyll's Chief Executive Officer, James Miceli ("Miceli"), and Argyll's Chief Scientific Officer and McClain Jr.'s father, Douglas McClain, Sr. ("McClain Sr."), raised approximately $20 million from their sale of Immunosyn shares, including sales to investors located in this judicial district.  These Defendants sold most of these shares through Argyll and two other entities, Argyll Equities LLC ("Argyll Equities"), which McClain Jr. and Miceli jointly owned, and Padmore Holdings Ltd. ("Padmore"), which McClain Jr., Miceli, and McClain Sr. jointly owned.  These Defendants engaged in insider trading by selling Immunosyn shares while in possession of material, nonpublic information that the FDA had issued a full clinical hold on applications for regulatory approval for SF-1019 and while knowing that Immunosyn was making misleading statements about the status of the regulatory approval process for SF-1019.

9.     McClain Sr. also made misstatements in a video that Immunosyn posted on its public website from at least 2007-2010, and additional misstatements in a 2008 presentation in which he sold his stock to individuals that attended the presentation at a Texas holistic clinic, some of whom were terminally ill patients at the clinic.  McClain Sr. purported to sell Immunosyn stock to approximately 15 of these attendees at the presentation at the clinic, including some terminally ill patients, raising over $300,000 from them.  He took their money but never gave them their Immunosyn stock.

10.     In 2009, Miceli caused Immunosyn to issue a false press release that there was no truth to the "rumors" that Immunosyn was exploring a change in control transaction.  In fact, when Immunosyn issued this press release, Miceli actively exploring such a transaction by trying to take the company private.  Miceli did not disclose this information to Immunosyn when Immunosyn asked him about it, resulting in Immunosyn's false press release.  Miceli traded on

Immunosyn stock while in possession of material, non-public information that he was exploring this change in control transaction.

11.     Miceli also failed to file, and Miceli, McClain Jr., Argyll, and Padmore failed to file timely, required disclosure forms with the SEC reflecting their transactions in Immunosyn stock.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77v(a)], and Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)-(e), 78aa].  The defendants have, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged in this complaint.

13.     This is an appropriate venue under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Some of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Northern District of Illinois.  In addition, Defendant Ferrone is a resident of this District, and the SEC's Chicago Regional Office, which has been responsible for investigating and prosecuting this action, is located within this District.

## THE DEFENDANTS

14.     Immunosyn Corporation is a Delaware corporation with its principal place of business located in San Diego, California.  It was formed to market, distribute, and sell a biopharmaceutical drug product referred to as SF-1019.  Immunosyn's common stock is

registered pursuant to Section 12(g) of the Exchange Act and is quoted on the over-the-counter bulletin board.

15.     Stephen Ferrone, age 60, is a resident of Lake Forest, Illinois.  He has been the Chief Executive Officer of Immunosyn from October 2007 to the present.

16.     Douglas McClain, Jr., age 36, is a resident of Savannah, Georgia.  From approximately August 2006 to the present, he has been the Chief Financial and Accounting Officer of Immunosyn, the President and a 50% shareholder of Argyll Biotechnologies LLC, a 50% shareholder of Argyll Equities LLC, and a 45% shareholder of Padmore.

17.     James T. Miceli, age 47, is a resident of Poway, California.  From approximately August 2006 to the present, he has been the Chief Executive Officer and a 50% shareholder of Argyll Biotechnologies, a 50% shareholder of Argyll Equities, and a 45% shareholder of Padmore.

18.     Douglas McClain, Sr., age 59, is a resident of Boerne, Texas.  From approximately 2006 to the present, he has been the Chief Scientific Officer of Argyll Biotechnologies and a 10% shareholder of Padmore.

19.     Argyll Biotechnologies, LLC is a Delaware limited liability company with its principal place of business located in San Diego, California.  During all relevant times to this Complaint, it has been the majority, controlling shareholder of Immunosyn stock.

20.     Argyll Equities, LLC is a Texas limited liability company with its principal place of business located in San Diego, California.  It has owned 4%-5% of Immunosyn's stock during all times relevant to this Complaint.

21.     Padmore Holdings Ltd. is a British Virgin Islands entity with its principal place of business located in San Antonio, Texas.  It is jointly owned by Miceli, McClain, Jr., and

McClain Sr. It has owned 5%-10% of Immunosyn's stock during all times relevant to this Complaint.

## FACTS

### SF-1019 And Its Significance to Immunosyn

22.     Argyll, a private company, formed Immunosyn in 2006 as a vehicle to market, distribute, and sell SF-1019. Under a September 2006 agreement between Argyll and Immunosyn, Argyll granted Immunosyn an exclusive license to market, distribute, and sell SF-1019, while Argyll continued to own the product and was responsible for obtaining regulatory approval for it. In exchange for the exclusive license to market and sell SF-1019, Argyll received 147 million shares of Immunosyn, or approximately 54% of the outstanding shares issued.

23.     According to Immunosyn's public filings with the SEC, Immunosyn's sole business is that it "owns an exclusive worldwide license to market, distribute and sell a biopharmaceutical drug product, currently referred to as SF-1019, for treatment of any and all diseases and pathological conditions." Further, Immunosyn "is entirely dependent upon Argyll's sole experimental drug, SF-1019." Immunosyn has repeatedly stated in public filings that Argyll, not Immunosyn, is responsible for obtaining regulatory approval for SF-1019.

24.     Immunosyn filed a selling shareholder registration statement with the SEC in 2006, and it was declared effective in January 2007. The Company also filed a registration statement in 2007 that registered the company's common stock. Immunosyn's stock began trading in the over-the-counter market in October 2007. Argyll, however, has continued to maintain controlling shareholder interest in Immunosyn at all relevant times.

25.     During all relevant times, Miceli has been Argyll's CEO, McClain Jr. has been its President, and McClain Sr. has been its Chief Scientific Officer.  Argyll has had few other employees besides these three individuals.

## The FDA Approval Process

26.     Before a drug can be sold in the U.S., a company must obtain approval from the FDA. The approval process is usually preceded by substantial pre-clinical testing (usually in animals), after which a company files an application with the FDA to conduct human clinical trials.  A company is not allowed to conduct human clinical trials without FDA approval. Human clinical trials usually occur in three phases and are designed to test for safety (Phase I and Phase II) and efficacy (Phase II and III).

27.     A company usually begins the FDA approval process by filing an Investigational New Drug ("IND") application requesting FDA approval for clinical trial testing on humans. After review, the FDA may allow the proposed clinical trials to proceed or place the application on clinical hold, meaning that no human clinical trials can be conducted.  Clinical holds may be full or partial and may be issued by the FDA for various reasons, mostly related to the safety of the drug to be tested on humans.   If sufficient data has been generated after the completion of Phase III trials, a sponsor may submit a New Drug Application to the FDA seeking approval to market and sell its product to the public.

## Defendants' Misleading Statements About the Status of Regulatory Approval of SF-1019 and Non-Disclosure of FDA's Full Clinical Holds

28.     From approximately December 2006 through April 2010, the Defendants made, or caused to be made, misleading statements about the progress of SF-1019 in the U.S. while failing to disclose that twice the FDA had issued clinical holds for the drug.  They also misleadingly suggested that the regulatory approval process in Europe for human clinical trials

7

was imminent or underway, when in fact Argyll never submitted an application in Europe to conduct human clinical trials.

29.     In December 2006, a scientist working with Argyll submitted an IND application to the FDA for SF-1019 to treat "autoimmune/inflammatory conditions of the nervous system."

30.     Also in December 2006, shortly after the scientist working with Argyll submitted the IND application to the FDA, Immunosyn filed a registration statement with the SEC, signed by McClain Jr., falsely stating that Argyll "has not yet applied for regulatory approval" for SF-1019.

31.     McClain Sr., on behalf of Argyll, reviewed, and provided comments to Immunosyn about, statements relating to scientific or medical issues in Immunosyn's filings with the SEC before Immunosyn filed them.

32.     In January 2007, Immunosyn filed another registration statement with the SEC, which again falsely stated that Argyll "has not yet applied for regulatory approval" for SF-1019, even though the scientist working with Argyll had applied for regulatory approval from the FDA a month earlier, in December 2006.

33.     Also in January 2007, the FDA informed the scientist working with Argyll that the FDA was issuing a full clinical hold on SF-1019, meaning that no human clinical trials could begin until the FDA's concerns with the IND application for SF-1019 were resolved.

34.     The scientist working with Argyll immediately informed Argyll of the FDA's issuance of a full clinical hold.

35.     In March 2007, the FDA staff sent a letter to the scientist working with Argyll confirming the full clinical hold. The letter detailed seventeen reasons for the issuance of the full clinical hold, including inadequate information on the chemistry and manufacturing of SF-1019,

deficiencies or lack of toxicology studies on animals, and overall concerns regarding the safety of the trials.

36.     In March 2007, Immunosyn filed its 2006 annual report with the SEC, signed by McClain Jr.  This annual report misleadingly stated that Argyll "anticipates that it will commence clinical trial and studies of SF-1019 and prepare and submit all filings required for regulatory approval" in the U.S. and other countries, and that Argyll "is preparing to conduct clinical trials, develop manufacturing protocols and, if possible, apply for regulatory approval of SF-1019's use."  In fact, Argyll had already applied for U.S. regulatory approval, and the FDA had responded with a full clinical hold.  McClain Jr. signed this 2006 annual report, and he also certified, among other things, that it did not contain any untrue statements of a material fact or omitted to state a material fact necessary to make the statements therein materially misleading.

37.     In October 2007, a consultant retained by Argyll to review the IND application submitted for SF-1019 emailed McClain Jr. and Miceli and informed them that the study that had been done in support of the IND application had serious "shortcomings in design" and was "without any potential scientific, medical, regulatory, or toxicologic use."  In the email, the consultant suggested remedies to McClain Jr. and Miceli for the "failed" IND application that Argyll had submitted and to address the concerns raised in "the 'clinical hold' letter from FDA."

38.     In October 2007, Immunosyn filed with the SEC a transcript of a presentation by Ferrone and McClain Sr., which Immunosyn then placed on its public website in video form (where it remained from at least 2007-2010).  In the presentation, McClain Sr. misleadingly stated that "we have initiated the process for regulatory approval in several countries and preparations for clinical trials are underway in both the US and Europe."  This statement was misleading because it omitted to state that the FDA had placed on full clinical hold on SF-1019

in response to Argyll's IND application. In the transcript and video presentation, McClain Sr. also falsely stated that "[c]ompassionate use waivers have already been issued by the Institutional review board of the FDA in Houston, Texas for the use of SF-1019." In fact, no such waivers were ever issued by the FDA.

39.    In November 2007, Immunosyn issued a press release, filed with the SEC, that touted the results of supposed clinical studies of SF-1019 by Argyll "with the approval of and under the supervisions of Research Consultants International and the RBIIRB Institutional Review Board" and after the "receipt of a compassionate approval." This press release was materially misleading because it suggested that Argyll had performed human clinical trials with some sort of regulatory approval, when in fact, any such clinical studies on human patients were illegal in light of the full clinical hold that the FDA had issued.

40.    McClain Sr., on behalf of Argyll, reviewed, and provided comments to Immunosyn about, statements relating to scientific or medical issues in Immunosyn's press releases before Immunosyn issued them. Likewise, Miceli, on behalf of Argyll reviewed, and provided comments to Immunosyn about, Immunosyn's press releases before Immunosyn issued them.

41.    Also in November 2007, Immunosyn issued another press release, quoting Ferrone, in which Immunosyn announced that Argyll had retained a consultant to assist it in responding to the FDA's request for additional information in support of an IND application for SF-1019. This press release was materially misleading because it omitted to state that the FDA had responded to Argyll's IND application with a full clinical hold.

42.    Also in November 2007, Immunosyn issued another press release, quoting Ferrone, in which Immunosyn announced that the European equivalent of the FDA, the

Medicines and Healthcare products Regulatory Agency, known as the MHRA, had issued manufacturing and import approval for SF-1019. The press release quoted Ferrone as stating: "The fact that SF-1019 has garnered manufacturing and import approval from the MHRA so rapidly is exciting news, as every milestone we achieve in this process brings us that much closer to producing revenue for our shareholders." Immunosyn's and Ferrone's statements in the press release were false and misleading because the MHRA never issued any regulatory approval specific to SF-1019.

43.     In March 2008, Immunosyn filed with the SEC Immunosyn's 2007 annual report, which contained nearly identical misleading statements to those contained in its 2006 annual report, referenced in paragraph 36 above. McClain Jr. and Ferrone signed this 2007 annual report, and they also certified, among other things, that it did not contain any untrue statements of a material fact or omitted to state a material fact necessary to make the statements therein materially misleading.

44.     In November 2008, a physician working with Argyll submitted an IND application to the FDA for the use of SF-1019 to treat multiple sclerosis. Prior to the physician's submission of the IND application, Argyll provided the physician with a copy of the full clinical hold letter that the FDA had issued on the earlier IND application for SF-1019 submitted in December 2006.

45.     Also in November 2008, Immunosyn filed a quarterly report with the SEC that announced the submission of this IND application and further stated that "[t]he FDA response timeline guidance would suggest that it would take approximately three to six months from the date of submission until approval and commencement of a trial for MS."

46. In December 2008, the FDA informed the physician working with Argyll that the FDA was issuing another full clinical hold on SF-1019, and the physician so informed Argyll. The FDA told the physician that the full clinical hold raised concerns about the inadequacy of the toxicity studies and questions about SF-1019's purity and potency, among other things.

47. Ferrone decided not to publicly disclose that the FDA had responded to the IND application submitted by the physician working with Argyll even though Ferrone knew that such information was material to investors in Immunosyn.

48. In March 2009 – by which time the FDA had issued two full clinical holds that Immunosyn had not disclosed -- Immunosyn filed with the SEC Immunosyn's 2008 annual report, which contained nearly identical misleading statements to those contained in its 2006 and 2007 annual reports, referenced in paragraphs 36 and 43 above. McClain Jr. and Ferrone signed this 2008 annual report, and they also certified, among other things, that it did not contain any untrue statements of a material fact or omitted to state a material fact necessary to make the statements therein materially misleading.

### McClain Sr. Makes False Statements About Immunosyn In Selling Immunosyn Shares to Investors, Then Takes The Investors' Money But Never Gives Them Their Stock

49. In July 2008, McClain Sr. gave a presentation at a Texas holistic clinic while selling Immunosyn shares he owned through Padmore.

50. McClain Sr. made false and misleading statements to these attendees at the presentation at the clinic, including some terminally ill patients, in selling them shares of Immunosyn stock. In McClain Sr.'s presentation, McClain Sr. claimed, among other things, that six terminal cancer patients were treated with SF-1019 under a compassionate waiver granted by

the FDA. This statement was false and misleading because the FDA never issued any approvals, "compassionate" or otherwise, for the use of SF-1019, and so if any patients were treated with the drug, such treatment was illegal.

51.    McClain Sr. also claimed in the presentation that the Department of Defense had purchased 600,000 vials of SF-1019. This claim was false.

52.    Based in part on these misrepresentations, McClain Sr. purported to sell Immunosyn stock to approximately 15 individuals, including some terminally ill patients who were seeking treatment at the clinic, raising over $300,000 from them. He took their money but never gave them their Immunosyn stock.

53.    McClain Sr. also purported to sell Immunosyn stock to an investor in Florida. This investor paid McClain Sr. $56,000 for the stock, but McClain Sr. never delivered any Immunosyn stock to this investor.

**Miceli Buys Immunosyn Shares, Causes Immunosyn to Make Misleading Statements About a Proposed Transaction to Take the Company Private, and Then Sells Shares At a Profit**

54.    Beginning in approximately the summer of 2009, Miceli contacted Immunosyn shareholders to solicit them to pledge their shares to a private company formed and controlled by Miceli with the goal of retiring Immunosyn's publicly traded shares and making Immunosyn a privately-held company.

55.    At the time of the solicitation, Miceli, through his person Immunosyn stock holdings and the Immunosyn stock holdings of entities he controlled, already had a controlling interest in outstanding Immunosyn shares. If shareholders had agreed to Miceli's solicitation, he would have controlled all the outstanding shares of Immunosyn.

13

56.     Between July and August 2009, Miceli purchased approximately 458,000 shares of Immunosyn stock through his personal IRA account at prices ranging from $.05-$.07 per share.

57.     In September 2009, while Miceli was actively soliciting Immunosyn investors to pledge their shares so that Immunosyn could be taken private, Immunosyn issued a press release and filed it with the SEC, stating in pertinent part: "Although it is generally the Company's practice not to respond to market rumors, management believes that in the current circumstances it is appropriate to do so.  Management has become aware that rumors are circulating in the market suggesting that the Company is actively exploring a change of control transaction.  Management believes that there is no basis whatsoever for these rumors that it is exploring such a transaction at this time."

58.     This press release was misleading because in fact Miceli was actively soliciting such a transaction.

59.     Before Immunosyn issued the press release, Ferrone and McClain Jr. asked Miceli what he knew about the "rumors" about a possible change in control transaction, but Miceli did not provide any information about his activities to them.  After speaking with Miceli, Ferrone and McClain Jr. caused Immunosyn to issue the misleading press release.

60.     By November 2009, Immunosyn's stock price had risen sharply, based in part of "rumors" about the change in control transaction that Immunosyn misleadingly denied.  During the month of November 2009, Miceli sold 300,000 shares from his IRA account for almost $100,000, realizing a gain of nearly $70,000 on trading in Immunosyn stock in that account.

### The Defendants Sell Shares of Immunosyn While Knowing that the Company
### Was Making Material Misstatements and Omissions about SF-1019

61.     During the time of Immunosyn's material misstatements and omissions, including Immunosyn's non-disclosure of the FDA's issuance of two full clinical holds for SF-1019, Argyll, Argyll Equities, Padmore, McClain Jr., McClain Sr., and Miceli sold at least 5,275,000 shares of Immunosyn they owned either individually or through entities they controlled for at least approximately $20 million.  These Defendants made these sales while in possession of material non-public information that the FDA had issued two full clinical holds for SF-1019. When Argyll and Argyll Equities sold shares of Immunosyn, Miceli and McClain Jr. caused these entities to disburse proceeds from the sales to Miceli's, McClain Jr.'s, and McClain Sr.'s personal bank accounts.

### The Defendants Fail to Make Timely Reports of Their Immunosyn Stock
### Holdings In Accordance With SEC Requirements

62.     Section 16(a) of the Exchange Act and Rule 16a-3 thereunder require that a public company's executive officers and directors, and direct or indirect holders of more than 10% of the outstanding shares of the company's common stock, to file initial reports of ownership and reports of changes in ownership with the SEC on a form known as a "Form 4."  SEC Rules require that these forms must be filed before the end of the second business day following the day on the transaction was executed.

63.     When Miceli sold his Immunosyn stock held in his personal IRA account in November 2009, as discussed in paragraph 60 above, he failed to report these sales by filing a Form 4 with the SEC.

64.     Additionally, Miceli, McClain Jr., Argyll and Padmore filed Forms 4 with the SEC later than the end of the second business day following the day on which their transactions

in Immunosyn stock were executed, during a period in which the size of their Immunosyn stock holdings subjected them to the reporting requirements of Section 16(a) of the Exchange Act and Rule 16a-3 thereunder.

## COUNT I

### Violation of Section 17(a) of the Securities Act
### (Against Miceli, McClain Jr., McClain Sr., Argyll, Argyll Equities, and Padmore)

65.     The SEC realleges and incorporates by reference the allegations of paragraphs 1 through 64 as if fully set forth herein.

66.     Defendants Miceli, McClain Jr., McClain Sr., Argyll, Argyll Equities, and Padmore, directly or indirectly, knowingly, recklessly or negligently, in the offer or sale of a security, by the use of means or instrumentalities of interstate commerce or the mails:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or the omission of a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

67.     By engaging in the conduct described above, Defendants Miceli, McClain Jr., McClain Sr., Argyll, Argyll Equities, and Padmore violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II

### Violation of Section 10(b) of the Exchange Act
### and Exchange Act Rule 10b-5
### (Against All Defendants)

68.     The SEC realleges and incorporates by reference the allegations of paragraphs 1 through 64 as if fully set forth herein.

69.     The Defendants, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of a material fact or omitted a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or course of business which operated or would operate as a fraud or deceit upon other persons.

70.     By engaging in the conduct described above, the Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## COUNT III

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5]

### (Against Miceli and Argyll)

71.     The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 64 and 68 through 70 above.

72.     As alleged above, Immunosyn committed primary violations of the Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

73.     By reason of the foregoing and pursuant to Section 20 of the Exchange Act [15 U.S.C. § 78t], Miceli and Argyll aided and abetted, and are therefore liable for, the primary violations committed by the Immunosyn of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule l0b-5 thereunder [17 C.F.R. § 240.10b-5], because each of these Defendants knowingly or recklessly provided substantial assistance to such entity's violations of these provisions.

## COUNT IV

### Violations of Exchange Act Rule 13a-14

### (Against Ferrone and McClain Jr.)

74.     The SEC realleges and incorporates by reference the allegations of paragraphs 1 through 64 as if fully set forth herein.

75.     As the principal executive officers of Immunosyn, Ferrone and McClain Jr. were required to, and did, sign and certify Immunosyn's annual report on Form 10-K for 2007 and 2008, filed in 2008 and 2009, respectively, and its quarterly reports on Form 10-Q for its 2008 and 2009 fiscal quarters.  Additionally, McClain Jr. was required to, and did, sign and certify Immunosyn's annual report on Form 10-K for 2006, filed in 2007, and its quarterly reports on

Form 10-Q for its 2007 fiscal quarters.  Among other things, Ferrone and McClain Jr. certified that: (a) the reports did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made not misleading; and (b) the financial statements and other financial information included in the report fairly presented in all material respects Immunosyn's financial condition, results of operations, and cash flows.  These certifications were materially false.

76.     By engaging in the conduct described above, Ferrone and McClain Jr. violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.131-14].

## COUNT V

**Violations
of Section 13(a) of the Exchange Act and
Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13**

**(Against Immunosyn)**

77.     The SEC realleges and incorporates by reference the allegations of paragraphs 1 through 64 as if fully set forth herein.

78.     Section 13(a) and Rules 13a-1, 13a-11, and 13a-13 thereunder, require issuers of registered securities to file with the SEC factually accurate annual and quarterly reports (Form 10-K and Form 10-Q) and certain current information with the SEC (Form 8-K).  Rule 12b-20 further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not mislead.

79.     By engaging in the conduct described above, Immunosyn violated Section 13(a) of the Exchange Act and Rule 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

## COUNT VI

### Aiding and Abetting Violations
### of Section 13(a) of the Exchange Act and
### Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13

### (Against Ferrone, McClain Jr., and Argyll)

80.     The SEC realleges and incorporates by reference the allegations of paragraphs 1

through 64 and 77 through 79 as if fully set forth herein.

81.      By engaging in the conduct described above, Defendants Ferrone, McClain Jr.,

and Argyll provided substantial assistance to Immunosyn in its violations of Section 13(a) of the

Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13

[17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13], thereby aiding and abetting

the Company's violations of the aforementioned provisions.

## COUNT VII

### Violations of Section 16(a) of the Exchange Act and Exchange Act Rule 16a-3

### (Against Miceli, McClain Jr., Argyll, and Padmore)

82.     The SEC realleges and incorporates by reference the allegations of paragraphs 1

through 64 as if fully set forth herein.

83.     Defendant Miceli failed to file with the SEC, and Defendants Miceli, McClain Jr.,

Argyll, and Padmore failed to file timely with the SEC, required statements of changes in

beneficial ownership on Form 4.

84.     By engaging in the conduct described above, Defendants Miceli, McClain Jr.,

Argyll, and Padmore violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)]  and Rule

16a-3 thereunder.   [17 C.F.R. § 240.16a-3].

<u>COUNT VIII</u>

**Control Person Liability In Connection With Immunosyn's Violations**

**(Against Miceli and Against Argyll In the Alternative)**

85.     The SEC realleges and incorporates by reference the allegations of paragraphs 1 through 64 as if fully set forth herein.

86.     Immunosyn violated the antifraud provisions of the Exchange Act, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], as alleged in paragraphs 68 through 70 above, and violated its reporting obligations of the Exchange Act, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13], as alleged in paragraphs 77 through 79 above.

87.     When Immunosyn violated the anti-fraud and reporting provisions of the Exchange Act, Miceli and Argyll, directly or indirectly, had a controlling interest in Immunosyn's outstanding stock and consequently were "control persons" with regard to Immunosyn within the meaning of 15 U.S.C. § 78t(a) [Section 20(a) of the Exchange Act].

88.     Further, when Immunosyn violated the anti-fraud and reporting provisions of the Exchange Act, Argyll's President, McClain Jr., was also the CFO of Immunosyn and one of Immunosyn's only employees, and, consequently, Argyll was a "control person" with regard to Immunosyn within the meaning of 15 U.S.C. § 78t(a) [Section 20(a) of the Exchange Act].

89.     Because Miceli and Argyll were control persons with regard to Immunosyn, Miceli and Argyll are liable with and to the same extent as Immunosyn for Immunosyn's violations of the anti-fraud and reporting provisions of the Exchange Act.

## RELIEF REQUESTED

**WHEREFORE**, the SEC respectfully requests that the Court:

### I.
### (Declaratory Judgment)

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein and enter judgment against each of them.

### II.
### (Injunctive Relief)

Grant an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

As to Defendants Miceli, McClain Jr., McClain Sr., Argyll, Argyll Equities, and Padmore only, grant an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining these Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77o(a)]

As to Defendants Ferrone and McClain Jr. only, grant an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining these Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Exchange Act Rule 13a-14 [17 C.F.R. § 240.131-14]

As to Defendants Immunosyn, Ferrone, McClain Jr., Miceli, and Argyll only, grant an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining these Defendants, their agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

As to Defendants Miceli, McClain Jr., Argyll, and Padmore only, grant an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining these Defendants, their agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 16(a) of the Exchange Act and

23

Rule 16a-3 thereunder.

**III.**
**[Disgorgement of Ill-Gotten Gains]**

Issue an Order requiring all Defendants to disgorge the ill-gotten gains that they received as a result of their wrongful conduct (including any losses they avoided by virtue of their unlawful conduct), including prejudgment interest.

**IV.**
**[Civil Penalties]**

Issue an Order imposing appropriate civil penalties upon the Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

**V.**
**[Officer-Director Bars]**

As to Defendants Ferrone, McClain Jr., McClain Sr., and Miceli only, issue an order imposing officer-director bars pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**VI.**
**[Retention of Equitable Jurisdiction]**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**
**[Other Relief]**

Grant such orders for further relief the Court deems appropriate.

24

Dated: August 1, 2011                    Respectfully submitted,


                                         /s/***Eric M. Phillips***
                                         Eric M. Phillips (IL Bar # 6237871)
                                         Tracy W. Lo (IL Bar # 6270173)
                                         U.S. Securities and Exchange Commission
                                         175 W. Jackson Blvd., Suite 900
                                         Chicago, Illinois  60604
                                         (312) 353-7390

                                         *Attorneys for the Plaintiff, the United States Securities and Exchange Commission*