IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Securities and Exchange Commission, | ) | |
| | ) | |
| Plaintiff, | ) | Hon. Jeffrey T. Gilbert |
| | ) | |
| vs. | ) | No.  11CV05223 (severed as to Ferrone) |
| | ) | |
| Stephen D. Ferrone, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT FERRONE'S *DAUBERT* MOTION
TO RESTRICT TESTIMONY OF DR. PETER RHEINSTEIN[1]**

Defendant moves to severely restrict, if not entirely exclude, the proffered expert testimony of Dr. Rheinstein, who the SEC identifies as an expert on the FDA regulatory requirements relating to new drug development. (*See* Dr. Rheinstein Report, attached as Exhibit 1.) Defendant does not challenge Dr. Rheinstein's credentials. But the vast majority of the opinions, summaries, and other statements in his report are of no meaningful assistance to the jury, are irrelevant to the securities fraud charges brought against defendant, and/or are the improper expressions of legal conclusions. The Court should exclude them under *Daubert* and its progeny.

Dr. Rheinstein's report is a virtual treatise on the statutes, regulations, and public policies behind the Food & Drug Administration's drug approval process, reciting its history from 1820 forward. But this case is not about the regulations governing the drug approval process. It is not

---

[1] Defendant's counsel has conferred with SEC counsel with respect to the subject-matter of this motion and has determined that the matter is actually in dispute.

about whether any of the players in this case – let alone Stephen Ferrone – complied with any of those regulations. And it does not require the expertise of a long-ago FDA insider to help the jury determine any facts at issue. Although the FDA regulatory status of SF-1019 provides the context for the alleged securities law violations, there is *no dispute* about that status: the FDA had put a hold on human clinical trials of that drug. No expert is needed to resolve that question. No expertise is helpful for a jury to understand that status. And no expertise is needed to establish the undisputed fact that the public filings of Immunosyn (which company did not own the drug, have any rights or responsibilities regarding its development or regulatory processes, or interact at all with the FDA), did not use the express words "clinical hold" to describe the drug's regulatory status.

Instead, what is at issue is whether Ferrone, the CEO of Immunosyn, violated the anti-fraud provisions of the securities laws based on that undisputed fact. What is at issue is whether Ferrone, himself a non-expert in the drug development and approval process who was surrounded by actual experts who were fully aware of the FDA's hold on clinical trials, acted in good faith when company counsel (in-house and outside), independent auditors, scientists and medical experts, and the company's FDA consultant either drafted or approved the company's public statements on those topics.

Because of the breadth and intricate detail of Dr. Rheinstein's report, it is difficult to tell what testimony the SEC actually intends to elicit at trial. In addition to the lack of relevance and helpfulness of the vast majority of that potential testimony, much of it consists of inadmissible legal opinions. Dr. Rheinstein's proffered testimony thus should be severely restricted, as discussed below in a section-by-section examination of his report, if not excluded in its entirety.

I.      Proffer of Relevant Facts

Ferrone became the CEO of a nascent public company called Immunosyn Corporation in October 2007. *See* Comp., ¶ 15. Immunosyn was established in 2006 by the principals of a privately-owned pharmaceutical company named Argyll Biotechnologies, LLC. *Id.* at 14, 19, 22, 23. When it was first established, Ferrone was not an officer or employee of Immunosyn. Immunosyn only had one or two employees at any time, and it never had any operations. Its only asset was a contingent right in a distribution agreement with Argyll to market and sell a potential pharmaceutical called SF-1019 – if Argyll was ever able to fully develop that drug, if Argyll was able to obtain sufficient funding, and if Argyll was ever able to obtain regulatory approval for it to be marketed. *Id.* Argyll owned all of the intellectual property for SF-1019, it was responsible for the research and development of that drug, and it was responsible for all dealings with the FDA regarding that drug. *Id.* at 23. In contrast, Immunosyn had no rights or responsibilities with respect to the development or regulatory dealings for that potential drug. Of the four individual defendants named in the SEC's complaint, Ferrone is the only one who had no role with Argyll: Jim Miceli was Argyll's CEO and controlling shareholder, Doug McClain, Sr. was its Chief Science Officer, and Doug McClain, Jr. was its President. *Id.* at 25. Ferrone's case has been severed from each of those co-defendants.

Immunosyn regularly disclosed to the market in its SEC filings its lack of operations, its total lack of revenue, its extremely poor financial condition, and, most importantly, its total dependence on Argyll to attempt to develop and to seek regulatory approval of SF-1019. Each of its 10-Ks, as well as its initial registration statement, disclosed that its ability to continue as a "going concern" was "doubtful," that it expected to "continue to incur significant operating losses for the foreseeable future" and that it may "never generate revenues." *See, e.g.*

Immunosyn 2007 10-K, at www.sec.gov/Archives/edgar/data/1375623/ 000095012008000115/ form10-ksb.htm.

The core of the SEC's allegations relates to Argyll's filing in December, 2006, of an investigational new drug application (IND) to the FDA seeking to conduct clinical trials of SF-1019.  *See* Comp., ¶¶ 29 *et seq.*  Immunosyn had no involvement in that submission, and, in any event, Ferrone was not yet an officer or employee of Immunosyn.  The regulatory framework for the allowance or disallowance of clinical trials – as related to the issues in this case – is quite straightforward:  The Federal Food, Drug, and Cosmetic Act provides that clinical trials may begin 30 days after the submission of an IND *unless* the FDA issues a notice putting those trials on hold, called a clinical hold.  *See* 21 U.S.C. § 355(i); 21 CFR § 312.40(b) ("An IND goes into effect . . . [t]hirty days after FDA receives the IND, unless FDA notifies the sponsor that the investigations described in the IND are subject to a clinical hold under § 312.42.")  According to the complaint, in January 2007 – still about ten months before Ferrone became Immunosyn's CEO –, the FDA informed Argyll that the IND was on clinical hold and that clinical trials thus could not begin until Argyll responded to the FDA's requests for additional information.  *See* Comp., ¶¶ 33-35.

On November 6, 2007, almost immediately after Mr. Ferrone became CEO, Immunosyn disclosed in a press release as follows:  "Presently, Argyll Biotechnologies, LLC is responding to a request from the FDA for additional information in support of an Investigational New Drug (IND) Application for SF-1019."  The complaint alleges that the press release misleadingly omitted to use the phrase "clinical hold" in describing the regulatory status of that IND and, more to the point, that Ferrone was responsible for that supposedly fraudulent omission.  *Id.* at 41.  In fact, the language in that press release was provided by Argyll's FDA consulting firm,

Becker & Associates, to describe the regulatory status of SF-1019.[2] Then, in the first 10-K filed after Ferrone became Immunosyn's CEO, the company disclosed that despite the submission of the IND, "Argyll Biotechnologies, LLC has not received regulatory approval of SF-1019's use in clinical trials." *See,* Immunosyn 2007 10-K, p. 16, at www.sec.gov/Archives/edgar/data/1375623/ 000095012008000115/form10-ksb.htm. Like every other press release and public filing, those statements were reviewed by Immunosyn's SEC counsel, who were also aware of the clinical hold. Likewise, Immunosyn's outside auditors were aware of both the IND and the clinical hold and approved each of the company's 10-Ks without qualification.[3]

The SEC appears to intend to call numerous witnesses to testify about the filing of the INDs and the subsequent clinical holds. Those witnesses include scientists and medical professionals affiliated with Argyll who worked on those INDs, Argyll's FDA consultant (Becker), Argyll's in-house counsel (Fougner), both McClain Sr. and McClain Jr., and the Argyll/Immunosyn contract worker (Ollendorff) who was primarily responsible for putting together all of Immunosyn's public releases and for being the liaison among all of the relevant players, including the scientists, outside counsel, and the auditors. The SEC also appears to intend to introduce a large number of exhibits, including numerous emails and other documents pertaining to the filing of the INDs and their aftermath.

---

[2] In response to a request to Dr. Becker that she provide language for a public disclosure by Immunosyn concerning Argyll's engagement of her firm and the regulatory status of SF-1019, she wrote: "You can say that we have been retained to provide the company with clinical and regulatory consulting services in support of the marketing authorization process by the US FDA. Presently, the Company is responding to a request from FDA for additional information in support of an Investigational New Drug Application." The press release issued by Immunosyn incorporated Dr. Becker's language verbatim.

[3] The complaint alleges a similar supposed omission pertaining to a second IND filing in late 2008, although Argyll was not the sponsor of that second, physician-sponsored IND.

5

II.	The Court's Gate-Keeping Function under *Daubert*

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the standards articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999). Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702 calls for a conjunctive test and thus expert testimony must meet each of the requirements to be admissible; failure on any prong is fatal to admissibility. *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) (affirming exclusion of expert testimony in part because it "failed to satisfy any of the ... *Daubert* guideposts for reliability.")

As a practical matter, district courts apply the *Daubert* framework using a three-part analysis. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). First, the Court must determine whether the proposed witness is qualified as an expert by knowledge, skill, experience, training, or education. If so, the Court must then decide whether the reasoning or methodology underlying the expert's testimony is reliable. If these two requirements are met, the Court must assess whether the expert's proposed testimony is relevant, whether it will assist the trier of fact in understanding the evidence or to determine a factual issue. *See Myers*, 629 F.3d at 644 (citing *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)); *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 816 (7th Cir. 2004).

In making this determination, the Court "is expected to reject any subjective belief or speculation." 368 F.3d at 816. And it must disregard an expert's "talking off the cuff – without data or analysis – that we have repeatedly characterized as insufficient." *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). Put another way, Rule 702 does not allow for the "untestable say-so" or "subjective impressions" of the witness, even if given by a preeminent expert, as opposed to his reliance on "facts or data." *See Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014), and *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 421 (7th Cir. 2005). Moreover, the proffered expert opinions must be relevant to the claims at issue in the case in order to meet the requirement of helpfulness to the jury. *See, e.g., Haager v. Chicago Rail Link, LLC*, 232 F.R.D. 289, 294 (N.D.Ill. 2005) (exclusion of opinion regarding retaliatory firing of employee where none of the counts related to that issue).

The Seventh Circuit also prohibits experts from testifying about questions of law, whether governed by statute, regulation, or otherwise. Of particular relevance here, "the meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court." *Bammerlin v. Navistar Intern. Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994). *See also RLJCS Enterprises, Inc. v. Professional Ben. Trust,* 487 F.3d 494, 498 (7th Cir. 2007) (proffered expert testimony of accountant and lawyers regarding the "demutulazation process" under federal tax law excluded as inadmissible "legal" opinions); *Roundy's Inc. v. NLRB*, 674 F.3d 638, 648 (7th Cir. 2012) (proffered expert testimony regarding breadth of "easements" under state property law properly excluded); *Haager, supra,* at 294 (excluding proffered expert testimony concerning federal railroad regulations as an inadmissible legal opinion).

7

Even general testimony concerning a regulatory regime or process that is offered merely for purposes of background should be excluded as inadmissible legal opinions:

> Pivot Point wants Professor Lloyd Weinreb to testify as an expert witness about the copyright process in general, and the copyrightability of mannequin heads in particular. . . I think the motion should have been granted in full. Professor Weinreb is a distinguished scholar, but he will not be allowed to testify in this case. . . [Both the general and specific testimony are] question[s] of law, which the court will decide. . . A jury has nothing to do with this subject. . . Similarly, the court will provide the jury with any necessary general information about the operation of the copyright system. There is no need for expert testimony on this subject; in a trial there is only one legal expert – the judge.

*Pivot Point Intern., Inc. v. Charlene Products, Inc.*, 932 F.Supp. 220, 225 (N.D.Ill. 1996). *See also United States v. Cinergy Corp.*, 2009 WL 77680, *1, No. 1:99cv1693 (S.D.Ill. 2009) (excluding testimony concerning the "objectives" of particular EPA regulatory processes even though it was offered merely as "background and context").

III. Dr. Rheinstein's Proffered Testimony Should be Severely Restricted, if not Entirely Excluded.

The FDA's "History, Structure and Role" (*See* Rheinstein Rept., attached hereto as Exhibit A, Sects. IV and V, pp. 4-8). Dr. Rheinstein's report cites to the FDA's website and then recites what he calls "a brief list of important events in the history of the FDA and drug regulation in the United States." *Id.* at ¶ 18. This historical background – beginning in 1820 and culminating in 1991 – has no relevance to the issues in this case and should be excluded. Likewise, the extended and highly-detailed description of the internal bureaucracies and workings of the FDA is irrelevant. *Id.* at ¶¶ 19-27. None of this proposed testimony is helpful background or context to the questions concerning the filing of the INDs, the subsequent clinical holds, and the alleged omission of that fact from Immunosyn's public statements.

"The Approval Process for New Drugs" (*Id.* at Sect. VI, pp. 8-10). Citing to the FDA website and the Code of Federal Regulations, this section of the report purports to set forth the legal requirements for obtaining marketing approval for new drugs. The section begins by explaining that "[t]he 1962 Kefauver-Harris Amendments, enacted after the thalidomide tragedy, were the genesis of the FDA's requirements that an IND be submitted . . ." *Id.* at ¶ 28. The section then recites the regulatory requirements for the granting of an IND, *id.*, and the agency's regulatory options in responding to that submission, as codified in 21 CFR § 312.42, *id.* at ¶ 29, 30, 33. Such questions of law are not the province of expert testimony, as the Seventh Circuit has made clear. *See, e.g., Bammerlin,* 30 F.3d at 900; *Haager* 232 F.R.D at 294. To the extent the SEC wishes the jury to be instructed as to those regulatory requirements, it may propose proper and relevant jury instructions for the Court to consider. But Dr. Rheinstein should not be permitted to testify concerning *his* understanding or interpretation of those requirements.

Moreover, this section of the report contains irrelevant statistics concerning the total number of INDs annually submitted to the FDA and the number of those submissions placed on clinical hold. *See* Exh. A, ¶ 31 (*e.g.*, 500 INDs filed in 2004, of which 135 were placed on hold). Those statistics have no bearing on any of the securities fraud claims regarding disclosures about *Argyll's* IND filing. Moreover, Dr. Rheinstein's foundation for those statistics is nothing more than his citation, yet again, to the FDA's website.

"The Purpose and Role of Institutional Review Boards" (*Id.* at Sect. VII, pp. 10-11). The report again purports to summarize regulatory requirements concerning the approval of an IND (citing to 21 CFR § 56.103.7 and the National Research Act), stating this time that any clinical trials must also be reviewed and supervised by an institutional review board (IRB). *Id.* Dr. Rheinstein then promotes his view of the public policies underlying those regulatory

9

requirements, including that they are "to assure protection of the rights and welfare of human subjects" and that they were so important that they were "adopted by more than a dozen federal entities." *Id.* at ¶¶ 34, 36. Those legal opinions are not admissible expert testimony for the reasons discussed above. His views on the public policies behind those regulations are likewise inadmissible, and they do not assist the jury in determining any matters at issue.

"The Clinical Trial Process" (*Id.* at Sect. VIII, pp. 11-12). This section of the report addresses the regulatory steps involved in the new drug development process *after* the approval of an IND, including the requirements surrounding the actual performance of human trials (*id.* at ¶ 37), any subsequent application for the actual marketing and distribution of the drug upon completion of those trials (*id.* at ¶¶ 38-39), the requirements concerning the labeling and packaging of the drugs to be distributed (*id.* at ¶ 39), and the FDA's "post-marketing" monitoring of the drug (*id.* at ¶ 41). But the regulatory steps that might occur *after* the successful submission of an IND are not at issue. The alleged fraudulent omissions did not relate to the actual performance of human trials, much less any post-trials activities concerning the marketing or sale of the drug. To the contrary, in each 10-K, Immunosyn clearly and accurately disclosed that "Argyll Biotechnologies, LLC has not received regulatory approval of SF-1019's use in clinical trials," let alone marketing approvals or any other post-trial steps. Therefore, Dr. Rheinstein's opinion concerning a "seven to ten year" timeframe for the entirety of the new drug development process – from discovery through ultimate approval of a marketing application (i*d.* at ¶ 40) – is irrelevant, as is the rest of the proffered testimony in this section.

"The Orphan Drug Designation" and "Compassionate Use" (*Id.* at Sects. IX and X, pp. 12-14). The proposed testimony in each of these two sections constitutes inadmissible legal opinions, including Dr. Rheinstein's interpretation of the requirements under the Orphan Drug

10

Act and the regulations enacted thereunder at 21 CFR Part 316 (*id.* at ¶¶46-47), as well as his views concerning the breadth and applicability of the regulations governing the compassionate access to investigational drugs for patients without other treatment alternatives, for which he cites 21 CFR §§ 312.305, 312.310, 321.315, 312.320, and 21 CFR 56.108 (*id.* at ¶¶ 48-52). As just one example, Dr. Rheinstein interprets those regulations to require an IND as a predicate to any compassionate use. *Id.* at ¶ 51. Opinions like that are exactly the type of legal analysis deemed improper expert testimony by the Seventh Circuit.

"Availability of Information to Help Speed Product Innovation" (*Id.* at Sect. XI, pp. 14-16). This section of the report purports to list numerous publicly-available reference materials regarding the drug development process. The report does not identify any relevance concerning the availability of that information. It should be excluded.

Dr. Rheinstein's "Timeline" of Key Exhibits Concerning SF-1019 (*Id.* at Sect. XII, pp. 16-28). This section – the heart and most lengthy piece of Dr. Rheinstein's report – reflects his summary or timeline of what he believes are the key exhibits in the case. In addition to his rote recitation of those documents, his timeline is peppered with his subjective views concerning their significance, both factual and legal. For example, he summarizes the contents of documents merely to emphasize the absence of a specific disclosure concerning the clinical holds. *See, e.g.*, ¶¶ 74 ("the [8-K] presentation does not mention that FDA had placed on full clinical hold on the only commercial IND ever filed for use of SF-1019"), 77 (emphasizing the same alleged omission from an analyst's brochure), 80 (emphasizing the omission from a press release), 82 (repeating that the clinical hold was not disclosed in a 10-Q), 89 (repeating that the clinical hold was not disclosed in the 10-K for 2008). Such a rhetorical exercise is not the purpose of expert testimony. Indeed, whether even a summary witness would be permitted to present mere

argument through the guise of sworn testimony is questionable.[4]  But allowing a witness with the court's imprimatur as an "expert" to do so is both contrary to the requirements of *Daubert* and the principles of Rule 403.  *See Terrell v. Childers*, 1996 WL 385310, *9, No. 93C2460 (N.D.Ill. July 3, 1996) (excluding expert testimony under Rule 403, noting that such exclusion is appropriate under that Rule even if the proposed evidence otherwise meets the requirements of Rules 702 and 703) (citing to *Daubert*).

Additionally, Dr. Rheinstein's opinion concerning the significance of the documents in his timeline is the kind of "subjective impression," "talking off the cuff without data or analysis," and "untestable say-so" that is routinely excluded as being of no help to the jury.  *See Bielskis*, 663 F.2d at 894; *Brown*, 765 F.3d at 772; *Durkin*, 406 F.3d at 421.  For example, the report opines that the documents reflect that the clinical holds "would have required several years" to resolve.  *See* Exh. A, ¶¶ 69 and 86.  But Dr. Rheinstein's ambiguous "say-so" about that timeframe is not useful to the factfinder and should be excluded.  Preventing this kind of *ipse dixit* testimony is what the Supreme Court envisioned for the district court in its gatekeeping function under *Daubert* and *Kumho Tire*.  See *Terrell, supra* (excluding proposed testimony of damages expert based on expert's individual view of the appropriate investment standards).

Dr. Rheinstein's "timeline" also improperly includes his legal opinions concerning compliance with FDA regulatory requirements.  For example, he opines that certain statements in one of the press releases "would be considered as violations of 21 CFR 312.7" because they constitute statements promoting an unapproved drug.  *Id.* at 78-79.  Like the legal opinions in other sections of his report, such a conclusion must be excluded.  Moreover, the FDA regulation that Dr. Rheinstein cites – prohibiting promotional statements prior to marketing approval – has

---

[4] The SEC has stated that it also intends to call a summary witness at trial, but has not yet identified the nature of the proposed summary testimony.

no relevance to the securities claims here, namely the alleged failure to disclose the holds placed on the commencement of human trials. Similarly, his legal opinion that "approval of an IND requires that the investigator be qualified by training and experience to conduct the study" is not a proper subject of expert testimony. *Id.* at 82. Moreover, his repeated opinions about what Immunosyn or Ferrone "should have done" or "should have known" in connection with the FDA regulatory requirements is improper. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 293 n. 6 (7th Cir. 1981) (in securities fraud case, affirming exclusion of proffered expert testimony on applicable standards of conduct of corporate officers or directors).

The report also summarizes certain FDA documents concerning administrative proceedings against Dr. Arthur Ericsson – one of the doctors listed as a proposed investigator in Argyll's 2006 IND – resulting in him being disqualified by the FDA as an investigator in 2009. *Id.* at 91-99. Dr. Rheinstein appears to take Argyll to task for not discovering that those proceedings began about 15 months after the IND listing Ericsson was filed with the FDA. But that issue, like many of the others in the report, has no bearing on any of the SEC's claims against Ferrone. None of the claims is based on a supposed misrepresentation or omission by Immunosyn concerning the subsequent proceedings against Ericsson.[5] *Compare* Comp., ¶¶ 28-48. Dr. Rheinstein's supposed opinions on that topic thus must be excluded. *See Haager,* 232 F.R.D. at 294 (exclusion of opinion regarding retaliatory firing of employee where none of the counts related to that issue).

---

[5]Indeed, although not necessary for this motion, there is no suggestion that either Dr. Ericsson or the FDA advised Argyll (much less Immunosyn or Ferrone) of those subsequent proceedings, or that Argyll became aware of them from some other source.

The entirety of this section reflecting Dr. Rheinstein's summary "timeline" and subjective impressions should be excluded as lacking relevance and helpfulness to the jury and/or as improper legal opinions.

<u>Dr. Rheinstein's "Conclusions" (Sect. XIII, p. 28)</u>. In the final section, Dr. Rheinstein lists seven "conclusions" he intends to offer at trial, each of which should be excluded for the same reasons discussed above:

¶ 102 – Whether "the regulatory requirements . . . [were] readily available from the FDA website" is not relevant to any issue or claim.

¶ 103 – His opinion that the INDs had "no chance of approval" is a purely subjective impression and untestable "say-so" that is of no use to the factfinder. Moreover, it is not relevant to the claims concerning the failure to disclose the clinical holds, and certainly not to the question of Ferrone's good faith. Again, there is no dispute the holds were issued; the dispute is whether Ferrone is liable under the anti-fraud provisions for Immunosyn's public statements omitting to use the term "clinical hold."

¶ 104 – The conclusion that Immunosyn's public statements failed to disclose the holds is summary argument best made by lawyers, not the stuff of expert testimony.

¶¶ 105-106 – His statements that "Argyll" was in possession of the clinical hold letters and that "Argyll" received certain information from its own advisors are neither relevant regarding the claims against Ferrone nor expert opinions of use to the factfinder. Likewise, his ambiguous statement that the holds would require "substantial periods of time" to resolve is of no practical assistance to the factfinder, and again irrelevant to the allegations against Ferrone.

¶ 107 – In this paragraph, he states his view that "Argyll and Immunosyn *knew*" that clinical trials were a prerequisite to full marketing approval. He doesn't explain how he is able

to conclude what "Argyll or Immunosyn knew," how that conclusion relates to Ferrone, or how his view is the subject of any expertise helpful to the jury. And his proposed testimony here is again nothing more than a rhetorical exercise in highlighting documents that the SEC intends to introduce into the case through other witnesses. No specialized knowledge or expertise is needed for a jury to determine whether those documents show what Ferrone knew or didn't know.

¶ 108 – Similarly, he concludes from his review of the emails and other exhibits that Argyll and Immunosyn "knew" that it would take years to initiate clinical trials. But Ferrone's state-of-mind, including what he knew or didn't know about how long it would take for clinical trials to begin, is not proper expert testimony – it is the function of a lay jury to make those determinations based on its review of the evidence and the credibility of the witnesses. It is also not within this witness's expertise, nor of any assistance to the jury, for him to testify that "Argyll and Immunosyn continued to trumpet that clinical trials and revenues from SF-1019 were imminent." Whether Immunosyn's public statements can or should be characterized as "trumpeting" anything, let alone imminent revenues, is not something on which an expert should be allowed to opine.

IV. Conclusion

Wherefore, defendant respectfully requests the Court to exclude Dr. Rheinstein's proposed testimony as set forth above.

Dated: May 14, 2015  Respectfully Submitted,
Stephen D. Ferrone


By: */s/ Corey B. Rubenstein*
One of His Attorneys

Mark L. Rotert
Corey B. Rubenstein
STETLER, DUFFY & ROTERT, LTD.
10 South LaSalle Street, Suite 2800
Chicago, Illinois  60603
Phone: 312-338-0200
Fax:     312-338-0070
mrotert@sdrlegal.com
cruben@sdrlegal.com

## **CERTIFICATE OF SERVICE**

  I, Corey B. Rubenstein, an attorney, hereby certify that I caused a true and correct copy of the foregoing **DEFENDANT FERRONE'S *DAUBERT* MOTION TO RESTRICT TESTIMONY OF DR. PETER RHEINSTEIN** to be served upon all counsel of record via the ECF filing system on this 14th day of May, 2015.

                */s/ Corey B. Rubenstein*