EX 1

**EXPERT REPORT AND DISCLOSURE OF PETER H. RHEINSTEIN**

**Securities and Exchange Commission,**

**v.**

**Stephen D. Ferrone, Douglas A. McClain, Jr., Douglas A. McClain, Sr., James T. Miceli, Immunosyn Corporation, Argyll Biotechnologies, LLC, Argyll Equities, LLC, and Padmore Holdings, Ltd.**

**Civil Action No: 11-CV-05223**

**Submitted December 5, 2013**
**Pursuant to**
**Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure**

**I. Background**

*Qualifications*

1. I am a physician and an expert in the regulation of prescription drug development and marketing, having served for 25 years -- from 1974 to 1999 -- in senior positions at the United States Food and Drug Administration (FDA). Currently I am a consultant on matters related to regulation of pharmaceuticals.

2. I graduated from the Johns Hopkins University School of Medicine with an M.D. degree in 1967. I also hold a J.D. from the University of Maryland and a B.A. with High Honors and an M.S. in mathematics from Michigan State University. I am board certified in family medicine and geriatric medicine by the American Board of Family Medicine (formerly the American Board of Family Practice). I am board certified in legal medicine by the American Board of Legal Medicine and I currently serve as the Chairman of the American Board of Legal Medicine.

3. I am currently licensed to practice medicine in Maryland, California and the District of Columbia. I am admitted to the practice of law in Maryland and the District of Columbia and before the United States Supreme Court.

4. I began my FDA career as Director of the Division of Drug Advertising (later the Division of Drug Advertising and Labeling; still later the Division of Drug Marketing, Advertising and Communications; and now the Office of Prescription Drug Promotion) in the Bureau of Drugs in 1974. During my time in the Division, FDA finalized the regulations for prescription drug advertisements and labeling. These regulations remain virtually unchanged to this day. Also, during my time in the Division, the pharmaceutical industry began its first direct-to-consumer

advertisements for prescription drugs. Also during my tenure in the Division we initiated FDA's first patient medication information program for prescription drugs. I received FDA's Commendable Service Award for innovations in regulation of prescription drug advertising.

5.   In early 1982, when the Bureau of Drugs merged with the Bureau of Biologics to form the National Center for Drugs and Biologics (NCDB), I was promoted to be the Acting Deputy Director, and then Acting Director, of the Office of Drugs within NCDB. The Division of Drug Advertising and Labeling continued to report to me. In that position, I was also the immediate supervisor of the Director of the Office of Compliance.

6.   In late 1983, in preparation for reorganizing NCDB into the Center for Drug Evaluation and Research and the Center for Biologics Evaluation and Research, I became Director of the Office of Drug Standards. In that position, the Division of Drug Advertising and Labeling continued to report to me. I also had responsibility for the Divisions concerned with the absorption, distribution, metabolism and elimination of drugs within the human body.

7.   From 1990 until my retirement from FDA's career Senior Executive Service in 1999, I was Director of the Medicine Staff in the Office of the Commissioner.  My responsibilities in this position included serving as Chairman of FDA's own Institutional Review Board (IRB) and serving as the presiding officer at hearings initiated by agency compliance personnel seeking to disqualify clinical investigators accused of violating the Investigational New Drug (IND) application regulations. From 1990 until the present time, I have spoken frequently before both medical and lay audiences regarding the evaluation of the safety and effectiveness of drugs and biologics.

8.   On the day following my retirement from FDA, I began a new position as Senior Vice President for Medical and Clinical Affairs at Cell Works Inc., a company specializing in cancer diagnostics and therapeutics.  The company's technologies were licensed from Johns Hopkins University. The founder had been a professor at Hopkins when I had been a medical student there years earlier.  At Cell Works, I was awarded an SBIR grant as a principal investigator by the National Cancer Institute and Orphan Drug Designation by FDA both for a ligand directed treatment of primary liver cancer.  I organized a scientific advisory board and planned strategy for development of a circulating cancer cell test to detect disease recurrence and help guide therapy. I represented Cell Works at scientific, medical and investor meetings.

9.   My employment contract with Cell Works allowed me to develop a consulting practice outside of the hours during which I was engaged in company business.  In these hours I provided consultation to industry, medical publishers, investors and law firms mainly on issues related to pharmaceuticals, both brand name and generic.  Beginning in 2001, as a clinical research consultant to Marnac, Inc., I was part of a team responsible for clinical trial design and regulatory issues related to testing pirfenidone for treatment of idiopathic pulmonary fibrosis.  I was elected to Marnac's Board of Directors in 2003 and helped to negotiate the transfer of intellectual property to our licensees and to wind down the affairs of the company following approval of pirfenidone in Japan and completion of Phase III trials in the US, both in 2009.

10. In 2001, with colleagues from the Johns Hopkins Medical Institutions, I started *Discovery*

*Medicine*, a publication summarizing for non-specialists our selection of major advances in cutting edge medical research. Since 2006, the National Library of Medicine has included *Discovery Medicine* as part of its PubMed website. From 2005 until 2010, I was a regular consultant on compliance issues for one of America's largest business-to-business publishers. I attended all meetings of the company's corporate compliance committee and provided day-to-day consultation on matters arising from a portfolio consisting of approximately 50 medical publications.

11. During my years at FDA, I was a Board member of the Drug Information Association (DIA) for ten years including two terms as President. I served twice as program chair for DIA's Annual Meeting and many times as a track chair. Each year from 1999 until 2010, I chaired the Public Policy and Legal Track at DIA's Annual meeting. DIA's 18,000 members are professionals at all levels and across all disciplines in the fields which it serves. DIA provides its members access to the information needed for success in the pharmaceutical, biotechnology, medical device, and related fields.

12. From 1999 until 2003 and from 2008 until 2012, I was a member of the Board of Trustees of the Academy of Physicians in Clinical Research (APCR). I have represented APCR in the American Medical Association House of Delegates since 2002. In 2008, I was elected as Secretary-Treasurer of APCR, in 2009, I became President-Elect, and from 2010 until 2011 I served as President. I am a co-author of APCR's Statement of Clinical Investigator Competence which may be viewed at http://www.acrpnet.org/PDF/apcr_consensus_statement.pdf .

13. From 1985 to 1990 and from 2009 until the present time, I have been a member of the United States Pharmacopeial (USP) Convention. The USP is an official public standards–setting authority for all prescription and over–the–counter medicines and other health care products manufactured or sold in the United States. From 1992 until 2013 I was a member of AMA's National Task Force on CME Provider/Industry Collaboration, serving as Annual Conference Chair in 2003. In 2005, I served as Program Chair for the Pharmaceutical Marketing Compliance Congress jointly sponsored by the Food and Drug Law Institute and the Center for Business Intelligence. I currently serve as Chairman of the United States Adopted Names (USAN) Council. The USAN Council is responsible for assigning the generic names for the active ingredients in all drug products marketed in the United States.

14. I served as a faculty member for two programs that are provided at no cost to all physicians through a grant to the Federation of State Medical Boards from the Attorney General Consumer and Prescriber Grant Program. These programs are designated as acceptable for Continuing Medical Education credit through the joint sponsorship of The University of Texas Southwestern Medical Center and the Federation of State Medical Boards Research and Education Foundation Drug. Both were released on March 13, 2008. The first program, "Approval in the U.S.: How Drugs Get to Market," may be viewed at http://208.40.175.32/cecity/FlashApp/fsmb/noreg/drug_approval/disclaim.htm. The second program, "Generic Drugs – Prescribing Sensibly," may be viewed at http://208.40.175.32/cecity/FlashApp/fsmb/noreg/generic_drug/disclaim.htm.
.

15. A copy of my *curriculum vitae* including a list of my publications is attached as Exhibit A.

*Compensation*

16. I am being compensated for my time at an hourly rate of $425.00.

*Prior Testimony*

17. Within the past four years, I have testified as an expert at trial or deposition in one case: (In re Gabapentin Patent Litigation, MDL Docket No. 1384, Master Civil Action No. 00-2931 US District Court for the District of New Jersey

## II. Materials Considered

18. In forming my opinions and preparing this report, I have reviewed and considered the materials cited and listed in this report, and/or the material listed in Exhibit B. I have also relied upon my training and experience as a physician, as well as my many years of experience in my employment with FDA, my many years of experience in working with professional organizations concerned with the development of innovator and generic pharmaceuticals and their introduction into clinical practice, several years as an employee of a startup pharmaceutical company and thirteen years as a consultant on matters related to regulation of pharmaceuticals.

## III. Subject Matter about Which I Expect to Testify

19. While I may address other matters in response to reports or other evidence offered by defendants, I presently plan to testify and give opinions concerning:

An overview of FDA and its programs relevant to development of drugs and biologics:

    a) FDA history relevant to the regulation of therapeutic biologic products
    b) FDA's structure and role in the regulation of therapeutic biologics products
    c) The approval process for new drugs including therapeutic biologic products (INDs, NDAs and BLAs, DMFs)
    d) The purpose and role of Institutional Review Boards (IRBs)
    e) The clinical trial process
    f) Orphan drug designation
    g) Access to investigational drugs for treatment use
    h) Availability of information to help speed product innovation
    i) Availability of information regarding clinical trials
    j) SF-1019 regulatory status timeline from December 2006 through December 2008 contrasting information available to the sponsor and information available to the public
    k) Conclusions

## IV. FDA History Relevant to the Regulation of Therapeutic Biologics

18. The FDA website has a brief list of important events in the history of FDA and Drug Regulation in the United States (http://www.fda.gov/AboutFDA/WhatWeDo/History/Milestones/ucm128305.htm).  Some of these events are particularly relevant to the issues about which I will testify in this case:

   a. 1820 - Eleven physicians meet in Washington, D.C., to establish the U.S. Pharmacopeia, the first compendium of standard drugs for the United States.  These physicians recognized that establishing the identity of a drug is fundamental to understanding the effects of that drug and using it rationally.

   b. 1902 – The Biologics Control Act is passed after two incidents involving the deaths of children caused by contaminated vaccines.  In 1901, the first incident involved a horse whose tetanus-contaminated serum was used to produce a diphtheria antitoxin that caused the deaths of thirteen children in St. Louis, Missouri. The second incident involved contaminated smallpox vaccine which killed nine children in Camden, New Jersey.

   c. 1906 -- The original Food and Drugs Act is passed by Congress on June 30 and signed by President Theodore Roosevelt. It prohibits interstate commerce in misbranded and adulterated foods, drinks and drugs.  Passage of the law came after shocking disclosures of insanitary conditions in meat-packing plants, the use of poisonous preservatives and dyes in foods, and cure-all claims for worthless and dangerous patent medicines.

   d. 1912 -- Congress enacts the Sherley Amendment to prohibit labeling medicines with false therapeutic claims intended to defraud the purchaser.  The law overcame a Supreme Court ruling that the 1906 Food and Drugs Act did not outlaw false medical claims but only false and misleading statements about the ingredients or identity of a drug.

   e. 1938 -- Congress passes The Federal Food, Drug, and Cosmetic (FDC) Act of 1938, which requires that new drugs show safety before selling. This law also eliminated the Sherley Amendment requirement to prove intent to defraud in drug misbranding cases.  It started a new system of drug regulation. The Act also required that safe limits be set for unavoidable poisonous matter and allows for factory inspections.  A year earlier 107 persons including many children died from taking Elixir Sulfanilamide.  This new product was a liquid version of a popular treatment for infections.  The active ingredient was dissolved in ethylene glycol, a sweet tasting, but highly poisonous substance that is the active ingredient in automotive antifreeze.  This event had dramatized the need to establish drug safety prior to marketing.

   f. 1962 – Congress passes the Kefauver-Harris Drug Amendments to ensure drug efficacy and greater drug safety. For the first time, drug manufacturers are required to prove to FDA the effectiveness of their products before marketing them and to prove the safety of any proposed new drug before beginning human trials.  This law was enacted after thalidomide, the active ingredient in a new sleeping pill, was found to have caused birth defects in thousands of babies born in Western Europe and in the US.  President John F. Kennedy awarded the Medal of Freedom to FDA Medical Officer Frances O. Kelsey for her role in uncovering the connection between thalidomide and birth defects and in preventing approval of the drug.  Nevertheless, the existing law had allowed the manufacturer to distribute samples for doctors to try them on their patients.

g. 1974 – In the wake of revelations that participants in the Tuskegee Syphilis Study had been denied a proven treatment for their disease, Congress passes the National Research Act (Pub. L. 93-348), thereby creating the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research.

h. 1981 -- FDA and the Department of Health and Human Services revise regulations for human subject protections, based on the 1979 Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research, Report of the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research.

i. 1991 – (i) FDA issues Regulations to Accelerate the Review of Drugs for life-threatening diseases. (ii) The policy for protection of human subjects in research, promulgated in 1981 by FDA and the Department of Health and Human Services, is adopted by more than a dozen federal entities involved in human subject research and becomes known as the Common Rule. This rule issues requirements for researchers who obtain and document informed consent, secures special protection for children, women, and prisoners, elaborates on required procedures for institutional review boards, and ensures that research institutions comply with the regulations.


**V. FDA's Structure and Role in the Regulation of Therapeutic Biologic Products**

19. FDA is an agency within the U.S. Department of Health and Human Services. Currently, it consists of the Office of the Commissioner and four directorates overseeing the core functions of the agency: Medical Products and Tobacco, Foods and Veterinary Medicine, Global Regulatory Operations and Policy. (http://www.fda.gov/AboutFDA/Transparency/Basics/ucm192695.htm). The Office of Medical Products is divided into four centers: (Center for Drug Evaluation and Research (CDER); Center for Biologics Evaluation and Research (CBER); Center for Devices and Radiological Health; Center for Tobacco Products; and the Office of Special Medical Programs. (http://www.fda.gov/AboutFDA/CentersOffices/default.htm).

20. FDA is responsible for protecting the public health by assuring the safety, effectiveness, quality, and security of human and veterinary drugs, vaccines and other biological products, medical devices, most of our nation's food supply, all cosmetics, dietary supplements, and products that give off radiation. FDA is also responsible for advancing the public health by helping to speed product innovation. (http://www.fda.gov/AboutFDA/Transparency/Basics/ucm194877.htm).

21. Biological products, like other drugs, are used for the treatment, prevention or cure of disease in humans. In contrast to chemically synthesized small molecular weight drugs, which have a well-defined structure and can be thoroughly characterized, biological products are generally derived from living material--human, animal, or microorganism-- are complex in structure, and thus are usually not fully characterized. (http://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/TherapeuticBiologicApplications/ucm113522.htm)

22. Section 351 of the Public Health Service (PHS) Act defines a biological product as a "virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic

product, or analogous product … applicable to the prevention, treatment, or cure of a disease or condition of human beings." FDA regulations and policies have established that biological products include blood-derived products, vaccines, in vivo diagnostic allergenic products, immunoglobulin products, products containing cells or microorganisms, and most protein products. Biological products subject to the PHS Act also meet the definition of drugs under the Federal Food, Drug and Cosmetic Act (FDC Act).

23. Since 2003 (http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CBER/ucm133463.htm), both the FDA's Center for Drug Evaluation and Research (CDER) and Center for Biologics Evaluation and Research (CBER) have regulatory responsibility for therapeutic biological products, including premarket review and oversight. Biological products regulated by CDER (under the FDC Act and/or the PHS Act, as appropriate) are the following:

Most proteins intended for therapeutic use, including cytokines (e.g., interferons), enzymes (e.g. thrombolytics), and other novel proteins, except for those that are specifically assigned to the Center for Biologics Evaluation and Research (CBER) (e.g., vaccines and blood products). This category includes therapeutic proteins derived from plants, animals, humans, or microorganisms, and recombinant versions of these products.

Immunomodulators (non-vaccine and non-allergenic products intended to treat disease by inhibiting or down-regulating a pre-existing, pathological immune response).

24. CDER's Division of Neurology Products is responsible for the review of therapeutic biologics intended for the treatment of multiple sclerosis. Products assigned to this division prior to 2006 for the treatment of multiple sclerosis include Avonex [Interferon beta-1a], Betaseron [Interferon beta-1b], and Rebif [Interferon beta-1a]. (http://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/TherapeuticBiologicApplications/default.htm)

25. FDA does not regulate veterinary biologics. The term "veterinary biologics" includes all viruses, serums, toxins, or analogous products of natural or synthetic origin which are intended for use in the treatment of animals and which act primarily through the direct stimulation, supplementation, enhancement, or modulation of the immune system or immune response. Such products include but are not limited to vaccines, bacterins, allergens, antibodies, diagnostics, antitoxins, toxoids, immunostimulants, antigenic or immunizing components of microorganisms intended for use in the prevention, diagnosis, management or cure of disease in animals. (http://www.fda.gov/AboutFDA/Transparency/Basics/ucm193868.htm)

26. The Animal and Plant Health Inspection Service (APHIS) in the U.S. Department of Agriculture regulates veterinary biologics (vaccines, bacterins, antisera, diagnostic kits, and other products of biological origin) to ensure that the veterinary biologics available for the diagnosis, prevention, and treatment of animal diseases are pure, safe, potent, and effective. This work is done by APHIS' Center for Veterinary Biologics (CVB) and is centered around enforcement of the Virus Serum Toxin Act enacted by Congress in 1913. (http://www.aphis.usda.gov/animal_health/vet_biologics)

27. Approval of a biologic by APHIS for treatment of animal diseases is not a substitute for the animal testing that FDA requires prior to human testing.


**VI. The Approval Process for New Drugs including Therapeutic Biologic Products**

28. The initial stage of drug development in human subjects involves filing of an investigational New Drug (IND) application with FDA. The 1962 Kefauver-Harris Amendments, enacted after the thalidomide tragedy, were the genesis of FDA's requirement that an IND be submitted to the agency prior to administration of any new pharmaceutical compound to any human being in the United States. (http://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/InvestigationalNewDrugINDApplication/default.htm)

   a. The IND must contain extensive information on the chemistry and manufacture of the drug. This characterization needs to establish the identity, strength, potency and purity of the proposed drug product. As the defendant's consultant, Dr. Peter Kanter said on page 63 of his deposition, "You have to assure Food and Drug that what you say is in that vial is in that vial." Recognition of the importance of establishing the identity of a drug substance goes back at least as far as 1820 when that group of physicians met in Washington to found the USP.

   b. For products of animal origin, characterization of the production process should include the absence of known and potential human pathogens, (both adventitious and endogenous agents). Recognition of the importance of ensuring purity and safety of serums used to treat disease in human goes back at least as far as the 1902 Biologics Control Act.

   c. The applicant must supply a listing of all raw materials as well as their grade/quality.

   d. The applicant must provide documentation that manufacturing and packaging of the test product will be performed according to current Good Manufacturing Practice (cGMP).

   e. Information regarding the container closure and packaging is required.

   f. The applicant must provide information to assure that the product will remain stable over the duration of the preclinical and clinical trials.

   g. For placebo controlled trials, there must be information regarding the formulation of the placebo.

   h. For biological products, there must be a potency bioassay relevant to the clinical activity that will be tested.

   i. The testing must include studies to assess immunogenicity (or collection of patient samples that will allow for testing of immunogenicity).

   j. Safety must be demonstrated through a core battery of safety pharmacology studies. The 1938 Federal Food, Drug, and Cosmetic Act, enacted after the elixir of sulfanilamide tragedy, was an early recognition of the need to show safety before a drug is administered to people.

    k. General toxicology studies need to be conducted in two animal species (one rodent and one non-rodent).

    l. Previous human experience with the test compound must be described.

    m. The experimental protocols must be described in sufficient detail for FDA to evaluate safety.

    n. The Investigator Brochure must contain sufficient information for investigators to conduct the study safely.

    o. Each investigator must sign an FDA Form 1572

        (1) to provide the sponsor with information about the investigator's qualifications and the clinical site that will enable the sponsor to establish and document that the investigator is qualified and the site is an appropriate location at which to conduct the clinical investigation, and

        (2) to inform the investigator of his/her obligations and obtain the investigator's commitment to follow pertinent FDA regulations.

29.  When FDA receives an IND, the Agency has several options (http://www.fda.gov/downloads/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ManualofPoliciesProcedures/UCM082022.pdf):

    a. FDA may notify the sponsor that the trial can begin immediately

    b. FDA may not respond in which case the sponsor may begin the trial 30 days after FDA receives the IND.  For commercial INDs (those filed by pharmaceutical companies) this is the most common outcome.

    c. FDA may place the IND on clinical hold.  The Agency communicates the clinical hold to the sponsor, usually in a teleconference. After an IND has been placed on clinical hold, the study may not be initiated until the applicant has received a communication (via phone, fax, letter, or e-mail) from the Agency allowing the study to proceed (21 CFR 312.42(e)).

    d. Within 30 days from the date of the teleconference placing an IND on clinical hold, the Agency must send the sponsor a clinical hold letter, signed by the Division Director or Acting Division Director, that describes in detail the reasons for the clinical hold (21 CFR 312.42(d)). The name of the responsible FDA contact will be included in the clinical hold letter.

30. A Clinical Hold is an order issued by FDA to the sponsor of an IND to delay or to suspend a clinical investigation for reasons described in 21 CFR 312.42.  For a Phase 1 investigation these reasons include:

    a. Human subjects are or would be exposed to an unreasonable and significant risk of illness or injury;

    b. The clinical investigators named in the IND are not qualified by reason of their scientific training and experience to conduct the investigation described in the IND;

    c. The investigator brochure is misleading, erroneous, or materially incomplete; or

    d. The IND does not contain sufficient information required under §312.23 to assess the risks to subjects of the proposed studies.

31. An FDA white paper issued on November 10, 2011 indicated that in FY 2004, FDA received approximately 500 commercial INDs.  Approximately 135 of them were placed on Clinical Hold

(http://www.fda.gov/forindustry/userfees/prescriptiondruguserfee/ucm119253.htm at pages 20 and 23).  This is likely the latest estimate that would have been available in December 2006 when the Argyll IND for SF-1019 was filed.  An FDA report issued in 2010 indicated that the number of commercial INDs received in FY 2008 and subsequently placed on clinical hold was approximately 213, but the total number of INDs received was not disclosed (http://www.fda.gov/aboutfda/reportsmanualsforms/reports/userfeereports/performancereports/pdufa/ucm209436.htm).

32. A company intending to supply a test drug to be administered under a Physician sponsored IND usually allows the physician sponsoring that IND to reference its own commercial IND for information establishing the identity and safety of that drug.  The physician would not otherwise have access to this information.

33. A clinical hold may be either a complete clinical hold or a partial clinical hold. A clinical hold (including a partial clinical hold) involves the
    a. A Complete Clinical Hold is a delay or suspension of all clinical work requested under an IND.
    b. A Partial Clinical Hold is a delay or suspension of only part of the clinical work requested under the IND (e.g., a specific protocol or part of a protocol is not allowed to proceed; however, other protocols or parts of the protocol are allowed to proceed under the IND)
    (http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm078764.pdf).


**VII. The Purpose and Role of Institutional Review Boards (IRBs)**

34. Any clinical investigation which requires the filing of an IND application may not be instituted unless that investigation has been reviewed and approved and remains subject to continuing review by an Institutional Review Board.  (21 CFR § 56.103.7)  The purpose of an IRB review is to assure protection of the rights and welfare of humans participating as subjects in a research study.  IRBs attempt to ensure protection of subjects by reviewing research protocols and related materials. The IRB may only approve research for which there is a bona fide informed consent process for participants, for which the risks to subjects are balanced by potential benefits to society, and for which the selection of subjects presents a fair or just distribution of risks and benefits to eligible participants.  For the study of a new drug or biologic, determining that there are potential benefits to society means determining that the test product has a potential benefit and that the study protocol has the potential of demonstrating  that benefit.

35. The IRB may be part of the Institution where the study will take place or at may be an independent organization acting on behalf of the Institution where the study will take place.  The current IRB regulations date from 1981 and are a result of the National Research Act passed by Congress in 1974.  FDA review of the IND and IRB review of the research protocols and related materials are separate processes.  Both are required before a clinical trial may begin.  Regardless of the outcome of an IRB a sponsor cannot begin clinical trials unless it has submitted an IND

application and it cannot begin a clinical trial if FDA has placed that application on full clinical hold.

36. In 1991, this policy for protection of human subjects in research, as espoused in the 1981 IRB regulations, was adopted by more than a dozen federal entities involved in human subject research and became known as the Common Rule.

**VIII. The Clinical Trial Process**

37. The Clinical Trial process is divided into three phases. Each phase may consist of a number of studies. A separate IND is required for each
    a. Phase 1 studies are used to find a range of doses that is high enough to produce pharmacological effects, but low enough to minimize unacceptable side effects. Other goals are to determine the drug's most frequent side effects and to determine how the drug is absorbed, distributed, broken down, and excreted. Phase 1 studies are typically done in healthy volunteers and may involve 20 to 80 individuals.
    b. Phase 2 studies provide preliminary data on whether the drug works in people who have a specific disease or condition. For controlled trials, patients receiving the drug are compared with similar patients receiving a placebo or a different drug. Phase 2 studies typically involve a few dozen to about 300 people. At the end of Phase 2, the FDA and sponsors negotiate about how the large-scale studies in Phase 3 should be done.
    c. Phase 3 studies begin if evidence of effectiveness is shown in Phase 2. Phase 3 studies are usually controlled comparing the test drug to a placebo and/or a currently marketed drug. The Standard for effectiveness may be statistical superiority to placebo or non-inferiority to an existing therapy. Phase 3 studies may test different dosages and may test the drug in different populations. These trials provide more definitive evidence of effectiveness as well as additional safety information. They typically involve several hundred to about 3,000 people and are often performed at several different sites.

38. When a sponsor determines that sufficient information has been compiled to demonstrate that a drug is safe and effective, it submits a New Drug Application (NDA) or Biologic License Application (BLA) to FDA for the drug or biologic. The NDA or BLA contains all available safety and efficacy data, as well as the proposed labeling. The NDA or BLA is subjected to rigorous reviews by FDA to determine whether the information provided is sufficient to establish that a drug is safe and effective for its intended use. Once an NDA or BLA is submitted, FDA assembles a team of doctors and scientists with expertise in many areas to perform a thorough and comprehensive review and analysis of the information submitted in the NDA or BLA.

39. Once FDA completes review of the NDA or BLA and the proposed labeling, it decides either to approve or disapprove the drug for marketing in the United States. The key consideration in approval of a new drug for marketing in the United States is whether the data provide substantial evidence that the drug is safe and effective for uses described in the product label. Safe and effective means that FDA concludes, based on all of the information available, that the benefits of the drug outweigh the known risks of the drug for the product's indicated uses. FDA carefully

reviews the proposed label and transmits recommendations for changes to the sponsor. FDA is very stringent about the information to be included in the label and may dictate specific wording and statements for the label.

40. In my experience, the approval process for new drugs including therapeutic biologic products from synthesizing or purifying of the active ingredient(s) through formulation of the products through preclinical and clinical testing, through sponsor preparation and FDA review of an NDA or BLA, is about seven to ten years. Seven to ten years is the same length of time noted by Becker & Associates Consulting Inc. in their report "Potential Regulatory Pathways for Approval of SF-1019" prepared for the Argyll Group and dated August 14, 2006. This estimate appears on page 3 of SEC Exhibit 90 to Karen Becker's deposition.

41. FDA continues to assess a drug's risk/benefit profile after the drug has been approved for marketing. Both the sponsor and FDA collect and analyze post-marketing adverse events to monitor the safety of drugs once they are on the market and continue to weigh the risks and benefits of the drug. Accordingly, FDA and the sponsor carefully analyze adverse event reports regarding the drug to determine if any labeling changes are necessary.

42. Approval of a drug or biologic for a second indication requires a sponsor to submit additional IND applications to perform additional studies to demonstrate the safety and effectiveness of the product for that second indication. Information from these additional studies and from the sponsor's ongoing assessment of the marketed product are submitted as a supplemental NDA or BLA, which like the original NDA or BLA, is subjected to rigorous reviews by FDA to determine whether the information provided is sufficient to establish that a drug is safe and effective for the additional intended use.

43. Drug sponsors such as Immunosyn frequently buy the components of their drug products, including active pharmaceutical ingredients, from suppliers that specialize in the manufacturing of these components. Drug Master Files allow these suppliers to provide FDA with information essential for the review of applications without disclosing confidential information to their customers.

44. A Drug Master File (DMF) is a submission to the Food and Drug Administration (FDA) that may be used to provide confidential detailed information about facilities, processes, or articles used in the manufacturing, processing, packaging, and storing of one or more human drugs. The submission of a DMF is not required by law or FDA regulation. A DMF is submitted solely at the discretion of the holder. The information contained in the DMF may be used to support an IND, an NDA, a BLA, another DMF, an Export Application, or amendments (changes in an NDA or BLA made prior to approval) and supplements to any of these.

45. A DMF is NOT a substitute for an IND, NDA, BLA or Export Application. It is not approved or disapproved. Technical contents of a DMF are reviewed only in connection with the review of an IND, NDA, BLA, or an Export Application.

**IX. Orphan Drug Designation**

46. The Orphan Drug Act (ODA) provides for granting special status to a drug or biological product ("drug") to treat a rare disease or condition upon request of a sponsor. This status is referred to as orphan designation (or sometimes "orphan status"). For a drug to qualify for orphan designation both the drug and the disease or condition must meet certain criteria specified in the ODA and FDA's implementing regulations at 21 CFR Part 316. Orphan designation qualifies the sponsor of the drug for various development incentives of the ODA, including tax credits for qualified clinical testing. A marketing application for a prescription drug product that has received orphan designation is not subject to a prescription drug user fee unless the application includes an indication for other than the rare disease or condition for which the drug was designated.

47. A sponsor seeking orphan designation for a drug must submit a request for designation to OOPD with the information required in 21 CFR 316.20 and 316.21. Each designation request must stand on its own merit. Sponsors requesting designation of the same drug for the same rare disease or condition as a previously designated product must submit their own data and information in support of their designation request. The granting of an orphan designation request does not alter the standard regulatory requirements and process for obtaining marketing approval. Safety and effectiveness of a drug must be established through adequate and well-controlled studies. (http://www.fda.gov/ForIndustry/DevelopingProductsforRareDiseasesConditions/Howtoapplyfor OrphanProductDesignation/default.htm).

## X. Access to investigational Drugs for Treatment Use (Compassionate Use)

48. FDA has a long history of facilitating access to investigational drugs for treatment use for patients with serious or immediately life-threatening diseases or conditions who lack therapeutic alternatives. Under FDA's current regulations, there are three categories of expanded access:

  a. Expanded access for individual patients, including for emergency use (21 CFR 312.310)
  b. Expanded access for intermediate-size patient populations (21 CFR 312.315)
  c. Expanded access for large patient populations under a treatment IND or treatment protocol (21 CFR 312.320)
      (http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidan ces/ucm351261.pdf)

49. The terms expanded access, access, and treatment use are used interchangeably to refer to use of an investigational drug when the primary purpose is to diagnose, monitor, or treat a patient's disease or condition. The distinction between expanded access and the use of an investigational drug in the usual studies covered under an IND is that expanded access uses are not primarily intended to obtain information about the safety or effectiveness of a drug.

50. For each category of access, there are two types of regulatory submissions that can be used: (1) an access protocol submitted as a protocol amendment to an existing IND (i.e., an access protocol), or; (2) a new IND submission, which is separate and distinct from any existing INDs and is intended only to make a drug available for treatment use (i.e., an access IND). 21 CFR 312.305(b)(1). Thus, all three categories of expanded access require the submission of an IND so that the patient is not deprived of the protection that comes with FDA's review of the required product safety data.

51. The term "Compassionate Use" is not defined by FDA, but is simply a lay term used to refer to any category of expanded use. Regardless of the terminology, an IND is still required.

52. For all expanded access uses including individual patient access uses, investigators are required to ensure that IRB review and approval is obtained consistent with 21 CFR part 56 (21 CFR 312.305(c)(4)). 21 CFR part 56 requires, among other things, that the IRB review the expanded access use at a convened meeting at which a majority of the IRB members are present ("full IRB review") (21 CFR 56.108(c)).

## XI. Availability of Information to Help Speed Product Innovation

53. The FDA website features extensive resources for sponsors. As noted on the FDA Basics for Industry page (http://www.fda.gov/ForIndustry/FDABasicsforIndustry/ucm234629.htm), "FDA is responsible for … advancing the public health by helping to speed product innovation." In furtherance of this goal, the FDA website has guidance documents allowing sponsors to learn the specific requirements that apply to their products.

54. Guidance covering all aspects of preparing an IND application is available on the FDA website. Some relevant examples include:
   a. "Guidance for Industry: CGMP for Phase 1 Investigational Drugs" is at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM070273.pdf. The current version was posted in July 2008. An earlier version was published in January 2006.
   b. The CDER/CBER "Guidance for Industry: Q6B Specifications: Test Procedures and Acceptance Criteria for Biotechnological/Biological Products" was published in August 1999 and is at http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm073488.pdf).
   c. FDA's "Guideline for Industry: Q2A Validation of Analytical Procedures" was issued in March 1995 and is at (http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM073381.pdf).

55. FDA's Center for Drug Evaluation and Research (CDER) policies for review information contained in industry submissions are codified in its Manual of Policies and Procedures. For example, the policy and procedure for reviewing Drug Master Files was published on August 17, 1998 and is available at (http://www.fda.gov/downloads/aboutfda/reportsmanualsforms/staffpoliciesandprocedures/ucm079565.pdf).

56. CDER maintains a Small Business Assistance website (http://www.fda.gov/Drugs/DevelopmentApprovalProcess/SmallBusinessAssistance/default.htm) "to support the CDER Small Business Assistance Program's mission of promoting interaction with regulated industry by assisting regulated domestic and international small pharmaceutical business seeking timely and accurate information relating to development and regulation of human drug products."

57. The FDA website provides complete instructions on how to apply for Orphan Drug designation (http://www.fda.gov/ForIndustry/DevelopingProductsforRareDiseasesConditions/Howtoapplyfor OrphanProductDesignation/ucm365086.htm).

58. FDA will not disclose an application for Orphan Drug Designation unless the Orphan Drug Designation is granted.

59. FDA's Office of Orphan Products Development regularly conducts workshops on Orphan Product Designation. A current example is the FDA/EMA (European Medicines Agency) Orphan Product Designation and Grant Workshop scheduled for October 4 at FDA headquarters in Silver Spring, MD (http://www.fda.gov/ForIndustry/DevelopingProductsforRareDiseasesConditions/OOPDNewsAr chive/ucm362551.htm). This workshop will be conducted in partnership with the European Organisation for Rare Disease (EURORDIS), Genetic Alliance, and the National Organization for Rare Disorders (NORD).

60. FDA employees work with major consumer and professional organizations to present educational programs relevant to the drug development process. During my career at FDA, I spoke at a number of such programs and served on the planning committees for many more. I served on the Board of Directors of the Drug Information Association (DIA) (http://www.diahome.org) for eight years including two one year terms as President of the organization. The tradition of FDA employees participating in public programs has continued without interruption. Examples of current programs include:

     a. Regulatory Affairs: The IND, NDA, and Postmarketing presented August 12-13, 2013 in Boston, MA and scheduled again for November 11-14, 2013 in Philadelphia, PA http://www.diahome.org/Meetings-and-Training/Find-Meetings-

and-Training/Meeting-
Details.aspx?ProductID=2089668&EventType=Training%20Course)
   b. US Conference on Rare Diseases & Orphan Products 2013 The New Era in Health
      Care scheduled October 7-9, 2013 in North Bethesda, MD
      (http://www.diahome.org/en/Flagship-Meetings/RareDiseases2013.aspx)
      (sponsored jointly by DIA and the National Organization for Rare Diseases)
   c. Basics of the IND scheduled October 1-10, 2013 online
      (http://www.diahome.org/en/Meetings-and-Training/Find-Meetings-and-
      Training/Meeting-
      Details.aspx?ProductID=2124834&EventType=Online%20Training%20Course)

61. I also served as a faculty member at courses sponsored by other professional organizations.
    Current (and former) FDA employees continue to serve as faculty in courses offered by these
    organizations.  Examples include:
a. Basic Drug Development by the Pharmaceutical Education and Research Institute scheduled
   November 18-19, 2013 in Arlington, VA (http://d35vocx1du7en1.cloudfront.net/wp-
   content/uploads/2013/06/fall-2013-basic-dd-tentative-agenda.pdf)
b. CMC Workshop: Key Implications for Regulatory Professionals and Their Role as Business
   Partners by the Regulatory Affairs Professionals Society scheduled October 28-29, 2013 in
   Philadelphia, PA (http://www.raps.org/education-amp-training/raps-meetings-amp-education-
   calendar/cmc-workshop-october-2013.aspx)

62. Fundamentals of Clinical Research by the Association of Clinical Research Professionals
    (APCR) scheduled September 19-20, 2013 in Seattle, WA
    (http://www.acrpnet.org/Events/FundamentalsofClinicalResearchSeptember2013SeattleWA.aspx
    )   I myself was a member of the Board of Trustees of the Academy of Physicians in Clinical
    Research, ACRP's affiliated physician organization, both during the time I worked at FDA and
    again after I retired.  I served for a total of eight years.  I was President of APCR from 2010 to
    2011 and I have represented APCR in the American Medical Association House of Delegates
    since 2002.

### XII. SF-1019 Regulatory Status Timeline from December 2006 through December 2008 contrasting information available to the Sponsor and information available to the Public

63. Kanter 4 exhibit shows a partially redacted IND application to use SF-1019 in a Phase 3 clinical
    investigation "For the therapy of autoimmune/inflammatory conditions of the nervous system."
    The sponsor is listed as "Argyll Biotechnologies, Inc. Dr. Kenneth Willeford."  The IND
    application states the persons responsible for monitoring the conduct and progress of the clinical
    investigations are "Arthur Dale Ericsson, MD-Director: Institute of Biologic Research" and
    "Michael Lieberman, MD-Director: The Methodist Hospital Research Institute."  The IND
    application has an FDA date stamp indicating it was received by FDA's CDER (Center for Drug

Evaluation and Research)/CDR (Central Document Room) on 12/26/2006 and the DR (Document Room) for TBP (Therapeutic Biologics Products) on 12/28/2006.

64. Pages 4 and 5 of the IND application appear to be an undated letter addressed to the Director of FDA's Office of Orphan Products Development requesting Orphan Drug designation for "Complex Regional Pain Syndrome (Reflex Sympathetic Dystrophy)." Pages 6 and 7 of the IND application appear to be an undated letter addressed to the Director of FDA's Office of Orphan Products Development requesting Orphan Drug designation for "Chronic Inflammatory Demyelinating Polyneuropathy."

65. SEC Exhibit 50 is a letter from FDA's Office of Orphan Products Development dated 12/26/2006 and addressed to Kenneth Willeford, Ph.D. Argyll Biotechnologies, Inc. The letter states, "We received your Orphan Designation Application submission on [December 22, 2006]. Upon our initial inspection, we find that in its current state, it does not adhere to the correct applications formatting. All applications must meet the criteria outlined in the enclosed guide sheet, "Tips for Submitting an Application for Orphan Designation."

"Therefore, your application is being returned to allow you an opportunity to correct the following deficiency:
1) Correct formatting;
2) Bibliography
3) Tabbed references and in binders
4) Identical copy of submission."

The criteria outlined on the guidance sheet are identical to those available on the Office of Orphan Products Development website. I have not found any suggestion that Immunosyn resubmitted these Applications for Orphan Designation.

66. Willeford Exhibit 17 is an e-mail dated 1/25/2007 from Dr. Willeford to Robert Fougner (an attorney performing work for both Argyll and Immunosyn) with copies to McClain (Sr.), and Dr. Erriccson. The e-mail states that the IND has been put on clinical hold and goes on to say, "we have long known the importance of toxicology studies."

67. Willeford Exhibit 18 is an e-mail dated 3/15/2007 from Dr. Willeford to McClain (Sr.), McClain (Jr.) and Jim Miceli. The e-mail states "We are on an official clinical hold" and forwards a copy of the Full Clinical Hold Letter received from FDA. The exhibit includes a copy of the response from Mr. Miceli indicating that he received the e-mail. His response states, "Lets (sic) talk on Monday, have a great weekend"

68. Kanter Ex 3 is the Full Clinical Hold letter from the Director of FDA's Division of Neurology Products (DNP) dated March 15, 2007 and addressed to Dr. Willeford. The letter references a

conversation between Dr. Willeford and members of DNP on January 25, 2007, in which Dr. Willeford was notified that the proposed study is on clinical hold and may not be initiated. Under the general heading of "Insufficient information to assess risks to human subjects [21 CFR 12.42(b)(2)(ii)]," the letter lists three categories of deficiencies and an extensive listing of information that will be required to resolve these deficiencies. The required information is referenced to guidelines publicly available on the FDA website. There is a fourth section pointing out that, "The consent form makes unsupported suggestions about drug efficacy and safety." The major categories of deficiencies listed include:

a. Chemistry, Manufacturing and Controls … This characterization needs to establish the identity, strength, potency and purity of the proposed drug product.
   The data supplied relating to the goat herd is inadequate.
   A listing of all raw materials
   Documentation that all manufacturing will be performed according to current Good Manufacturing Practices (cGMP)
   A detailed description of the manufacturing and purification processes and in process controls that will be used to ensure the quality of the product
   Characterization with respect to strength, identity, purity and potency
   Information regarding the container closure and packaging
   Information on the stability of the product covering at least the amount of time over which preclinical and clinical trials are planned
   Certificates of analysis for the drug substance and the drug product
   Data for the drug substance and drug product produced to date
   Formulation of the placebo, its active ingredients if any, and its similarity to the drug product
   A biologically relevant potency bioassay and information and data to support its suitability
   Studies to assess the potential immunogenicity of the product

b. Nonclinical data to support the safety of the proposed clinical study
   The core battery of safety pharmacology studies (i.e. CNS, cardiovascular, respiratory
   General toxicology studies in two species (rodent and non-rodent)

c. Clinical
   A detailed description of previous human experience
   A detailed description of experimental protocols
   Rewrite the Investigator Brochure to contain sufficient information for investigators to conduct the study safely

69. In my opinion, the information needed to resolve these clinical hold deficiencies would have required several years to accumulate. First the composition of SF-1019 would have to be more clearly defined. Once the composition of SF-1019 had been clearly defined, the raw materials, manufacturing and packaging issues would have to be addressed. Because neither Argyll nor Immunosyn was the manufacturer of the product, the company would be entirely dependent on its suppliers to produce this information and submit it to FDA in the form of Drug Master Files

(DMFs). The use of DMFs is standard practice to keep the suppliers' information confidential from their customers. Argyll would need to develop a potency assay. After addressing these issues, the company would need to manufacture several batches of the drug product and test them for stability. After demonstrating stability, the company would need to manufacture additional batches of SF-1019, test the product for immunogenicity and carry out the required pharmacology and toxicology studies. The studies would need to be carried out in two species according to the standards of the FDA requirements known as Good Laboratory Practices (GLPs). Animals in these toxicology studies would need to receive SF-1019 for a period of time at least as long as that proposed for humans. After the dosing phase of these toxicology studies had been completed, additional time would be required to autopsy the test animals and assess the effects of the drug and still more time for the results to be written up and submitted to FDA as part of an IND application for a Phase 1 trial which would have to be carried out before the Phase 2 and Phase 3 trials needed to demonstrate efficacy.

70. Willeford Exhibit 20 is an e-mail to McClain (Sr.) and Jim Miceli dated March 20, 2007. Writing about Dr. Ericsson's work in preparing the IND, Dr Willeford says, "no one could have prepared a successful IND submission with the material available … We will not get anywhere until he identify (sic) the active ingredients in SF-1019 and account for the inactive components ensuring that the levels are consistent. This is our first big hurdle."

71. SEC Exhibit 13 is an excerpt from a Form 8-K filed October 25, 2007 with the SEC. Beginning on page 33, there are materials from a presentation given jointly by Immunosyn CEO Stephen A. Ferrone and Argyll Biotechnologies Chief Scientific Officer Douglas McClain (Sr.). Under the headline "Efficacy of SF-1019 in Pre Clinical (sic) human Studies" McClain is quoted as stating, "Research suggests the current product … possesses analgesic properties with an ability to substantially reduce the inflammation attending a number of clinical conditions including Major Auto Immune (sic) Disorders such as Multiple Sclerosis (MS)…..and Neurological Disorders such as Chronic Inflammatory Demyelinating Polyneuropathy (CIDP)….Reflex Sympathetic Dystrophy Syndrome (RSD or RSDS) and diabetic neuropathy. SF-1019 promotes angiogenesis, the ability to promote capillary and nerve growth…..and has been shown effective for diabetic and chronic wounds."

72. The presentation described on October 25, 2007 8-K filing goes on to say, "Compassionate use waivers have already been issued by the Institutional review board of the FDA in Houston, Texas for the use of SF-1019."

73. In my experience at FDA (including several years as Chairman of the FDA Institutional Review Board), the FDA's IRB does not review protocols unless they are to be conducted at FDA facilities and/or by FDA employees and/or under contract with FDA. The FDA IRB meets at FDA headquarters. In my opinion, the presentation described in the Form 8-K conflates the protections afforded by FDA approval of an IND application with the additional protection

afforded by the requirement that before a study may be carried out it must have both an IND application approved by FDA and the approval of an Institutional Review Board.

74. The October 25, 2007 8-K filing continues, "In addition, we have initiated to process for regulatory approval of SF-1019 in both the US and Europe." The presentation does not mention that FDA had placed on full clinical hold the only commercial IND ever filed for use of SF-1019.

75. A bullet point in the October 25, 2007 8-K filing is "Unmet Needs in Orphan Diseases." The presentation does not mention that on December 26, 2006, four days after FDA's receipt of the commercial IND application which contained letters requesting Orphan Drug Designation for two uses of SF-1019, these letters were returned to Argyll with a list of deficiencies.

76. Willeford Exhibit 11 contains an e-mail from Karen Becker, the head of a consulting firm working for Argyll. The e-mail is dated October 26, 2007 and states, "I reviewed the letter from FDA, and see they require a substantial amount of new data and information on (unless you have it and did not include it in the IND.) What they are requesting is not out of the ordinary, and although it is possible to negotiate some points, the CMC and Nonclinical requests in general will need complete responses."

77. SEC Exhibit 53 is a copy of a Proteus Equity Research Report on Immunosyn dated December 19, 2007. Statements included in this report include:
   a. Encouraging Regulatory Outlook …Under the guidelines of the Orphan Drug Act in the United States, clinical studies of SF-1019 for treatment of CIDP and RSP could begin over the near-term …we believe that Immunosyn will be able to develop revenue streams from the marketing of SF-1019 during fiscal 2008.
   b. Based upon our expectation of limited regulatory approval of SF-1019 for treatment of a number of orphan diseases and conditions during fiscal 2008, we anticipate that Immunosyn Corporation will attain gross revenues of approximately $1.04 billion … in fiscal 2008. As the Company continues to expand applications of SF-1019 for additional diseases and conditions, we expect that revenues will ramp appreciably to $2.26 billion … for FY 2009. The brochure does not mention that the only commercial IND for SF-1019 remains on full clinical hold and that FDA had returned Argyll's two applications for Orphan Drug Designation without substantive review so that the company could correct deficiencies.

78. SEC Exhibit 10 is a PR Newswire release dated July 16, 2008 and headlined, "IMMUNOSYN ANNOUNCES PROPOSED AGREEMENTS FOR DISTRIBUTION OF THE BIOPHARMACEUTICAL SF-1019 IN UTAH." The release notes that, "Immunosyn, together with Argyll Biotech and Utah Biopharmaceutical Laboratories, is working to finalize ..." The release quotes Mitchell J. Melling, MD, Manager of Utah Biopharmaceutical Laboratories, LLC. "My review of the scientific background, preclinical testing, initial safety evaluations and studies performed under compassionate waivers, coupled with therapeutic benefits I have witnessed, give me confidence in the benefit my patients will receive with SF-1019 treatment. In the press

release Stephen D. Ferrone, President and CEO of Immunosyn, discusses patient demand for SF-1019. Ferrone states, "This patient demand stemmed from the perceived benefit of treatment in patients who participated in early preclinical studies and who desire access to SF-1019 to alleviate their symptoms."

79. In my experience at FDA (including sixteen years overseeing the regulation of prescription drug promotion), the statements that appear in SEC Exhibits 13 and 10 regarding efficacy of SF-1019 and made by McClain (Sr.), Ferrone and Melling on behalf of organizations working together with Argyll, an IND applicant, would be considered as violations of 21 CFR 312.7 which states in part,

" A sponsor or investigator, or any person acting on behalf of a sponsor or investigator, shall not represent in a promotional context that an investigational new drug is safe or effective for the purposes for which it is under investigation or otherwise promote the drug."

80. SEC Exhibit 8 is a PR Newswire release dated August 12, 2008 and headlined, "ARGYLL BIOTECH NOTIFIES IMMUNOSYN OF MALAYSIA MINISTRY OF HEALTH APPROVAL." In a section of the release entitled, "About Immunosyn Corporation," the release states, "Argyll Biotechnologies, LLC has initiated the process for regulatory approval of SF-1019 in several countries and preparations for clinical trials are underway in both the US and Europe." Nowhere does the release state that the only US IND for SF-1019 is on full clinical hold.

81. SEC Exhibit 17 is the cover of an IND submitted 11/11/2008 for a Phase 2 clinical investigation using SF-1019 for the treatment of progressive multiple sclerosis. Renewed Hope Clinic, LLC is listed as the Sponsor. Mitchell Joe Melling, MD is named as the person responsible for monitoring the conduct and progress of the trial, the person responsible for review and evaluation of information relevant to the safety of the drug and the sponsor's authorized representative.

82. SEC Exhibit 7 is from Morningtstar® Document Research[SM]. It shows a Form 10-Q filed with the SEC on November 14, 2008. Under "Item 5. Other Information," the Form 10-Q states, "A physician sponsored IND Application to the Food and Drug Administration in the U.S. for a Phase II Clinical Trial for Multiple Sclerosis using SF-1019 has been submitted. If the submitting doctor is successful in gaining approval for his Clinical Trial, Argyll Biotech intends to supply SF-1019 at no cost to the physician for use in the trial. The FDA response timeline guidance would suggest that it would take approximately three to six months from the date of submission until approval and commencement of a trial for MS." The document does not disclose that the only previous commercial IND application is on full clinical hold even though FDA had given as reasons for the hold both lack of information about the identity of SF-1019 and lack of adequate safety data. FDA approval of an IND requires that the investigator be

qualified by training and experience to conduct the study. The document does not disclose that the physician's CV shows no training or experience in neurology or in clinical research. Because the document does not name the physician, the reader is unable to perform his or her own check of the physician's credentials.

83. SEC Exhibit 44 is an FDA Memorandum of Telecon dated December 17, 2008 between Dr. Melling and Dr. Eric Bastings, Deputy Division Director of FDA's Division of Neurology Products DNP). The subject of the conversation was "hold." The memo states:
The following hold issues were conveyed to the sponsor.
"Product
    1. The product is insufficiently characterized in regard to identity, purity and potency.
    2. The product needs to be validated as to viral clearance.
    Nonclinical
    3. The nonclinical studies are inadequate as to design and duration.
Clinical
4. Fo11owing resolution of the product and nonclinical issues, the first clinical study should be a Phase 1 single dose study.
A letter will follow will contain the details.
The tcon was ended."

84. SEC Exhibit 18 is a partially redacted FDA Full Clinical Hold letter addressed to Dr. Melling. The date of the letter is not visible, however it makes reference to the December 17, 2008 telephone conversation between Dr. Melling and Dr. Bastings wherein "Dr. Melling was notified that the study he proposed "is on clinical hold and may not be initiated." The letter spells out the specific deficiencies and the information that would be needed to resolve the deficiencies. Under the general heading of "Unreasonable and significant risk of illness or injury to human subjects [21 CFR 12.42(b)(1)(i)]," the letter lists three categories of deficiencies and provides a fourth section regarding information to resolve clinical hold deficiencies:

a. Clinical hold deficiencies – Chemistry – The specific list has been redacted from the letter.
b. Clinical hold deficiencies – Nonclinical
You did not provide sufficient nonclinical data to support the safety of the proposed clinical study. Although you have conducted single-dose studies in. rat and guinea pig, those studies are not adequate to support human use. The major deficiencies in those studies are as follows:
a. The doses of SF-1019 administered are not provided, preventing calculation of a safe starting dose and safety margin for human use.
b. The number of animals per group is not sufficient.
c. The studies were not conducted in compliance with Good Laboratory Practices (GLP) and no statement regarding deviations from GLP was provided.
d. The studies did not include an assessment of a full battery of toxicology parameters (e.g., clinical pathology, histopathology on a standard battery of tissues)

e. Both studies were conducted in rodent; no toxicology study in a non-rodent species was submitted.

f. The duration and dosing regimen used for the nonclinical studies are not sufficient to support the duration and regimen planned for the proposed clinical trial.

c. Clinical hold deficiencies – Clinical

You did not provide sufficient clinical data to support the safety of the proposed clinical study. Although you have provided limited clinical data to support your intended study, these data are not adequate to support your proposed investigational use. Major deficiencies in these data include:

a. Poorly defined drug substance

b. Uncontrolled drug administration

c. Uncertain duration of exposure

d. Uncertain drug dosage

e. Administration to patients with unrelated conditions

f. Insufficient documentation of referenced studies

g. Subjective reports (telephone interviews, internet reports)

d. Information needed to resolve clinical hold deficiencies – Clinical

In general, we advise you that an early phase (phase 1) safety and tolerability study in healthy volunteers with detailed pharmacokinetic analysis is the appropriate stage at which to begin your clinical development program. You will need to provide a protocol for such a study that incorporates detailed safety monitoring at doses and durations that are supported by non-clinical data (as described above), with a drug product that is supported by CMC data (as described above). We refer you to the Agency's website (www.fda.gov) for links to relevant guidance (e.g., Guidance for Industry S7 A Safety Pharmacology Studies for Human Pharmaceuticals ICH July 200 I, Guidance for Industry Content and Format of Investigational New Drug Applications (INDs) for Phase I Studies of Drugs, Including Well Characterized, Therapeutic, Biotechnology-derived Products). You may also wish to refer to Guidance for Industry E6 Good Clinical Practice: Consolidated Guidance which can be found at http://www.fda.gov/cder/guidance/959ful.pdf.

85. In my opinion, the issues noted in the Full Clinical Hold letter are essentially the same issues noted in the Full Clinical Hold letter that the Director of FDA's Division of Neurology Products sent to Dr. Willeford on March 15, 2007. The materials I reviewed contain no suggestion that Dr. Melling performed his own animal testing. This further suggests to me that the safety data in his IND came from Argyll and that Argyll had made little progress in resolving the clinical hold deficiencies in the 21 months that elapsed between March 2007 and December 2008 when Dr. Melling submitted his physician IND.

86. In my opinion, the information needed to resolve these clinical hold deficiencies would have required several years to accumulate. First the composition of SF-1019 would have to be more

clearly defined. Once the composition of SF-1019 had been clearly defined, a new toxicology study in rodents would be necessary because the previously submitted rodent studies had not been conducted to the standards of the FDA requirements known as Good Laboratory Practices (GLPs). A toxicology study in a non-rodent species would need to be conducted because no such study had been conducted. Animals in these toxicology studies would need to receive SF-1019 for a period of time at least as long as that proposed for humans. After the dosing phase of these toxicology studies had been completed, additional time would be required to autopsy the test animals and assess the effects of the drug and still more time for the results to be written up and submitted to FDA as part of an IND application for a Phase 1 trial which would have to be carried out before a Phase 2 trial could be approved.

87. My opinion is bolstered by Kanter Exhibit 5 which is a final report by Peter M. Kanter, DVM, PhD, a consultant to Argyll. The report is dated January 11, 2008 and reports "A rangefinding (safety) laboratory study (not conducted under compliance with Good Laboratory Practices Act of the United States Food and Drug Administration) … conducted in … guinea pigs dosed … with SF-1019." In Kanter Exhibit 8, an e-mail from Peter Kanter dated October 18, 2007 advises Dr. Willeford, McClain (Jr.) and Miceli as to the value of this study. Dr. Kanter states, "Because of all of the shortcomings in design (it should have been a multiple dose study), and conduct of the study, it is unfortunately without any potential scientific, medical, regulatory, or toxicologic use." This e-mail suggests that Immunosyn and Argyll were aware of this deficiency at least two months before Dr. Melling submitted his physician IND to FDA.

88. SEC Exhibit 77 to Mr. Ferrone's deposition is Immunosyn's Form 10-KSB for Fiscal Year Ending 31 Dec. 07. This 10-KSB is dated March 28, 2008 and signed by Stephen D. Ferrone as "President, Chief Executive Officer, Director (Principal Executive Officer)" and Douglas A. McClain, Jr. as "Chief Financial and Accounting Officer, Director (Principal Financial and Accounting Officer)." In a section captioned "Government Regulations" beginning on page 8, Immunosyn's 10-KSB describes the process required by the FDA before any products may be marketed in the US. The description provided in this Immunosyn 10-KSB is much the same as I have outlined in previous sections of this report.

89. SEC Exhibit 14 is Immunosyn's Form 10-K/A (Amendment No. 1) for the fiscal year ended December 31, 2008. The Form states that the original 10-K was filed with SEC on March 16, 2009 and that this form is filed to amend the original report to eliminate references to an individual who had previously resigned from Immunosyn's Board of Directors. This form states, "In November 2008, a physician submitted a physician-sponsored IND application to the US Food and Drug Administration for a Phase II (sic) clinical trial for Multiple Sclerosis utilizing SF-1019. If the submitting doctor is successful in gaining approval for his clinical trial, Argyll Biotech intends to supply SF-1019 at no cost to the physician for use in the trial." The form does not disclose that FDA had placed this IND on full clinical hold. Again, the document does not disclose that the only previous commercial IND is also on full clinical hold even though FDA had given as reasons for the hold both lack of information about the identity of SF-1019 and lack of adequate safety data. Again, the document also does not disclose either the identity of the physician or that his CV shows no training or experience in neurology or research.

90. SEC Exhibit 14 is dated March 20, 2009 and signed by Stephen D. Ferrone as "President, Chief Executive Officer, Director (Principal Executive Officer)" and Douglas A. McClain, Jr. as Chief Financial and Accounting Officer, Director (Principal Financial and Accounting Officer). In a section captioned "Government Regulations" beginning on page 10, Immunosyn's 10-K/A repeats the description of the process required by the FDA from the Immunosyn 10-KSB dated March 28, 2008. The Immunosyn 10-K/A does not provide an estimate of the minimum time remaining that would be required to obtain marketing approval for SF-1019. However, because Argyll had not yet completed the work necessary to resolve the existing clinical holds, my estimate would be that as of the date of this document, it is likely that SF-1019 was still at least seven to ten years away from receiving marketing approval.

91. SEC Exhibit 19 is a partially redacted copy of a NIDPOE (Notice of Initiation of Disqualification Proceedings and Opportunity to Explain) letter to Arthur Ericsson, M.D. Dr. Ericsson was named as one of the two persons responsible for monitoring the conduct and progress of the clinical investigations in the commercial IND filed by Dr. Willeford on behalf of Argyll Biotechnologies, Inc. The date of the letter is not shown in the exhibit, but a more heavily redacted version appears on the FDA website with the date of issuance stated as 03/31/2008 (http://www.fda.gov/regulatoryinformation/foi/electronicreadingroom/ucm103496.htm). The copy in SEC Exhibit 19 identifies the investigational drug as Argyll SF-1019 and the sponsor as Argyll Biotechnologies, Inc., but the name of the drug and the sponsor redacted from the copy on the FDA website.

92. It is standard practice for pharmaceutical companies to monitor the work of their clinical investigators studying products that they own or plan to market. Therefore, Argyll and Immunosyn should have been aware of Dr. Ericsson's noncompliance prior to issuance of the NIDPOE letter.

93. It is common practice for pharmaceutical companies to monitor the FDA website for postings related to clinical investigators studying products that they own or plan to market. Therefore, Argyll and Immunosyn should have been aware of this letter shortly after it was issued and regardless of whether they had been notified about it by Dr. Ericsson.

94. Initiation of Disqualification Proceedings is extremely rare and is reserved for the most serious violations. Proceedings are initiated only when FDA officials believe that the violations seen during an inspection cannot or will not be corrected. Less than 200 investigators have been disqualified in the history of FDA.

95. The letter to Dr. Ericsson states, "Between March 22 and April 18, 2007, Ms. Andrea Branche, representing the U.S. Food and Drug Administration (FDA), conducted an investigation and met

with you to review your conduct of a clinical investigation (protocol 1019 entitled "Evaluation of SF-1019 for the therapy of autoimmune/inflammatory conditions involving the nervous system") of the investigational drug Argyll SF-1019, performed for Argyll Biotechnologies, Inc." A listing of the violations follows:

    a. Administering the investigational new drug Argyll SF-1019 to subjects without an IND in effect [21 CFR 313.40].

    b. Violating a clinical hold by giving subjects Argyll SF-1019 after FDA issued an order to delay the proposed clinical investigation. [21 CFR 312.42].

    c. Failing to obtain informed consent in accordance with the provisions of 21 CFR Parts 50 and 56, as required by 21 CFR 312.60 and 312.66.

    d. Failing to assure that an IRB complying with requirements set forth in 21 CFR Part 56 was responsible for the initial and continuing review and approval of a clinical study [21 CFR 56.103, 312.60, and 312.66].

    e. Failing to maintain adequate and accurate case histories that record all observations and other data pertinent to the investigation on each individual [21 CFR 312.62(b)].

    f. Failing to maintain adequate records of the disposition of the drug, including dates, quantity, and use by subjects [21 CFR 312.62(a)].

    g. Failing to conduct the clinical investigation according to the signed investigator statement and investigational plan, and to fulfill other responsibilities of an investigator, including to protect the rights, safety, and welfare of subjects under your care, as required by 21 CFR 312.40(a)(2), 312.60, and 312.66.

96. The NIDPOE letter to Dr. Ericsson is signed by Leslie K. Ball, M.D., Director, Division of Scientific Investigations, in the Center for Drug Evaluation and Research.  In 1982 and 1983, I was the first line supervisor of Dr. Frances Kelsey, who at that time held the position currently occupied by Dr. Ball.  (President Kennedy had previously awarded Dr. Kelsey the Medal of Freedom for her role in preventing birth defects from exposure to thalidomide, an unapproved sedative drug.)  During the 1990s, my responsibilities in this position included serving as Chairman of FDA's own Institutional Review Board (IRB) and serving as the presiding officer at hearings initiated by agency compliance personnel seeking to disqualify clinical investigators accused of violating the Investigational New Drug (IND) application regulations.  The violations cited in this NIDPOE letter are among the most serious that I have seen.

97. SEC Exhibit 92 is Dr. Ericsson's letter responding to Dr. Ball.  The letter is dated June 25, 2008.  The Exhibit does not contain whatever attachments may have submitted as documentation.

98. A Notice of Opportunity for Hearing (NOOH) letter was hand delivered to Dr. Ericsson on March 4, 2009.  A redacted copy of that letter was posted on the FDA website on March 8, 2009.  The NOOH letter recounts each of the seven major violations listed in the NIDPOE letter and concludes, "Your response is unacceptable because it does not adequately address the violations set forth in the NIDPOE letter."  Especially noteworthy is FDA's reply to Dr. Ericsson's

response to the first listed violation (Administering the investigational new drug Argyll SF-1019 to subjects without an IND in effect [21 CFR 313.40]):

Your written response and attachment did not address this violation. You attached an August 16, 2006, letter from [Burzynski Research Institute (BRI) Institutional Review Board (IRB) approving the compassionate use of [SF-1019]). This letter does not address your failure to comply with the regulations described above. There are certain FDA regulations that allow for the administration of an investigational drug without meeting the above referenced requirements, for example by obtaining a treatment IND or authorization for emergency use of an IND. See 21 CFR 312.34 and 21 CFR 312.36. However, you did not provide any evidence indicating that you submitted or received approval for a treatment IND under 21 CFR 312.34. Nor does it appear that [SF-1019] could have met the requirements for a treatment IND, as the drug was not under investigation in a controlled clinical trial under an IND in effect for the trial. See 21 CFR 314.34(b)(iii). In addition, you did not provide any evidence indicating that you received authorization to administer [SF-1019] through the emergency use of an IND under 21 CFR 314.36.

99. Dr. Ericsson was disqualified on May 4, 2009
(http://www.accessdata.fda.gov/scripts/SDA/sdDetailNavigation.cfm?sd=clinicalinvestigatorsdis
qualificationproceedings&id=CD5EDDB44CC3AA37E040A8C0754D57E1&rownum=53).
Once an investigator is disqualified, he or she may not receive investigational drug products.
Data produced by a disqualified investigator cannot be used in support of a New Drug
Application.

100.        SEC Exhibit 88 is a copy of a letter from the BRI-IRB to Mr. Douglas McClain, Sr., The
Argyll Group.  The letter is dated August 18, 2008 and is signed by Carlton F. Hazlewood,
Ph.D., Chairman.  The letter states:

    "Re: SF-1019 animal toxicity
Our Institutional review board (BRI-IRB) met on 8 August, 2008. At that meeting, concern was
expressed that no information has been submitted by Argyll concerning the additional animal
toxicity studies that were requested by us. The Board unanimously passed a motion requesting
that, within thirty days from today's date that the Board be provided a status report on the
progress of these animal toxicity studies concerning SF-1019. Further, the BRI-IRB requires that
this letter include a listing of milestones to be met and an estimated time of completion of the
animal toxicity studies.
At this time, I must remind you that human studies, according to the protocol, cannot proceed
until your Investigative New Drug (IND) Application is approved by the FDA.
If you have any questions, please contact me."

101.        On page 90 of his deposition taken on October 7, 2013, Dr. Hazlewood discusses the BRI
IRB's oversight of Dr. Ericsson's work.  He first says, "I didn't know it was on hold, if it was on
hold.  If it was on hold, couldn't do it, or shouldn't do it."  He responds to a follow-up question
regarding the December 2006 clinical hold on the IND, "Until -- until I heard you say "hold," I
didn't know that there was a hold on this."  In my opinion Dr. Hazlewood appears to be stating
that he understood that once the FDA had issued a clinical hold on the IND submitted by Argyll

no studies could go forward, whether characterized as compassionate use or otherwise, for as long as that clinical hold remained in effect.

## XIII. Conclusions

102.    Information regarding the regulatory requirements for a therapeutic biologic product such as SF-1019 was readily available from the FDA website and from a number of additional sources.

103.    Argyll submitted a commercial IND application for a Phase 3 study and assisted Dr. Mitchell Melling in the preparation of a physician IND application for a Phase 2 study even though these applications had no chance of approval.

104.    Argyll and Immunosyn employees were responsible for presentations and press releases announcing these INDs, but failing to disclose that these INDs had been put on full clinical hold.

105.    Argyll was in possession of Full Clinical Hold letters listing deficiencies that would require substantial periods of time to correct before even a Phase 1, let alone a Phase 2 or Phase 3 clinical study could be initiated.

106.    Argyll had confirmation from its own advisers that they would need to establish the identity of their product was insufficiently characterized in regard to identity, purity and potency and that new pharmacology and toxicology studies would need to be performed before even a Phase 1 study could be initiated.

107.    Argyll and Immunosyn knew that data from completed clinical trials is a prerequisite to assembling and submitting a Biologic Licensing Application required for the marketing of SF-1019.

108.    Despite Argyll and Immunosyn knowing that initiating clinical trials, let alone applying for approval to market SF-1019 would take years, Argyll and Immunosyn continued to trumpet that clinical trials and revenues from SF-1019 were imminent.


Dated:  December 4, 2013

*Peter H. Rheinstein, MD*

Peter H. Rheinstein, M.D., J.D., M.S.

**PETER H. RHEINSTEIN, M.D., J.D., M.S.**
**621 Holly Ridge Road**
**Severna Park, Maryland  21146-3520**

Telephone:  410 647-9500                          Cellular Telephone:  301-792-2800
 (from DC):  301 261-1300                          E-Mail:              phr@jhu.edu
Facsimile:   410 647-6135

## SUMMARY OF EXPERIENCE

Current:  Consultant to industry, investors and law firms.  Leader in professional organizations.
(http://en.wikipedia.org/wiki/Peter_Rheinstein)  Publisher of *Discovery Medicine*
(http://www.discoverymedicine.com/about/editorial-board-of-discovery-medicine).

Previous:  Senior Vice President for Medical and Clinical Affairs at biotechnology company.  Twenty five
years senior level experience at Food and Drug Administration with emphasis on health policy, technology
transfer, medico-legal and health economics issues.  Managed multiple drug regulatory activities and large
staffs.  Extensive experience in outreach to government agencies and organized medicine.  Private
practice of family medicine and geriatrics.  Corporate medical director.  Organized company to provide
hospital emergency department coverage.

## CURRENT POSITIONS

President, Severn Health Solutions                                          10/99-present

 Consultant to industry, medical publishers, investors and law firms on issues related to
 development and marketing of pharmaceuticals, generic drug eligibility and approval, Rx/OTC
 Switch and patent term restoration, reimbursement, HIPAA, Healthy People 2010, GCPs, clinical
 trials, medical ethics

Publisher, *Discovery Medicine*                                          11/01-present

 With colleagues from Johns Hopkins Medical Institutions, started publication of a journal
 summarizing major advances in cutting edge research.  Assembled a distinguished board of
 senior editors.  *Discovery Medicine* is indexed at www.pubmed.gov as Discov Med (Details at
 http://www.discoverymedicine.com.)

## RECENT PAST POSITIONS

Clinical Research Consultant, Marnac, Inc.                                  07/01-06/09

 Consult on design and regulatory issues for Phase II clinical trials of pirfenidone in pulmonary
 fibrosis and multiple sclerosis.  Edit Clinical Investigator's Brochures.  Elected to company's Board
 of Directors 08/03.  Helped license pirfenidone to Shionogi (approved in Japan 02/09) and
 InterMune (phase III trials completed in US) and wind up affairs of company

Senior Vice President for Medical and Clinical Affairs, Cell Works Inc.     10/99-06/04

 Chief Medical Officer at startup biotechnology company specializing in cancer diagnostics and
 therapeutics.  Awarded SBIR grant as principal investigator by National Cancer Institute and
 Orphan Drug Designation by Food and Drug Administration both for ligand directed treatment of
 hepatocellular carcinoma.  Organized Scientific Advisory Board.  Planned strategy for
 development of circulating cancer cell tests to detect disease recurrence and help guide therapy.
 Supervised clinical trials and work of contract research organizations.  Prepared and reviewed
 legal documents.  Represented company at medical society (ASCO, Prostate Cancer Foundation,
 MD Anderson Tumor Markers Conference, BIO) and investor meetings.

2

**EXPERIENCE AT FDA, ROCKVILLE, MD**

<u>Director</u>:  Medicine Staff, Office of Health Affairs, Senior Executive Service (SES, Level IV) 1990-09/99

A principal medical spokesperson for FDA.  Accountable for FDA interface with health professionals and their organizations and with other government health agencies.

- Incorporated FDA objectives into Healthy People 2000 and 2010 (US National Health Goals)
- Chair of FDA's Internal Institutional Review Board, Dramatically cut review times
- Chief hearing officer for clinical investigator disqualification hearings
- Advisor to HCFA (now CMS) on Medicare Coverage issues
- FDA representative to AHCPR (now AHRQ) National Advisory Council
- FDA representative on numerous advisory panels, both federal and non-governmental
- Responsible for <u>The FDA Medical Bulletin</u> (circulation 700,000) and "From the FDA" columns in journals for physicians, pharmacists and nurses
- Developed original materials and partners for MedWatch, FDA's Medical Product Reporting Program, increased number and quality of practitioner reports.
- Focal point liaison for FDA Alternative and Complementary Medicine initiatives including strategies for evaluating botanical and homeopathic compounds

<u>Director</u>:  Office of Drug Standards, Center for Drug Evaluation and Research (SES, Level IV) 1983-1990

Managed Divisions of Drug Advertising and Labeling (now OPDP); Generic Drugs (now Office of Generic Drugs), Bioequivalence, Biopharmaceutics and OTC Drug Products

- Implemented Drug Price Competition and Patent Term Restoration Act of 1984
- Established precedents for determining patent rights and marketing exclusivity
- Responsible for review of all abbreviated new drug applications speeding review through computerization and streamlining of work flow
- Chaired meetings between FDA and Manufacturers on alleged violations of FDA regulations governing prescription drug promotion
- FDA delegate to U.S. Pharmacopeial Convention
- FDA representative to Bilateral Meetings with Japanese Drug Regulatory Authority
- Consultant to National Institute for the Control of Pharmaceutical and Biological Products, Beijing, China, 1981-1989

<u>Acting Director</u>:  Office of Drugs, National Center for Drugs and Biologics            2/83-10/83
<u>Acting Deputy Director</u>:  Office of Drugs, National Center for Drugs and Biologics        1982-1983

Managed 500 employees in compliance, drug research and testing, epidemiology, biostatistics, information systems, generic drugs, over-the-counter drugs, promotion and biopharmaceutics

<u>Director</u>:  Division of Drug Advertising and Labeling, Bureau of Drugs (GM-15)            1974-1982
        (Now Office of Prescription Drug Promotion)

Responsible for regulation of all prescription drug promotion within the US

- Finalized (still current) regulations for Rx Drug Advertising and Labeling
- Developed precedents that have remained in effect until the present day
- Initiated FDA's first patient medication information program
- Responsible for review of research studies supporting advertising claims
- For six years, chair of Bureau-wide Committee on Advanced Scientific Education winning and maintaining ACCME and ACPE accreditation

3

## EDUCATION

M.D.: Johns Hopkins University, Baltimore, MD, 1967
      Teaching Asst., Dept. of Biomathematics; Research Asst., DCRT/NIH
      Epidemiology Training Program, California Dept. of Public Health

J.D.: University of Maryland, Baltimore, MD, 1973
      Senior Class President; Vice-President, Student Bar Association

M.S.: Michigan State University, East Lansing, MI, 1964
(math) Graduate Asst. with sole responsibility for teaching "Elementary Mathematical Analysis"

B.A.: Michigan State University, East Lansing, MI, 1963
(math) Graduation with High Honors; Completed 4 year curriculum in 2 years

      Federal Executive Institute, Charlottesville, VA
       Senior Executive Training Program, 1984; Follow-on Programs 1985, 2011

      Additional course work at Harvard University School of Public Health, Johns Hopkins
       University School of Hygiene and Public Health, and the Brookings Institution

## MEDICAL TRAINING AND CERTIFICATION

Internship:     Straight Medical, U.S. Public Health Service Hospital, San Francisco, 1967-68
Residency:     Internal Medicine, U.S. Public Health Hospital, Baltimore, MD, 1968-70
              (The name of this institution has been changed to Homewood Hospital Center.)
Certification:    American Board of Family Medicine
              Certified 1977; Recertified 1983, 1989, 1995, 2001, 2008
              Certificate of Added Qualifications in Geriatric Medicine 1996; Recertified 2006

## CURRENT LICENSURE

Medicine:     Maryland, District of Columbia, California
Law:          Maryland, District of Columbia, U.S. Supreme Court

## CURRENT PROFESSIONAL SOCIETIES

Drug Information Association (Life Member)
  President, 1984-85 and 1988-89 (http://www.diahome.org/en/About-DIA/History/Past-Presidents.aspx)
  Board of Directors, 1982-1990; Annual Meeting Chair, 1991, 1994
American College of Legal Medicine (Fellow, 1973-  )
  Board of Governors, 1983-1993 and 2011- (http://www.aclm.org/dirAbout/Board-Of-Governors.aspx)
  Treasurer, 1985-88 and 1990-91
Academy of Physicians in Clinical Research
  Immediate Past President, 2011-2012
  President, 2010-2011 (http://www.acrpnet.org/PDF/appi/appi_2010_leadership.pdf)
  President-Elect, 2009; Secretary-Treasurer, 2008-2009
  Board of Trustees, 1999-2003, 2008-2012; Vice President, AMA Relations, 1999-
  President, Washington-Baltimore Chapter, 1999-2003
American Academy of Family Physicians (Fellow, 1978-  ); Maryland Academy of Family Physicians
American Medical Association (Life Member)
  Delegate Representing Academy of Physicians in Clinical Research, AMA House of Delegates, 2002-
MedChi – The MD State Medical Society; Baltimore City Medical Society (Life Member)
  MedChi Delegate to U.S. Pharmacopeial Convention, 2008-

National Task Force on CME Provider/Industry Collaboration, 1992-
   Membership Committee Chairman 2002-2005; Annual Meeting Chairman, 2003
American Public Health Association
Johns Hopkins Medical and Surgical Association
Academy of Medicine of Washington, DC
Federal Bar Association (Chairman, Food and Drug Committee, 1976-79)
Delta Theta Phi Law Fraternity (Life Member)
American Bar Association; Maryland State Bar Association

Mathematical Association of America
Society for Industrial and Applied Mathematics (Life Member)

### PROFESSIONAL AWARDS AND RECOGNITION

Numerous from FDA
American Academy of Pharmaceutical Physicians President's Outstanding Service Award, 2003
American College of Legal Medicine President's Award, 1985, 86, 89, 91, 93; Gold Medal, 2003
(http://www.aclm.org/about/goldmedal.aspx)
Federal Bar Association Distinguished Service Award, 1977
Drug Information Association Outstanding Service Award, 1990
Phi Kappa Phi National Honorary Society (Life Member) (http://en.wikipedia.org/wiki/Phi_Kappa_Phi)
Listed in current editions of Who's Who in America, Who's Who in the World, Who's Who in American
   Law, Who's Who in the East, Who's Who in Finance and Industry, Who's Who in Medicine and Health
   Care, Who's Who in Science and Engineering, American Men and Women of Science, The Official
   ABMS Directory of Board Certified Medical Specialists
   (http://biography.marquiswhoswho.com/healthcare-executive/peter-rheinstein/3989512)

Program Chair, 6th World Health Conference, "The Ongoing Transformation of Healthcare: Empowering
Leadership for Change," April 15-16, 2004, The University of Chicago Pritzker School of Medicine
Member and Chair of Membership Committee, Clinical Global Advisory Board, EduNeering, Inc., 2003-05
Advisory Council, National Commission for Certification of CME Professionals, 2006-  (http://www.nc-
cme.org/content.aspx?dbid=16)
Chairman, American Board of Legal Medicine, 2011- ; Treasurer 2003-11 (www.ablminc.org/officers.htm)
Chairman, United States Adopted Names (USAN) Council, 2012- ; Member, 2006-  ; Review Board 04-05
(USAN establishes the generic names for all pharmaceutical products marketed in the US.  Details are at
http://www.ama-assn.org/GO/USAN and http://en.wikipedia.org/wiki/United_States_Adopted_Name)
Program Chair, FDLI/CBI Pharmaceutical Marketing Congress, 2005
Program Co-Chair, Pharmaceutical Executive Medical Education Congress, 2006

### EXPERIENCE IN PRIVATE MEDICAL PRACTICE AND ADMINISTRATION

Physician:  Part-time practice of family, emergency and geriatric medicine                1970-1993

Medical Director:  Maryland Manor Convalescent Center, Glen Burnie, MD             1975-1988
Medical Director:  CHC Corporation, Baltimore, MD                                                    1972-1976

   Supervised physicians and attended patients, developed medical policy for health care facilities.
   Met with federal, state and local officials on regulatory matters and to express views on pending
   legislation and regulations.  Problem solver throughout 2500 bed CHC chain

President:  Zimmerly, Rheinstein & Joson, P.A., Severna Park, MD                          1975-1976

   Organized corporation to provide medical coverage for hospital emergency rooms.  Recruited and
   supervised physicians.  Marketed program to hospital administrators and medical staffs.  Met with
   community leaders. (Sold interest in firm in 1976)

5

Physician and Instructor in Medicine:  U of Maryland School of Medicine, Baltimore, MD    1970-1973

Attended patients and supervised medical students and house staff in medical and adult cardiac clinics at University of Maryland Hospital.  Physician for students and staff.

## BOOKS, MONOGRAPHS AND BOOK CHAPTERS

Rheinstein, Peter H., M.D., J.D., M.S., Some Tips on FDA Etiquette I (Chapter in Pines, Wayne L. (Editor), "How to Work with the FDA, 2nd Ed," Food and Drug Law Institute, Washington, 2003)

Morris, Louis A., Rheinstein, Peter H., New Directions in Pharmaceutical Promotion:  Regulatory Concerns and Contrivances (Chapter in Cato, AE, Sutton, S, Cato III, AE (Editors), "Clinical Drug Trials and Tribulations," Marcel Dekker, Inc., New York, 2002)

Montauk, Susan Louisa, M.D., Rheinstein, Peter H., M.D., J.D., M.S., Appropriate Use of Common OTC Analgesics and Cough and Cold Medications, An *American Family Physician* Monograph, American Academy of Family Physicians, Leawood, KS, 2002 (http://www.fda.gov/ohrms/dockets/dailys/02/Aug02/082202/80022395.pdf)

Rheinstein, Peter H., M.D., J.D., M.S., Some Tips on FDA Etiquette I (Chapter in Pines, Wayne L. (Editor), "How to Work with the FDA," Food and Drug Law Institute, Washington, 2000)

Hoffman, Freddie Ann, M.D., Rheinstein, Peter H., M.D., J.D., M.S., Health Professionals and the Regulated Industry: The Laws and Regulations Enforced by the U.S. Food and Drug Administration (Chapter in American College of Legal Medicine, "Legal Medicine," Mosby, Inc., St. Louis, 4th ed. 1998, 5th ed. 2001, 6th ed. 2004, 7th ed., 2007)   (Dr. Rheinstein also chaired the ACLM Publications Committee during production of both the first and second editions of this book.)

Rheinstein, Peter H., A Regulatory Response to Adverse Drug Events, (Chapter in Escovitz, Alan, PhD, Pathak, Dev S., DBA, Schneider, MS, RPh (Editors), Error Prevention and Reducing Adverse Drug Events, Pharmaceutical Products Press, New York, 1998.)

Cowan, Dale H., M.D., J.D., Kantorowitz, Jo Ann, J.D., Moskowitz, Jay, Ph.D., Rheinstein, Peter H., M.D., J.D., M.S. (Editors), "Human Organ Transplantation: Societal, Medical-Legal, Regulatory and Reimbursement Issues," American Society of Law and Medicine, 1987.

Morris, Louis A., Rheinstein, Peter H., The Package Insert as a License to Market, (Chapter in Cato, Allen E. (Editor), Clinical Drug Trials and Tribulations, Marcel Dekker, Inc., New York, 1988.)

Jones, J.K. (Dr. Rheinstein served as special editorial advisor), "The Good Housekeeping Guide to Medicines and Drugs," Hearst, New York, 1977.

## EDITORIAL BOARDS

Pharmaceutical Development and Regulation (Adis), 2003-2006

Drug Information Journal (Drug Information Association), 1981-1992

## PUBLISHED ARTICLES

Koren, MJ, Koski G, Reed DP, Rheinstein PH, Silva H, Stonier P, Seltzer J.  APPI Physician Investigator Competence Statement. *The Monitor* 2011 Aug;25(4):79-82.

Rheinstein PH. A Year of "Profound Importance."  *The Monitor* 2010 Feb;24(1):73-74.

6

Rheinstein PH. The Clinical Investigator's Responsibility as a Teacher. *The Monitor* 2009 Sep;24(5):75-6).

Rheinstein PH.  Opening borders to foreign drugs is wrong prescription.  *Baltimore Business J.*  2003; July8; Reprinted as Opening up U.S. borders for prescription drugs unhealthy.  *Baltimore Business J.* 2003; Sep8; (See http://www.bizjournals.com/baltimore/stories/2003/09/08/editorial2.html?t=printable.)

Rheinstein PH.  Overview of the US Food and Drug Administration's reform legislation.  *Clin Ther.* 1998;20 Suppl C:C4-11.

Rheinstein PH, Tsai VW.  Keeping abreast of new drug approvals and labeling changes.  *Am Fam Physician.* 1998 Sep 15;58(4):995-8.

Rheinstein PH, Akbari B.  Significant FDA approvals in 1997.  *Am Fam Physician.*  1998 Jun;57(11):2865-8.

Rheinstein PH.  Prescription to over-the-counter drug switches.  *Am Fam Physician.*  1998 Sep 15;56(4):1211-4

Rheinstein PH.  Significant FDA approvals in 1996.  *Am Fam Physician.*  1997 Jun;55(8):2855-8

Rheinstein PH, McGinnis TJ, Nightingale SL.  Children and tobacco: the FDA's final rule.  *Am Fam Physician.*  1997 Mar;55(4):1441-4.

Rheinstein PH.  Seven tips for sun sense.  *Am Fam Physician.*  1996 Sep 15;54(4):1385-8.

Rheinstein PH,  McGinnis TJ.  Ways to Access FDA Information.  *Am Fam Physician.*  1996 Jul;54(1):353-8.

Rheinstein PH.  Significant FDA approvals in 1995.  *Am Fam Physician.*  1996 Apr;53(5):1871-4.

Rheinstein PH, McGinnis TJ, Nightingale SL.  The patient information and education initiative.  *Am Fam Physician.*  1995 Dec;52(8):2377-8, 2381-2.

Rheinstein PH, McGinnis TJ.  Children and tobacco: the Clinton administration proposal.  *Am Fam Physician.*  1995 Sep 15;52(4):1205-8.

Rheinstein PH, Thomas A.  Home test kits and monitors.  *Am Fam Physician.*  1995 Jul;52(1):293-6.

Rheinstein PH.  Significant FDA approvals in 1994.  *Am Fam Physician.*  1995 Mar;51(4):888-90.

Rheinstein PH.  Avoiding problems with liquid medications and dosing devices.  *Am Fam Physician.*  1994 Dec;50(8):1771-2.

Nightingale SL, Kimbrough CA, Rheinstein PH.  Access to investigational drugs for treatment purposes.  *Am Fam Physician.*  1994 Sep15;50(4):845-7.

Hoffman FA, Rheinstein PH, Houn F.  The Mammography Quality Standards Act of 1992.  *Am Fam Physician.*  1994 Jun;49(8):1965-70.

Rheinstein PH.  The generic drug approval process.  *Am Fam Physician.*  1993 Dec;48(8):1357-60.

Rheinstein PH.  MedWatch:  the FDA medical products reporting program.  *Am Fam Physician.*  1993 Sep 15:48(4):636-8.

Rheinstein PH, Klontz KC.  Shellfish-borne illnesses.  *Am Fam Physician.*  1993 Mar;47(4):1837-40.

Rheinstein PH.  Update of food labeling.  *Am Fam Physician*.  1993 Mar;47(4):979-82.

Rheinstein PH.  Healthy people 2000 initiative.  *Am Fam Physician*.  1992 Dec;46(6):1829-32.

Rheinstein PH.  Reporting of adverse drug events: a key to postmarketing drug safety.  *Am Fam Physician*.  1992 Sep;46(3):873-4.

Lazar EJ, Banks D, Graham C, Adams D, Rheinstein PH, Gross M, Witt AM.  Drug company sponsorship of education: the response to the FDA draft concept paper (letter).  *JAMA*.  1992 Jul 1;268(1):53-4.

Rheinstein PH, McGinnis TJ.  Medication Errors.  *Am Fam Physician*.  1992 Jun;45(6):2720-2.

Rheinstein PH, Bagley GP.  Food labeling reforms for 1992.  *Am Fam Physician*.  1992 Mar;45(3):1349-53.

Rheinstein PH, Hoffman FA.  Update on Breast Implants.  *Am Fam Physician*.  1991 Dec;44(6):2227-9.

Rheinstein PH.  The FDA as an information source for family physicians.  *Am Fam Physician*.  1991 Sep;44(3):1037-41.

Rheinstein PH.  Significant FDA approvals in 1990.  *Am Fam Physician*.  1991 Jun;43(6):2257-8.

Peck CC, Rheinstein PH.  FDA regulation of prescription drug advertising.  *JAMA*.  1990 Nov 14;264(18):2424-5.

Rheinstein PH.  Regulatory Status of pancreatic enzyme preparations.  *JAMA*.  1990 May 9;263(18):2491-2.

Rheinstein PH.  Therapeutic Inequivalence.  *Drug Saf*.  1990;5 suppl 1:114-9.

Faich GA, Morrison J, Dutra EV Jr, Hare DB, Rheinstein PH. Reassurance about generic drugs? *N Engl J Med*.  1987 Jun 4;316(23):1473-5.

Rheinstein PH, Mazis MB.  Regulation of O-T-C drug advertising: the FDA "prescription".  *J Am Pharm Assoc*.  1976 Sep;16(9):505-6, 524.

Rheinstein PH.  Drug Labeling as a standard for medical care.  *J Leg Med* (NY).  1976 Jan;4(1):22-4.

**Presentations and references are available on request.**

## SOCIAL MEMBERSHIPS

Intercultural Friends Foundation (Foreign Student Exchange Program) (Vice-President, 1998-  )
Michigan State University (MSU) Alumni Assn. (Life Member) (President's Club)
  MSU Honors College Alumni Assn. (Member, Executive Committee, 1998-2001, President, 2000-2001)
Federal Executive Institute Alumni Assn. (Life Member)
Johns Hopkins University Alumni Assn. (Life Member)
National Association of Retired Federal Employees (Life Member)
University of Maryland Alumni Assn. (Life Member)
Annapolis Yacht Club
Chartwell Golf and Country Club
The Johns Hopkins Club
Mensa (Life Member)
U.S. Power Squadrons

8

**PERSONAL**

Born:  Cleveland, Ohio, September 7, 1943
Married:  Miriam Ruth Weissman; February 22, 1969; President, Intercultural Friends Foundation, Severna
  Park, MD
Child:  Jason Edward Rheinstein; born June 29, 1978; Attorney
Hobbies:  Physical Fitness, Boating

### EXPERT REPORT AND DISCLOSURE OF PETER H. RHEINSTEIN

**Securities and Exchange Commission,**

**v.**

**Stephen D. Ferrone, Douglas A. McClain, Jr., Douglas A. McClain, Sr., James T. Miceli, Immunosyn Corporation, Argyll Biotechnologies, LLC, Argyll Equities, LLC, and Padmore Holdings, Ltd.**

**Civil Action No:  11-CV-05223**

**Submitted December 5, 2013**
**Pursuant to**
**Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure**

## EXHIBIT B – MATERIALS REVIEWED IN THE PREPARATION OF THIS REPORT

Complaint

      SEC v. Stephen D. Ferrone et al.      August 1, 2011

Deposition Transcripts with Exhibits Cited Therein

| | |
|---|---|
| Karen M. Becker, Ph.D. | August 16, 2013 |
| Robert B. Fougner, J.D. | May 7, 2013 |
| Douglas A. McClain (Sr.) | August 27, 2013 |
| Carlton F. Hazlewood, Ph.D. | October 7, 2013 |
| Peter B. Kanter, D.V.M. | January 17, 2013 |
| Todd J. Ollendorf | July 9, 2013 |
| Stephen D. Ferrone, J.D. | September 19, 2013 |
| Kenneth O. Willeford, Ph.D. | January 28, 2013 |

Gregory S. Witz, C.P.A.                    May 7, 2013


Transcripts of Testimony with Exhibits Cited Therein

    Arthur D. Ericsson, M.D.              December 10, 2009

    Stephen D. Ferrone, J.D.             September 17, 2009

    Peter M. Kanter, D.V.M,              December 8, 2009

    Douglas A. McClain (Jr.)             September 18, 2009

    Douglas A. McClain (Sr.)             December 2, 2009

    Mitchell J. Melling, M.D.            November 18, 2009

    James T. Miceli                      December 9, 2009

    Alan R. Osmond                       November 18, 2009

    Robert H. Potter                     December 17, 2009

    Kenneth O. Willeford, Ph.D.          December 3, 2009


Other

    Pulmo-Clear Package Insert           Downloaded August 1, 2013
                                         http://www.professionalbiological.com/

    FDA Warning Letter to BRI-IRB        October 5, 2009

    Websites Identified by URL within the Report