UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | ) | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 11-cv-5223 |
| v. | ) ) ) | HON. JEFFREY T. GILBERT |
| **STEPHEN D. FERRONE, ET AL.,** | ) ) | |
| Defendants. | ) ) ) | |

**SEC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
*DAUBERT* MOTION TO RESTRICT TESTIMONY OF DR. PETER RHEINSTEIN**

Eric M. Phillips
Alyssa A. Qualls
Tracy W. Lo
United States Securities and
 Exchange Commission
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604-2615
Telephone: (312) 353-7390
Fax: (312) 353-7398

*Attorneys for Plaintiff United States
Securities and Exchange Commission*

Plaintiff, the United States Securities and Exchange Commission ("SEC"), respectfully submits this Memorandum of Law in Opposition to Defendant's *Daubert* Motion to Restrict Testimony of Dr. Peter Rheinstein.

## PRELIMINARY STATEMENT

Defendant Stephen D. Ferrone's motion to exclude the opinion of Dr. Rheinstein is based upon a misunderstanding of the requirements of Rules 702 and 704 of the Federal Rules of Evidence concerning the purpose of admitting expert testimony. Ferrone seeks to prevent an expert with 25 years of experience working for the U.S. Food and Drug Administration from testifying about the FDA regulatory approval process. The jury is entitled to the benefit of Dr. Rheinstein's expertise and experience at the FDA to assist it in understanding the regulatory approval process and the related disclosures in this case. As courts have recognized, "[a] lay jury cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry." *In re Fosomax Prods. Liab. Litig*, 645 F. Supp. 2d 164, 191 (S.D.N.Y. 2009). Moreover, contrary to Ferrone's argument, Dr. Rheinstein does not voice any legal opinions that usurp the role of either the Court or the jury. Rather, consistent with Rule 704, Dr. Rheinstein provides factual conclusions, not ultimate legal conclusions, that will be helpful to the jury to understand the evidence and determine the facts at issue in this case.

## BACKGROUND

Ferrone was the President and CEO of Immunosyn Corporation ("Immunosyn"), a now defunct public biopharmaceutical company whose sole business was to market and sell a drug called "SF-1019." The SEC alleges that Ferrone made, or aided and abetted the making of, various misstatements and omissions in: (1) Immunosyn's periodic reports on Forms 10-Q and 10-K, which Ferrone signed and certified; (2) Immunosyn's press releases that Ferrone reviewed,

approved, or was quoted in; and (3) a video presentation posted on Immunosyn's website and the transcript of that presentation filed as an attachment to a Form 8-K. The SEC contends that these statements were materially misleading because they omitted to state that Argyll Biotechnologies, LLC ("Argyll Biotech"), Immunosyn's controlling shareholder, had submitted Investigational New Drug ("IND") applications and that the FDA had responded by issuing "clinical holds," which immediately halted clinical trials from going forward.

Specifically, by way of example, Immunosyn's Form 10-K for its fiscal year 2007 misleadingly stated that Argyll Biotech "anticipates that it will commence clinical trials and prepare and submit all filings required for such clinical trials," when, in fact, Argyll Biotech already had filed an IND application with the FDA to commence clinical trials, and the FDA had responded with a clinical hold. Likewise, Immunosyn's 2007 Form 10-K described the U.S. regulatory approval process, including the possibility that Argyll Biotech could submit an IND and the FDA could respond with a clinical hold, but omitted to state that these events already had occurred. Similarly, in a press release dated November 6, 2007 that Ferrone reviewed and approved, Immunosyn misleadingly stated that Argyll Biotech "is responding to a request from the FDA for additional information in support of an Investigational New Drug (IND) Application for SF-1019," but omitted to state that the FDA had already issued a full clinical hold pending receipt and approval of such additional information.

Then, in a video presentation posted on Immunosyn's website, Ferrone misleadingly stated that "[a]pplications are underway for clinical trial approval for SF-1019" and that Immunosyn was engaged in activities relating to "SF-1019 and its pending approval in appropriate jurisdictions" while omitting to state that Argyll Biotech had applied to the FDA for clinical trial approval, and the FDA had issued a clinical hold. In that same video presentation,

2

Ferrone's colleague, Douglas McClain Sr., also falsely stated that "[c]ompassionate use waivers have already been issued by the Institutional review board of the FDA in Houston, Texas for the use of SF-1019." In fact, no such waivers or any approvals were ever issued by the FDA for SF-1019. To the contrary, the FDA had issued clinical holds in response to all INDs. Ferrone reviewed and approved the video presentation before it was posted on Immunosyn's website, and he reviewed and approved the presentation transcript before it was filed with the SEC.

On December 5, 2013, the SEC served Ferrone with the expert report of Dr. Peter Rheinstein, a physician and expert in the regulation of prescription drug development and markerting. (Def. Mot., Ex. 1, Rheinstein Report)[1] In his report, Dr. Rheinstein explains that he spent 25 years in senior positions at the FDA, including in the Division of Drug Advertising (and its subsequent iterations), the Office of Drugs within the National Center for Drugs and Biologics, and the Office of Drug Standards, among other departments and/or divisions. (*Id.* at 1-2.) For the last nine years of his career at the FDA, Dr. Rheinstein was the Director of Medicine Staff in the Office of the Commissioner and had the responsibility of serving as the chairman of the FDA's own Institutional Review Board and "the presiding officer at hearings initiated by agency compliance personnel seeking to disqualify clinical investigators accused of violating Investigational New Drug (IND) application regulations." (*Id.* at 2.)

In his report, Dr. Rheinstein provided an overview of the FDA and its programs relevant to the development of new drugs (*id.* at 5-6); FDA's structure and role in drug regulation (*id.* at 6-8); the approval process for new drugs (*id*. at 8-10); the purpose and role of Institutional Review Boards (*id.* at 10-11); the clinical trial process (*id.* at 11-12); orphan drug designation (*id.* at 13); access to investigational drugs for treatment use (*id.* at 13-14); and availability of information to help speed product innovation (*id.* at 14-16). Then, based on his review of

---

[1] "Def. Mot. at __," refers to Defendant's *Daubert* Motion to Restrict Testimony of Dr. Peter Rheinstein.

documents and deposition testimony, Dr. Rheinstein constructed a regulatory status timeline for SF-1019, contrasting information available to the IND applicants and information available to the public. (*Id.* at 16-28.) Based upon this review and analysis, Dr. Rheinstein concluded that:

(1) Information regarding the regulatory requirements for SF-1019 was readily available from the FDA's website and from additional sources (*id.* ¶ 102);

(2) Argyll Biotech submitted an IND Application for a Phase 3 clinical study and assisted a physician IND Application for a Phase 2 clinical study even though these applications had no chance of approval (*id.* ¶ 103);

(3) It would have taken several years for Argyll Biotech or Immunosyn to accumulate the information needed to resolve SF-1019's clinical hold deficiencies before any clinical studies could be initiated (*id.* ¶¶ 69, 85-86, 105);

(4) Argyll Biotech had confirmation that its product was insufficiently characterized and that new pharmacology and toxicology studies would need to be performed before even a clinical trial could be initiated (*id.* ¶ 106);

(5) Argyll Biotech and Immunosyn knew that data from completed clinical trials is a prerequisite to submitting a marketing application for SF-1019 (*id.* ¶ 107); and

(6) Argyll Biotech and Immunosyn continued to announce that clinical trials and revenues were imminent, when they knew that the initiation of clinical trials and the marketing of SF-1019 would have taken years (*id.* ¶ 108).[2]

Ferrone declined to examine Dr. Rheinstein at a deposition. Ferrone now moves to "severely restrict, if not entirely exclude," Dr. Rheinstein's testimony on the grounds that his opinions will not assist the jury, are irrelevant to the securities fraud charges against Ferrone, and/or are inadmissible legal conclusions. (Def. Mot. at 1.) Ferrone does not challenge Dr. Rheinstein's qualifications or the reliability of his methodology.

## ARGUMENT

**I.      The Standard For Admission Of Expert Opinions**

Rule 702 of the Federal Rules of Evidence expressly incorporates the requirements for

---

[2] Dr. Rheinstein will not offer the opinion at trial that Argyll and Immunosyn failed to disclose that the FDA had placed the IND Applications on full clinical hold. (Rheinstein Report ¶ 104.)

4

admission of expert testimony established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under Rule 702, expert testimony is admissible if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 "specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000). "While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004). Expert witnesses must "testify to something more than what is 'obvious to a layperson' in order to be of any particular assistance to the jury." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998)).

Resolution of the correctness of an expert's opinion is an issue of fact left to the jury's determination. *Smith*, 215 F.3d at 718. The trial court's role is "limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Id.* The ultimate conclusion as to the admissibility is committed to the discretion of the trial court. *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009).

## II.     Dr. Rheinstein's Opinions Would Be Helpful To The Jury.

### A.     Dr. Rheinstein Will Provide Helpful Background Information Concerning The FDA Regulatory Approval Process.

The "touchstone" for admission of an expert opinion under Rule 702 "is helpfulness to the trier of fact." *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991). Expert

testimony is admissible "if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262 (citing Fed. R. Evid. 702). It is well settled that expert testimony concerning standard practices in an industry is admissible when it is relevant and the expert has demonstrated a basis for the opinion. *See Frazier*, 387 F.3d at 1298 n.17; *Martin ex. rel. Heckman v. Midwest Exp. Holdings, Inc.*, 555 F.3d 806, 811 (9th Cir. 2009) (expert testimony may be the basis to establish standard industry practice); *see also Weinstein's Federal Evidence* § 704.04[2][a] (2d ed. 2003) ("[E]xpert testimony may be helpful if the case involves a specialized industry."). Moreover, "in complex cases . . . expert testimony may help a jury understand unfamiliar terms and concepts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d. Cir. 1991). This is particularly true where complex regulatory regimes are involved. *See United States v. Davis*, 471 F.3d 783, 789 (7th Cir. 2006) ("We have held before, and hold today, that experts are allowed to testify about how they enforce regulations, whether transactions comply with regulations, and how they ensure that the public knows about regulations," provided "the testimony does not incorrectly state the law or opine on certain ultimate legal issues in the case."); *United States v. Owens*, 301 F.3d 521, 526-27 (7th Cir. 2002) (allowing expert testimony that appraisal reports did not comply with regulations and appeared to be fraudulent).

In products liability cases concerning pharmaceuticals, courts have held that expert testimony assists the trier of fact in understanding the FDA regulatory regime. Simply put, "[a] lay jury cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry." *In re Fosomax Prods. Liab. Litig*, 645 F. Supp. 2d 164, 191 (S.D.N.Y. 2009). Courts, therefore, have repeatedly allowed FDA expert witnesses to testify regarding their understanding of the rules and regulations governing the industry. *See, e.g., Baldonado v. Wyeth*, No. 04 C 4312, 2012 WL 3234240, at *7 (N.D. Ill. Aug. 6, 2012);

6

*Fosomax*, 645 F. Supp. 2d at 191; *In re Actos Prods. Liab. Litig.*, No. 12-cv-64, 2014 WL 120973, at *12-13 (W.D. La. Jan. 10, 2014); *In re Yasmin and Yaz Prods. Liab. Litig*, No. 3:09-md-02100, 2011 WL 6302287, at *12, *17-18 (N.D. Ill. Dec. 16, 2011); *Georges v. Novartis Pharmaceutical Litig.*, No. CV 06-5207, 2012 WL 9064768, *9-10, (C.D. Cal. Nov. 2, 2012).

Based upon his 25 years of experience at the FDA, it is beyond dispute that Dr. Rheinstein is qualified to testify concerning the FDA regulatory approval process. He is clearly qualified to explain terms used in the industry that are not necessarily within the "ken" of the average juror. Moreover, he can provide the jury a context with which to evaluate Ferrone's conduct by explaining the history of FDA regulation (Rheinstein Report §§ IV-V); how the drug approval process works, including the meaning of a "clinical hold" (*id.* § VI); the purpose and role of Institutional Review Boards (*id.* § VII); the clinical trial process (*id.* § VIII); orphan drug designations and compassionate use waivers (*id.* §§ IX-X); and the availability of FDA information to the public (*id.* § XI).

Contrary to Ferrone's assertions (Fed. Mot. at 8-11), each of these topics is relevant to the issues in the case and will assist the trier of fact. Brief testimony about FDA history and its regulations will provide the jurors, many of whom may have no prior experience with drug regulations, with important background to assist them in evaluating the allegations against Ferrone. Dr. Rheinstein's testimony about the drug approval process will be equally helpful. To the extent Dr. Rheinstein refers to statistics about the number of IND applications placed on clinical hold, that information will provide necessary context to the jurors about the regularity of clinical holds. These statistics are set forth on the FDA's website and Ferrone has not provided any basis to suggest that they are not reliable. (Def. Mot. at 9.)

Ferrone next takes issue with Dr. Rheinstein's testimony regarding the regulatory steps

7

involved in the drug development process after approval of an IND application, arguing that such information is irrelevant. (Def. Mot. at 10.) Ferrone once again misses the mark. In Immunosyn's 2007 Form 10-K, it misleadingly stated that Argyll Biotech "anticipates that it will commence clinical trials and prepare and submit all filings required for such clinical trials." Similarly, in the video presentation posted on Immunosyn's website, Ferrone misleadingly stated that "[a]pplications are underway for clinical trial approval for SF- 1019." In order to evaluate the misleading nature of these statements, the jury will need information about the regulatory steps involved to understand just how far away Immunosyn was from commencing any clinical trials. As Dr. Rheinstein explains, the 2006 IND Application was to use SF-1019 in a ***Phase 3 clinical trial***. (Rheinstein Report ¶ 63.) Before a Phase 3 clinical trial may commence, an applicant must submit, and receive approval for, separate IND applications for Phase 1 and 2 clinical trials. (*Id.* ¶ 37.) Only by understanding the overall process for each of the three phases will the jury be able to evaluate the accuracy of these statements.

Finally, Ferrone claims that Dr. Rheinstein's testimony regarding the availability of public information about the FDA regulatory process and his conclusion that such information was readily available from the FDA website and additional sources (Rheinstein Report § XI & ¶ 102) is irrelevant and should be excluded. (Def. Mot. at 11, 14.) This information is highly relevant to Ferrone's state of mind and the reasonableness of his conduct. For example, at his deposition, Ferrone stated that he did not do anything to educate himself independently on the FDA regulatory approval process, he did not recall ever asking to see the 2006 IND Application, he did not recall whether he was even aware that the FDA had responded to the application in writing, and that he relied entirely on oral information from James Miceli. (Ex. 1, Ferrone Dep. Tr. at 75:3-79:19.) The existence of readily available information on the FDA's own website

8

about the regulatory approval process is highly relevant to the reasonableness of the decision by Ferrone, the President and CEO of Immunosyn, to rely exclusively on James Miceli regarding the regulatory approval status of Immunosyn's sole product.

> **B.     Dr. Rheinstein's Regulatory Status Timeline Of Events And Conclusions Are Relevant And Will Assist The Jury.**

In his report, Dr. Rheinstein reviewed certain exhibits in the case and developed a timeline of events about SF-1019's regulatory approval process. (Rheinstein Report § XII.) This analysis of events forms the basis of Dr. Rheinstein's ultimate conclusions (*id.* ¶¶ 102-08) and is necessary to provide proper context to the jury about key exhibits, which will be admitted into evidence through various fact witnesses. It is beyond dispute that Dr. Rheinstein has more than sufficient qualifications and experience to assist the jury in understanding the 2006 and 2008 IND Applications and the FDA's responses, and Ferrone does not suggest otherwise. (Def. Mot. at 11-14.) Similarly, Dr. Rheinstein's expertise will assist the jury in evaluating the misstatement and omissions in Immunosyn's public filings and press releases.

Moreover, these opinions and conclusions are relevant to the issue of materiality. By elucidating the FDA approval process, Dr. Rheinstein will assist the jury in determining whether a reasonable investor would have considered the statements made by Ferrone, or reviewed and approved by him, important in the total mix of information made available. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Indeed, the Honorable Elaine E. Bucklo has relied upon Dr. Rheinstein's conclusions in determining that Ferrone's co-defendants violated the securities laws based on false or misleading statements about the FDA clinical trial process that are very similar to the statements and omissions at issue here. *SEC v. Ferrone*, No. 11 C 5223, 2014 WL 5152367, at *1-2, 5-7 (N.D. Ill. Oct. 10, 2014).

Ferrone would have this Court believe that Dr. Rheinstein's testimony will only

summarize the contents of documents in some sort of "rhetorical exercise." (Def. Mot. at 11.) Nothing could the further from the truth. Dr. Rheinstein carefully evaluated each of Immunosyn's public filings and press releases and provided necessary context for and evaluation of the accuracy of those statements. For example, Dr. Rheinstein analyzed Immunosyn's Form 8-K filed on October 25, 2007, which attaches a materials from presentation given jointly by Ferrone and Argyll Biotech's Chief Scientific Officer Douglas McClain Dr. that states that "[c]ompassionate use waivers have already been issued by the Institutional review board of the FDA in Houston, Texas for the use of SF-1019." (Rheinstein Report ¶¶ 71-72.) Based upon his expertise and experience at the FDA (including several years as the Chairman of the FDA Institutional Review Board), Dr. Rheinstein opines that the presentation materials misleadingly conflate FDA approval of an IND application with the additional requirement that an Institutional Review Board in Washington, DC approve a clinical study before it may be carried out. (*Id.* ¶ 73.) It is just this type of analysis that will assist the jury in understanding the context of Immunosyn's public filings and press releases.

Similarly, Dr. Rheinstein's conclusion that (a) the 2006 and 2008 IND Applications had no chance of approval; (b) it would have taken several years to resolve the clinical hold deficiencies cited by the FDA before even initiating clinical trials or applying for approval to market SF-1019; (c) Argyll Biotech had confirmation from its own advisors that it would need to perform numerous steps before even a Phase 1 clinical trial could be initiated; and (d) data from completed clinical trials is a prerequisite to submitting an application for the marketing of SF-1019 (Rheinstein Report ¶¶ 69, 85-86, 103, 105-08), is highly relevant and will assist the jury in evaluating the materiality of Ferrone and Immunosyn's failure to disclose the clinical holds. (Def. Mot. at 12, 14.) Dr. Rheinstein concluded that because neither Argyll Biotech nor

10

Immunosyn was the manufacturer of the product, they would be entirely dependent on their suppliers to produce information about the composition of SF-1019 to the FDA in the form of Drug Master Files. He further opined that Argyll Biotech would then need to develop a drug potency assay, manufacture several batches of the drug product and test them for stability and immunogenicity, carry out the required pharmacology and toxicology studies on two different species of animals for a period of time at least as long as that proposed for humans, autopsy the test animals and assess the effects of the drug and then resubmit the IND Application before even a Phase 1 clinical trial could be carried out. (Rheinstein Report ¶¶ 69, 85-86.) All told, Dr. Rheinstein concluded that in his expert opinion based upon 25 years at the FDA it would have taken several years to complete these requisite steps before a Phase 1 clinical trial could be initiated or Immunosyn could market SF-1019. (*Id.* ¶¶ 69, 85-86, 103, 105-08.)

Contrary to Ferrone's assertions (Def. Mot. at 12), this type of detailed analysis is hardly "off the cuff" or "untestable say-so" that is routinely excluded as being of no help to the jury.[3] Indeed, courts routinely permit experts to construe regulations and opine on efforts to comply with regulations, provided the testimony does not incorrectly state the law or opine on certain ultimate legal issues in the case. *Davis*, 471 F.3d at 789; *Baldonado*, 2012 WL 3234240, at *7; *Fosomax*, 645 F. Supp. 2d at 191; *Actos*, 2014 WL 120973, at *12-13; *Yasmin and Yaz*, 2011 WL 6302287, at *12, *17-18; *Georges*, 2012 WL 9064768, *9-10. Moreover, Dr. Rheinstein's testimony concerning the state of Argyll Biotech's knowledge is clearly relevant to the claims

---

[3] The cases cited by Ferrone do not offer any support for this proposition. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887 (7th Cir. 2011) (affirming exclusion of mechanical engineer testimony as "off the cuff" who concluded that a caster stem broke because it was screwed in "too tightly" and whose methodology consisted of a Google search); *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) (affirming exclusion of expert testimony as "subjective impressions" where doctor deviated from his own stated description of analysis and differential etiology in general); *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 421 (7th Cir. 2005) (affirming exclusion of English professor testimony as "untestable say-so" where expert opined that letters were "confusing" without articulating manner or method by which he made that determination).

against Ferrone and will assist the trier of fact. (Def. Mot. at 14.) Argyll Biotech was Immunosyn's controlling shareholder and Ferrone admitted (Ex. 1, Ferrone Dep. Tr. At 76:17-19) that he obtained nearly all of his information about the regulatory approval status of SF-1019 from James Miceli, Argyll Biotech's CEO. Therefore, in assessing the reasonableness of Ferrone's conduct, it will assist the jury to understand the scope of Argyll Biotech's knowledge as to the FDA's responses to the IND Applications.

Finally, Dr. Rheinstein's analysis of the qualifications of Dr. Arthur Ericsson, one of the doctors listed as a proposed investigator in the 2006 IND Application, and his disqualification by the FDA in 2009 is hardly irrelevant, as Ferrone claims (Def. Mot. at 13). Dr. Ericsson was disqualified by the FDA at a time when Immunosyn was still promoting the possibility of SF-1019 clinical trials in SEC filings and press releases. This fact is relevant to misstatements and omissions alleged here since it is yet another factor making it less likely that Argyll Biotech could ever resolve its clinical hold deficiencies in the near future.

### III. Dr. Rheinstein's Report Does Not Contain Inadmissible Legal Opinions.

Rule 704 of the Federal Rules of Evidence provides, in pertinent part: "(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise inadmissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Rule 704 provides an expert with wide latitude to voice an opinion even if it "embraces" an ultimate issue to be determined by the jury. One universally recognized limitation to this rule is that an expert cannot "offer opinions about legal issues that will determine the outcome of a case." *United States v. Sinclair*, 74 F.3d 753, 757-58 n.1 (7th Cir. 1996) (collecting cases); *see also* Fed. R. Evid. 704, 1972 Advisory Committee Notes (explaining that rule change "afford[s] ample assurances against the admission of opinions which

would merely tell the jury what result to reach").

However, where expert testimony concerns applicable regulations, the Seventh Circuit has held "that experts are allowed to testify about how they enforce regulations, whether transactions comply with regulations, and how they ensure that the public knows about regulations." *Davis*, 471 F.3d at 789; *see also Baldonado*, 2012 WL 3234240, at \*7 (denying motion to exclude FDA expert testimony regarding industry practice and custom, FDA regulations, and standard of care in pharmaceutical industry); *Yasmin and Yaz*, 2011 WL 6302287, at \*12, \*17-18 (denying motion to exclude FDA expert testimony regarding FDA regulations, requirements, and procedures and reasonableness of defendant's conduct in light of expert's experience and understanding of such regulations).

The cases cited by Ferrone (Def. Mot. at 7-8) are readily distinguishable. In *Bammerlin v. Navistar Intern. Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994), the court held that the meaning of federal regulations regarding seatbelt safety standards was "not a question of fact, to be resolved by the jury after a battle of experts." There, in a defective design case, Plaintiff offered the testimony of experts as to whether the seatbelt was defectively designed because it did not comply with federal safety standards. The plaintiffs' experts admitted at trial that they, unlike the defendant's experts, "were unfamiliar with the legal interpretation of the safety standards and that their test protocols did not conform to those specified by the National Highway Transportation Safety Administration." *Id.* at 901. The district court allowed the "battle" of the parties' experts to go to the jury and the Seventh Circuit reversed, holding that "the meaning of federal regulations is a question of law to be resolved by the court." *Id.* at 900. Here, there is no battle of the experts. Indeed, Ferrone has not challenged Dr. Rheinstein's interpretation of FDA regulations. Rather, Ferrone simply argues that any recitation of

13

regulatory requirements is a question of law for the Court to address through jury instructions. (Def. Mot. at 9.) This is not the law of the Seventh Circuit. *Davis*, 471 F.3d at 789.

Ferrone's remaining cases (Def. Mot. at 7-8) are likewise distinguishable. *See RLJCS Enterprises, Inc. v. Professional Ben. Trust*, 487 F3d 494, 498 (7th Cir. 2007) (affirming exclusion of expert accountant and attorneys' testimony where plaintiffs missed expert discovery deadline and testimony concerned the legal meaning of certain contract terms); *Roundy's Inv. v. NLRB*, 674 F.3d 638, 648 (7th Cir. 2012) (holding no abuse of ALJ's discretion in excluding attorney expert testimony on "ultimate legal opinion" regarding Wisconsin real property law on easements); *Haager v. Chicago Rail Link, LLC*, 232 F.R.D. 289, 294 (N.D. Ill. 2005) (pre *Davis*, excluding, in part, expert testimony of attorney/locomotive engineer on meaning of federal regulations); *Pivot Point Intern., Inc. v. Charlene Prods., Inc.*, 932 F. Supp. 220, 225 (N.D. Ill. 1996) (in copyright infringement action, affirming magistrate judge's exclusion of testimony by Harvard law professor expert as to the copyright process in general and whether certain mannequin heads were copyrightable); *United States v. Cinergy Corp.*, No. 99-cv-1693, 2009 WL 77680, *1 (S.D. Ind. Jan. 9, 2009) (in Clean Air Act enforcement proceeding, excluding portions of defendant expert's testimony concerning the purpose of the New Source Review and other Clean Air Act provisions as improper legal opinion where expert was not involved in passage of provisions and was unsure whether he had read relevant statutory provisions).

Contrary to Ferrone's argument (Def. Mot. at 7-8, 9-10, 12-13), Dr. Rheinstein's opinions do not contain impermissible legal conclusions that usurp the role of the Court or the jury in this case. Dr. Rheinstein opines on the regulatory approval process by explaining the relevant FDA regulations for IND applications, Institutional Review Boards, orphan drug designations, and compassionate use waivers and the various public policies underlying those regulations.

(Rheinstein Report §§ VI, VII, IX, X.) Dr. Rheinstein also offers the opinions that (a) certain statements in one of Immunosyn's press releases would have violated an FDA regulation because they constitute statements promoting an unapproved drug (Rheinstein Report ¶¶ 78-79); (b) an investigator must be qualified by training and experience to conduct the study before the FDA will approve an IND application (*id.* ¶ 82); and (c) Immunosyn and/or Ferrone should have known certain things about the FDA regulatory requirements or should have acted in a certain way in response to FDA actions (*id.* ¶¶ 92-93, 106-08). These opinions do not concern the ultimate legal issue in this case—whether Ferrone violated the *federal securities laws* by knowingly or recklessly participating in a fraudulent scheme to defraud or making untrue statements of material fact or omitted material facts regarding the regulatory approval status of SF-1019. *See Davis*, 471 F.3d at 789 (affirming admission of expert testimony regarding state Medicaid reimbursement rules because it did not opine on ultimate legal issues in case); *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006) (admission of expert testimony regarding Department of Transportation regulations did not determine outcome of case and was not plain error); *Owens*, 301 F.3d at 526-27 (affirming admission of expert testimony that appraisal reports did not comply with regulations and appeared to be fraudulent).

Rather, Dr. Rheinstein provides his opinion concerning the FDA regulatory approval process, the standards and practices in the industry, and the factual significance of Ferrone and Immunosyn's public statements that their failure to disclose certain undisputed facts. These are not legal opinions. They are factual conclusions reached by Dr. Rheinstein as a result of his analysis of the 2006 and 2008 IND Applications, the FDA's responses, and Argyll Biotech, Immunosyn, and Ferrone's conduct thereafter. In other words, Dr. Rheinstein provides an opinion that would assist the jury in measuring Ferrone and Immunosyn's conduct.

15

## **CONCLUSION**

For all the foregoing reasons, the SEC respectfully requests that the Court deny Defendant's *Daubert* Motion to Restrict Testimony of Dr. Peter Rheinstein.

Dated: June 4, 2015Respectfully Submitted,

**U.S. SECURITIES AND EXCHANGE COMMISSION**

*/s/ Alyssa A. Qualls*
Eric M. Phillips (IL Bar # 6237871)
Alyssa A. Qualls (IL Bar # 6292124
Tracy W. Lo (IL Bar # 6270173)
175 W. Jackson Blvd., Suite 900
Chicago, IL  60604-2615
Telephone:  (312) 353-7390
Fax:  (312) 353-7398
phillipse@sec.gov
quallsa@sec.gov
lot@sec.gov
*Attorneys for Plaintiff*
*U.S. Securities and Exchange Commission*