1
2
3

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

4  SECURITIES AND EXCHANGE      )
   COMMISSION,                  )
5                               )        Docket No. 11 C 5223
                Plaintiff,      )
6                               )
                                )
7           vs.                 )
                                )
   STEPHEN D. FERRONE,          )        Chicago, Illinois
8                               )        April 28, 2016
                Defendant.      )        9:14 a.m.
9

10                          Volume 8A
              TRANSCRIPT OF PROCEEDINGS - Trial
11     BEFORE THE HONORABLE JEFFREY T. GILBERT, and a jury

12
   APPEARANCES:
13

14  For the Plaintiff:      U.S. SECURITIES AND EXCHANGE COMMISSION
                            BY:  MR. ERIC M. PHILLIPS
15                               MS. CHRISTINE S. BAUTISTA
                                 MS. TRACY W. LO
16                          175 West Jackson Boulevard, Suite 900
                            Chicago, Illinois  60604
17

18  For the Defendant:      STETLER DUFFY & ROTERT, LTD.
                            BY:  MR. MARK L. ROTERT
19                               MR. COREY B. RUBENSTEIN
                            10 South LaSalle Street, Suite 2800
20                          Chicago, Illinois  60603

21

22

23  Court Reporter:         FRANCES WARD, CSR, RPR, RMR, FCRR
                            Official Court Reporter
24                          219 S. Dearborn Street, Suite 2144A
                            Chicago, Illinois  60604
25                          (312) 435-5561
                            frances_ward@ilnd.uscourts.gov

1    THE COURT:  Is everybody ready to talk a little

2    bit?

3    MS. LO:  Yes.

4    THE COURT:  I would like to go on the record.  I

5    want -- good morning everybody, first of all.

6    MS. BAUTISTA:  Good morning.

7    THE COURT:  I wanted to follow-up on some things

8    that we discussed at last night's jury instruction

9    conference, which unfortunately went late.  I mean, that's

10   why I hate to do this at the end -- I hated when I was a

11   trial lawyer, to do it right before this.  I hate it as a

12   judge.  And I think we all tried our hardest to get those

13   instructions done before, but I know we are all deadline

14   junkies, too, myself included.  But I just -- I don't like

15   running late on the day before you are going to do closings.

16   But I have had an opportunity to think about some

17   things more, to read the cases that the SEC cited to me on

18   certain things, and I want, on the record, to say something

19   so it's very clear for any review that may happen here, the

20   reason for some rulings.  All right?

21   First of all, we talked last night, and the SEC had

22   said that they wanted to comment on the failure of

23   Mr. Ferrone to bring in lawyer witnesses.

24   I don't know if Mr. Ferrone still intends to do

25   that or not.  I sent an e-mail last night saying that if the

1    SEC did want to do that, I would want to know what those

2    lawyers could have said if they were brought in and whether I

3    would have allowed it.  Okay?  I don't know if you are

4    prepared to address that or not.

5                 MR. PHILLIPS:  I am, your Honor.

6                 So, I mean, there is -- first of all, let me say at

7    the outset, I think we all appreciate the thoughtful way that

8    you have approached these type of issues.  We know they are

9    not easy.  So I think everybody in the room appreciates all

10   the effort you have put into it.  Obviously nobody is

11   completely happy, but that's the way these things work.

12                First of all, on this issue -- and I have a lot I

13   could say, but I will try to keep it short.

14                First of all, I am not planning on saying anything

15   in my affirmative opening about the failure of the defense to

16   call any witnesses, including lawyers.  I will save that

17   possibility for the rebuttal.

18                And so I will -- whatever I say in the rebuttal

19   will basically match what Mr. Rotert says in his

20   presentation.

21                So my view is that you have let in this evidence

22   about review by lawyers as evidence of Mr. Ferrone's state of

23   mind, and it's evidence of the process that he says that he

24   relied on or was aware of and that that impacts his state of

25   mind.  And we have had testimony from at least two live

1　witnesses on that subject, Mr. Ollendorff and Mr. Ferrone.

2　And Mr. Ollendorff, you know, was allowed to testify about

3　that process even when it was in reference to e-mails that

4　Mr. Ferrone wasn't on.

5　　　　So from my point of view, a lawyer is just like

6　anybody else in that process. Just like Mr. Ferrone or

7　Mr. Ollendorff, they could provide relevant testimony about

8　that process just like the witnesses that have testified live

9　have done and that the defense wants to rely on.

10　　　　So in terms of what they could say about the

11　process -- I mean, they could say the same things that

12　Mr. Ollendorff and Mr. Ferrone said, and the defense thinks

13　that that's, you know, helpful and relevant to them what they

14　said about the process. The lawyers could say the same

15　thing.

16　　　　A perfect example of how a lawyer could contribute

17　to the case is -- again, we brought this up yesterday --

18　Mr. Fougner. He is a lawyer who the defense has said and

19　presumably would say was involved in the process. He gave

20　testimony in part that related to that process. We managed

21　to take his testimony without invading the privilege. We

22　worked around it.

23　　　　So, for example, Ms. Hewitt, who they didn't

24　identify as a witness and, therefore, for all the reasons

25　that we talked about at length, we didn't depose, but we

1    could have; or they could have called her and she could

2    contribute to the process just the same way that Mr. Ferrone

3    has and Mr. Ollendorff and other witnesses who may have

4    testified about the process through deposition.

5         So your Honor has circumscribed the way that the

6    defense can argue about involvement of lawyers, circumscribed

7    it to the process, and a lawyer could contribute to that just

8    like any other witness.

9         THE COURT:  Okay.  Thanks.  I understand that.

10        First of all, we are going to break before you do

11   your rebuttal argument so that we could talk about anything

12   that needs to be talked about.  We would have broken anyway

13   so you could gather your thoughts.  We will break.  We will

14   let the jury go out, and we will deal with this.

15        You are saying you are not going to mention this in

16   your affirmative opening, and I take it that -- and so then

17   we will see what, if anything, the defendants want to say

18   about this.

19        Here is where -- so here is where I am on it,

20   though, so you know kind of how you want to set it up and how

21   it's going to go.

22        I read the cases that you cited -- not you, but the

23   plaintiff -- *United States v. Emmett*, 321 F.3d 669; *U.S. v.

24   Wesley*, 422 F.3d 509; and *U.S. v. Alanis*, and I don't have

25   the cite, but you gave it to us last night.

1688

1    All criminal cases, all involved somewhat of a
2    different issue, which is whether the prosecutor's -- and I
3    think Mr. Rubenstein flagged this for you -- the prosecutor's
4    comment on the defendants not bringing somebody in was okay
5    or not.  And in those cases it was okay.  But those cases
6    are, in my view, totally off point from what we are dealing
7    with in this case.

8    To the extent they are on point, I think they
9    support the notion that the plaintiff cannot comment on the
10   lawyers not coming in because there are other cases,
11   including *United States v.* -- I think it's called *Simpson;* is
12   it Simpson? -- 974 F.2d 845, which talk about this being in
13   the -- this issue being in the discretion of the court.

14   But one of the things that every court that I have
15   read on this has said is they look to whether the witness is
16   equally available to both sides.  Okay?  And you alluded in
17   your brief statements here that you could have deposed
18   Ms. Hewitt, and you could have.  And this witness is
19   available to both sides.

20   You know, to the extent that her testimony could
21   have been germane here, it would have been along the lines
22   of, you never spoke to Mr. Ferrone.  He never called you.  He
23   never reached out to you.  Those were the kinds of questions
24   that, frankly, I anticipated in the examination of
25   Mr. Ferrone, not with respect to seeking legal advice, but,

1   you know, Mr. Ferrone, you never sat down and talked to

2   Ms. Hewitt.  Maybe you wouldn't even know her if you saw her

3   in the train station.

4          So you did not talk to this lawyer, and you never

5   met with her.  And you were the CEO of this company for X

6   number of years, and you knew this lawyer was involved in the

7   process, but you never took it upon yourself to sit down with

8   her.

9          I think those are the questions that I was kind of

10  anticipating to tie up the procedure kind of thing, not

11  necessarily these other ones.

12         But be that as it may, I think because this witness

13  is available to both sides, because the SEC moved *in limine*

14  to bar any comment about the lawyers, and I have

15  circumscribed the comment that can be made, I think it's a

16  bit unfair to then allow you to say the defense could have

17  brought this person in for whatever limited testimony could

18  have been made.

19         I mean, that's what my thinking is on this.  I

20  don't know what this is going to -- I think this should

21  inform what the defendants are doing, too.

22         And Mr. Rubenstein is looking like he wants to say

23  something, which I will listen to.

24         But this would have been my ruling if you intended

25  to raise it in the opening -- in your primary closing for

1    these reasons, and then I will look at it again on rebuttal.

2              MR. RUBENSTEIN:  And the issue, Judge, with that is

3    only, obviously we don't have an opportunity to surrebut the

4    rebuttal.

5              THE COURT:  Right.

6              MR. RUBENSTEIN:  So, Judge, you are absolutely

7    right, and I looked at these cases, too, because, of course,

8    we are more familiar with than venue, but these are very,

9    very different cases.

10             There is no case -- not any of these, and none

11   other that I saw -- that stand for a general principle that

12   either party can comment on either other party's failure to

13   call witnesses.

14             These were cases where the defendant raised a straw

15   man defense.  In *Wesley*, for example, without any evidence,

16   the defendant said, I have a brother.  My brother looks

17   exactly like me.  It was an identification case.  No evidence

18   was put in by either party, particularly the defendant, about

19   the brother, what he looked like.  Certainly he didn't

20   testify.

21             Under those circumstances, when the prosecutor

22   commented on the lack of evidence, the court held, rightly,

23   that it wasn't prosecutorial misconduct.  It wasn't a

24   violation of the Fifth Amendment or a comment on the

25   defendant's failure to testify.

1691

1    THE COURT:  In *Wesley*, just taking that a little

2  bit further -- and we don't have to dwell on this.  But in

3  that case, the defendant implied that his brother had the

4  motive and opportunity to commit the crime and said that the

5  government should have compared his brother's fingerprints to

6  those found at the scene of the crime rather than picking on

7  him.

8    So, I mean, the defendant had kind of opened the

9  door there to a comment about, you know, the brother in a way

10  that I don't really feel my ruling here does or the defense's

11  evidence with respect to the participation in the process

12  does.

13    I mean, I just haven't had an opportunity -- I

14  don't deal with these issues probably as much as you guys do,

15  so I had to think about it and read some cases.  But I think

16  as long as you are not going to do it in the opening -- I

17  mean, in your first part of your closing, we could talk about

18  it in rebuttal, and the defendant can be advised as to where

19  I stand and where you stand on the plaintiff's side.

20    MR. RUBENSTEIN:  And, Judge, just so we are

21  clear -- and again, Mr. Rotert is giving the closing.

22    THE COURT:  He is here.  He is listening.

23    MR. RUBENSTEIN:  Well, I expect he is going to tell

24  you and he will confirm what I am going to say, which is,

25  there is going to be discussion in the closing of the

1692

1    evidence that's been in the case, including the overall

2    process which involved all these people.  I don't see how

3    that would open the door at that point to what Mr. Phillips

4    has asked for.

5              THE COURT:  I don't know that it opens the door

6    either to saying, well, you should have called them as

7    witnesses.  It may open the door to, as Mr. Phillips said,

8    his responding to within the context of what you are going to

9    say about the participation in the process.  And I am not

10   barring any of that.  I am just talking about whether you

11   could say somebody should have brought in a witness.

12             MR. PHILLIPS:  Just so I understand, I mean, with

13   all due respect to the Court and to counsel, I think it's

14   quite elemental that either party can, in the ordinary

15   course, comment on the other side's failure to call witnesses

16   so long as there is equal access.  I think that's what the

17   case law says.

18             I understand the Court's comments about how the

19   cases we cited in the criminal context are somewhat

20   distinguishable.  What we thought was that, if you can do it

21   in a criminal case where there is a Fifth Amendment right not

22   to testify, you can certainly do it in a civil case.  But I

23   think it's quite elemental that we can.

24             But just so I understand the Court's ruling, is the

25   Court saying now that we cannot comment on their failure to

1    call any witnesses at all?

2              THE COURT:  No.

3              MR. PHILLIPS:  So it's just lawyers?

4              THE COURT:  Yes.

5              MR. RUBENSTEIN:  Judge, just to be clear, if the

6    comment is going to be, the defendants didn't call any

7    witnesses, that's not accurate.  We had dep designations.  We

8    had identified -- these were counter-designations.  They did

9    all come in through their case.

10             THE COURT:  That's argument.  That's argument.

11   That's fine.  I mean, you have got a response to that.

12             I was talking -- I think it is unfair on the lawyer

13   thing.  All right.  I mean, if the plaintiff wants to say and

14   take advantage of the -- try and take advantage of the fact

15   that the defendant didn't put on a defense, I don't think

16   it's an unfair response to that to say, we examined all the

17   witnesses we needed to examine in their case.  We went

18   through the dep designations, and some of those were ours and

19   some of them were theirs.

20             MR. RUBENSTEIN:  We can't do that if it's in

21   rebuttal, Judge.

22             THE COURT:  Correct.

23             MR. RUBENSTEIN:  And as a matter of fact --

24             THE COURT:  I think he is talking about doing it in

25   his primary statement.

1              Right?

2              MR. PHILLIPS:  Look, I mean --

3              THE COURT:  Here, let me interrupt you here because

4     I don't want to spend all day on this.  It is not

5     elemental -- it is not elemental that any party is free to

6     comment on the failure to call witnesses.

7              In *United States v. Simpson*, which is 974 F.2d 845,

8     the Seventh Circuit cautioned that when the witness is

9     equally available to both sides, the preferred practice is to

10    preclude the argument about failure to call rather than to

11    leave the jury to speculate about a lot of nonevidence.

12    Okay?

13             So it is not elemental, and it's within the Court's

14    discretion to be able to regulate that.  I was focused on the

15    lawyers, not on these other people.

16             I think -- you could do what you want to do, but I

17    think it is -- first of all, I don't think it is factually

18    true that the -- although the defendant technically did not

19    call any witnesses, you-all had an agreement that he could

20    examine Mr. Ferrone in your case, and they did.

21             You also had an agreement that you would read in

22    testimony from dep designations that, in some cases, was

23    testimony that was elicited by either side rather than having

24    the defendant having to do it in their case-in-chief.  And,

25    if necessary, to correct any misimpression, I could tell the

1695

1   jury that, too -- okay? -- because I don't want there to be a

2   misimpression.

3            It is true that the defendant didn't, after all the

4   witnesses testified, call any witnesses in -- quote,

5   unquote -- its case.  But I don't think it's true, based on

6   the way both sides tried this case, that the defendant wasn't

7   able to put in -- quote -- his defense through his

8   examination of witnesses in the SEC's case.  If I need to

9   instruct the jury on that in order to level the playing

10  field, I have every ability to do that at the end of the

11  case.  I don't want to, but I am just telling you that.

12           But I disagree that it's elemental that anybody

13  could argue to the jury about stuff that didn't happen in

14  front of the jury in a way that potentially could be a frolic

15  and detour.  With respect to the lawyers, I have already

16  ruled.

17           MR. PHILLIPS:  Thank you.  I understand the Court's

18  ruling.

19           What I am going to do is -- as I said at the

20  outset, I am not planning on commenting on it in my

21  affirmative, if you will, opening.  I will wait for rebuttal,

22  and we can, as your Honor noted, revisit it at that time.

23           THE COURT:  Okay.

24           Number two, I relooked at the e-mails that you sent

25  and the cases that the SEC sent us about Claim II and the

1696

1    instruction that says it was false or misleading.  This is

2    for the Section 13 claim.  I agree with the SEC on this.

3    Defendants have cited to me no cases that are contrary to

4    that.  There are a lot of cases out there where jury

5    instructions have been approved in the Section 13 claim that

6    say that the certification is false or misleading.  The case

7    law not only on instructions but just on the claim itself

8    seems to accept that notion.

9          So I am fine with the instruction that I -- I

10   reaffirm what I said last night in terms of giving that

11   instruction.

12         Third, I wanted to say at least on the record, we

13   talked about the good faith issue a lot last night.  And

14   because it was late, I think it was a little jumbled.

15         I would like to at least state on the record a

16   little bit more about my justification for not allowing the

17   defendant or not acceding to the defendant's request to use

18   the Criminal Jury Instruction 6.10 here because, in reading

19   the transcript from last night, I am not sure it was all in

20   one place.  It's in several places.

21         So I would like to briefly just say this:  "Good

22   faith" is a very nuanced term.  And although the defendant

23   argued and I agreed in my motion *in limine* ruling that the

24   defendant could bring in evidence -- notwithstanding the fact

25   that he was not raising a reliance on counsel defense, I

1    agreed that evidence about the attorneys' involvement in the

2    process was relevant to his state of mind to some extent, and

3    we have tried the case like that.

4           And the defendant is going to want to argue that he

5    knew the attorneys were involved in the process and that had

6    some affect on his state of mind.

7           The door through which I talked about that in the

8    motion *in limine* ruling was -- quote, unquote -- good faith,

9    good faith reliance on counsel, and that the ability of a

10   defendant to show, if he didn't knowingly or recklessly make

11   misstatements, was not limited to the reliance on counsel

12   defense.

13          So the ruling stands for itself.

14          That notion, however, of the effect of his

15   knowledge about the lawyers' involvement in the process, in

16   my view, is encompassed in what I am calling the advice of

17   counsel instruction that we nailed down last night.  You have

18   called it a limiting instruction.  Whatever.  It's the

19   instruction that -- you know what it is.  It's the one that

20   we are giving right after Claim 1 that says, the defendant is

21   not raising advice of counsel, and any evidence of lawyers is

22   relevant only to state of mind with respect to knowing and

23   recklessness.

24          So I think the concept that I was describing that I

25   thought was relevant is encompassed within how we are giving

1   the state of mind instruction and this instruction about

2   involvement of lawyers.

3           I do not think we need a separate good faith

4   instruction as the defendant was urging.  I don't think the

5   Seventh Circuit criminal instruction in 6.10 is meant for a

6   case like this where the defendant can be held liable for

7   being -- for knowing or recklessly making misstatements or

8   misrepresentations or omitting to state facts.

9           And I say that notwithstanding the fact that I

10  understand in the Seventh Circuit recklessness is a pretty

11  high standard, but it doesn't mean exactly the same as

12  intent.  And the Seventh Circuit's instruction in 6.10, as I

13  said last night, I read the commentary, the advisory

14  committee comments, as being an instruction that would be

15  given in specific intent cases.

16          I also don't view the Supreme Court's statement in

17  *Hochfelder* as determinative of whether I give a good faith

18  instruction -- a separate good faith instruction.

19          It uses the same words, but the cases that I cited

20  last night, all decided after *Hochfelder,* are more on point

21  to me as to whether good faith is a get-out-of-jail-free card

22  in a 10(b)(5) prosecution, and it's not in the air.  Good

23  faith in the air is not.  Good faith as it animates your

24  defense to a charge of knowing and reckless misrepresentation

25  or omissions is a little bit different.

1599

1        And finally, Mr. Rubenstein noted last night that I
2   had cited to the parties some cases that I found in which
3   courts had given a good faith kind of instruction in
4   securities cases.  I don't know the facts of those cases.
5   But when I looked at the instruction that was given in those
6   cases more after I, you know, gave you some of those cites, I
7   didn't like the instruction.  I thought it was misleading to
8   the jury, and it gave, I think, a false impression that good
9   faith in the air would be a complete defense to something,
10  and it confused the notion of whether the plaintiff -- in
11  those cases, the SEC -- had to show knowing or reckless
12  misconduct.  And I just think it's confusing.

13       So I think the "state of mind" instruction we have
14  now is good, and it encompasses what I think is properly
15  within the jury's province.  I think, supplemented by the
16  instruction that deals with the reason that any lawyer
17  involvement was admitted in the case as relevant to state of
18  mind, I think that frames the issue for the jury and is
19  sufficient and appropriate to orient the jury here without a
20  separate good faith instruction.

21       So having slept on it, rather than at 7:00 or 7:30
22  last night, I just wanted to say that was my reasoning on
23  that.  I know the defense doesn't agree, but at least I
24  wanted my ruling to be clear.  And I think Mr. Rubenstein
25  last night explained why the defense thought there should be

17:00

1    a separate instruction.  Okay?

2            MR. RUBENSTEIN:  Yes, Judge.

3            THE COURT:  And then finally on this last motion *in*

4    *limine* that was filed, I mean, I don't know if you need a

5    formal ruling on it or not, but my inclination was, as a

6    formality, to grant it.  I think the SEC is right.  But based

7    on the discussion last night we had, it didn't sound like the

8    defendant was intending to introduce that kind of an argument

9    until the SEC framed it for him.

10           MR. RUBENSTEIN:  That's right, Judge.  And I

11   conferred with Mr. Rotert and think the language from the

12   motion was that we be precluded from arguing that the alleged

13   misstatements and omissions about the status of SF-1019 could

14   not have been material to investors since the stock price

15   declined over that period.  And that's not an argument we

16   will be making.

17           I think the motion is moot.  But if your Honor

18   wants to rule on it, that's fine, too.

19           THE COURT:  It's probably moot, but I could say in

20   my order, given the fact that -- given that the defendant has

21   said they don't intend to make that argument, as a formality,

22   that the Court grants the motion, although technically it may

23   be moot.  I will leave it like that.

24           Okay.  Let me just see if there was anything else

25   that I wanted to raise before we -- did everybody get the

1  instructions last night from Joe?  Were they okay?

2          MR. PHILLIPS:  Yes.

3          MR. RUBENSTEIN:  And yes.

4          THE COURT:  That was a compound question.

5          MR. PHILLIPS:  Yes, they were consistent with what

6  was discussed last night.  Thank you.

7          THE COURT:  Okay.

8          MR. RUBENSTEIN:  Judge, I have one other thing, and

9  I apologize for this because I'm not as practiced as counsel.

10          Under Rule 50(a), we would have just a motion to

11  preserve the record for judgment as a matter of law with

12  respect just to Claims I and III, which are the

13  *scienter*-based claims, based on the lack of sufficient

14  evidence of Mr. Ferrone's *scienter*, particularly his

15  knowledge, as "knowledge" is defined by law and by the

16  instructions, to include an extreme departure from the

17  standards of ordinary care that present a risk that's

18  actually either known to the defendant or so obvious that he

19  must have been aware of it.

20          I don't -- I'm not aware of any evidence in this

21  case, certainly not sufficient evidence from which a jury

22  could find by a preponderance of the evidence that

23  Mr. Ferrone either had knowledge or was aware of facts

24  approaching knowledge that investors were -- that there were

25  misstatements or omissions that had the potential to mislead

1702

1   investors.  And I know your Honor can reserve on that.

2           THE COURT:  I was listening after the close of the

3   plaintiff's case.  And when that motion wasn't made, I was

4   wondering.

5           But I do note that under 50(a)(2) of the Rules of

6   Civil Procedure it says, "A motion for judgment as a matter

7   of law may be made at any time before the case is submitted

8   to the jury."

9           So I think you probably technically got in before

10  the curtain raised.  As you know, that has to be made to

11  preserve arguments later.

12          I will take it under advisement.  I am not going to

13  hear argument on it now.  I mean, I will have to be reminded

14  that I have it under advisement.  But my initial reaction to

15  it is that there is enough to go to the jury on both Claims I

16  and III.

17          That's what you are moving on, right, I and III,

18  the *scienter*-based claims?

19          MR. RUBENSTEIN:  I am, Judge.

20          THE COURT:  Is it I and II or --

21          MR. RUBENSTEIN:  I and III.

22          MS. BAUTISTA:  Your Honor, just on the motion *in*

23  *limine* regarding the stock price.

24          THE COURT:  Yes.

25          MS. BAUTISTA:  I am looking at Mr. Rubenstein's

1703

```
1   quote, and he is saying that he understands that the defense
2   is precluded from arguing that the alleged misstatements and
3   omissions about the status of SF-1019 could not have been
4   material to investors since the stock price declined over
5   that period.
6           And I just want to make clear that we are all clear
7   on that, and if something does come up in closing surrounding
8   this issue, the SEC will be prepared to object.
9           THE COURT:  That's fine.  To be clear, so there is
10  no misunderstanding, I am going to grant the motion.  All
11  right?
12          MS. BAUTISTA:  Thank you, your Honor.
13          THE COURT:  The defendant will govern themselves
14  accordingly, and you guys will govern yourselves accordingly.
15  And if there is an issue we need to address, we could do it.
16          MS. BAUTISTA:  Thank you.
17          THE COURT:  And although I am not fond of
18  objections during closings, if there has to be one, we will
19  deal with it.  Okay?
20          MR. ROTERT:  Your Honor, on a less substantive
21  point, I would be grateful if, at the conclusion of the
22  Commission's opening closing argument, if we could take five
23  minutes for me to get organized and then come back to present
24  the defense closing?
25          THE COURT:  Request granted.  And I will do the
```

1    same thing with the rebuttal.  As I said, we will take a

2    break.

3                MR. ROTERT:  I appreciate it.  Thank you.

4                THE COURT:  And depending on what the timing is, it

5    may be appropriate to just take a bathroom break then, too,

6    because it's in the morning -- a comfort break, as they say.

7                MR. PHILLIPS:  Yes.  I am hoping -- I haven't had

8    time to time out the presentation, but I am aiming to keep my

9    affirmative presentation for an hour, and then I will reserve

10   some time for rebuttal.

11               THE COURT:  Okay.  That's fine.  And if it lasts

12   that or a little bit longer, it would be appropriate to take

13   a morning comfort break after coffee at that time, too.

14               MR. PHILLIPS:  All right.

15               THE COURT:  Let me just check to see if there is

16   anything else that I needed to do.

17               (Brief pause.)

18               THE COURT:  All right.  Do you want to take five

19   minutes here and then come back?

20               MR. PHILLIPS:  That would be great.  Thank you.

21               THE COURT:  So Brenda, tell them we are almost

22   ready.  So they should take their last bathroom break.

23               (A brief recess was taken at 9:43 a.m.)

24               (Jury in at 9:50 a.m.)

25               THE CLERK:  Please be seated and come to order.

1          THE COURT:  Good morning, everybody.  Welcome back.

2          Okay.  As I said, we are going to hear the closing

3    arguments of both parties today.  The plaintiff will go

4    first.

5          Mr. Phillips, whenever you are ready.

6          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

7          MR. PHILLIPS:  Thank you, your Honor, Counsel.

8          Smiling faces, happy people, scientists doing

9    research, those were the images that this defendant thought

10   made for a perfect guide to a presentation about Immunosyn in

11   January 2009.

12         This presentation, just like all the previous

13   presentations that this defendant made about this company,

14   was a lie.  It was full of lies.  It was full of half-truths.

15   It was full of misleading statements.

16         This defendant in this presentation and in many

17   others, week after week, day after day, one after the other

18   after the other, presentations that said nothing about the

19   truth of the regulatory approval process that was the key to

20   this company's success.

21         And this defendant knew it.  He knew that was the

22   key to this company's success, and he put out one statement

23   after the other, after the other with complete nonsense

24   regarding that subject.

25         No disclosure of the truth.  Lie after lie after

1    lie after lie.

2              Why did he do that?  Money.  We saw from the very

3    beginning with this defendant, when he was in negotiations

4    with Mr. Miceli at Argyll back in 2005, when he was

5    contemplating becoming the CEO of that previous public

6    company, he wanted money, club memberships, a big salary, all

7    sorts of other things, a bonus.

8              And we saw that when he became CEO of this company,

9    Immunosyn, later, in 2007, he got all those things.  He

10   didn't end up receiving them, but he negotiated for them, and

11   he had a strong incentive to lie about this company so that

12   he could get his big payday at the end of the day.

13             He had a bonus structure that entitled him to a

14   percentage of revenues of Immunosyn if this drug sold and

15   marketed.  And so he had an incentive to keep the stock price

16   up, because that would get money into Immunosyn and Argyll so

17   this regulatory approval process could advance.

18             He had a motive to keep the stock price up so that

19   he could get his big salary.  He had a motive to keep the

20   stock price up so this stock could get on the NASDAQ, and

21   that would get money into the company.

22             His motive was money.  He wanted his big payday at

23   the end.  That's why he lied, to keep this stock price up, to

24   lie about this company, to lie about what he knew was

25   important about this company, which was the status of

1    regulatory approval.

2           And this slide we have up, part of this

3    presentation in January of 2009, this is a perfect example of

4    the lies that this defendant told over and over and over to

5    investors, to brokers who he knew made recommendations, to

6    customers.  This page is a perfect example of all the lies

7    this defendant told repeatedly.

8           This page talks about all these supposed milestones

9    that were going on with this company, which he said in his

10   public statements, such as his statements that he made, which

11   we have a transcript of, to the Flaherty conference in New

12   York, he said all these milestones speak directly to the

13   regulatory approval process that was so important to this

14   company.

15          So, for example, we can see in this page of this

16   presentation to brokers in January of 2009, and as you have

17   seen throughout this trial, this was typical of what he said.

18   One supposed milestone, initiation of the regulatory approval

19   process for SF-1019 by Argyll Biotechnologies, LLC, in

20   several countries as well as preparations for clinical trials

21   in both the U.S. and Europe.

22          There were no preparations for clinical trials.  We

23   heard zero evidence of preparations for clinical trials.

24   Why?  Because this company in the United States was on

25   clinical hold from the FDA.  Two clinical holds.  The

1　preparations for clinical trials could go nowhere until the

2　deficiencies that were identified by the FDA could be

3　resolved.  And this defendant knew they never were resolved.

4　He knew that.

5　　　　　　For example, these toxicity studies, where you test

6　the drug on animals to prove they are safe and effective for

7　clinical trials, he knew all about those.  Sometimes he

8　called them LD50 studies.  Sometimes he called them something

9　else.

10　　　　　　He knew they were never completed.  He knew it.

11　And he knew that there could not be and were not any

12　preparations for clinical trials in the United States.

13　　　　　　What about Europe?  He knew there were no

14　applications filed for clinical trials in Europe.  And he

15　knew because Europe, as he said and was said in the public

16　filings that were repeatedly made, the standards for clinical

17　trials in Europe were the same as in the United States.  So

18　he knew if they did submit an application for clinical trials

19　in Europe, which they never did, and he knew that; but he

20　knew if they did, that would get the same response, or a

21　similar one, that the FDA had given -- clinical hold,

22　deficiencies, important deficiencies to demonstrate the

23　safety and efficacy of the drug.  He knew that nothing was

24　going on in the United States and in Europe.

25　　　　　　Initiation of the regulatory approval process.

1    Well, that may have been true in the United States, but it

2    sure left out an important fact, didn't it, ladies and

3    gentlemen?  That the FDA had issued a clinical hold.  That

4    there were 17 deficiencies.  That there was no progress made

5    on those deficiencies.  That the process of this drug toward

6    regulatory approval was delayed, delayed, delayed.  And the

7    longer he served as the CEO of this company, the longer the

8    delay was.  The delays that he talked about in the company's

9    public filings that were a risk and uncertainty, no risk and

10   uncertainty, folks.  That was a certainty.  He knew it.

11         The next bullet point in the supposed milestones,

12   positive preclinical human SF-1019 study results in the U.S.

13   for treatment of chronic inflammatory demyelinating

14   polyneuropathy, CIDP, and reflex sympathetic dystrophy, RSD

15   or RSDS, released.

16         You heard, ladies and gentlemen, that these

17   preclinical human studies, those had been going on for years,

18   for ten years, Mr. Ferrone thought, prior to when he became

19   CEO.  They weren't human clinical trials.  And, in fact, we

20   saw from one of the very first witnesses in this case,

21   Dr. Willeford -- he was a scientist from Mississippi state.

22   He was the person who signed the IND application in

23   December 2006.

24         We went over the IND application with him, which

25   was Trial Exhibit 217.  And you saw in the IND application

1   that Argyll and Dr. Willeford and Dr. Ericsson, they cited

2   all these preclinical human studies that had been done,

3   including ones done in Europe by this Dr. Dalgleish, that

4   supposedly demonstrated the safety and efficacy of this drug.

5   And how did the FDA respond?  Did the FDA say:  Great.  You

6   have done preclinical human studies.  Go ahead and do these

7   clinical trials.  In fact, go ahead and skip them.  Is that

8   the way they responded?  No.

9          The FDA looked at those preclinical studies, issued

10  this full clinical hold, said the preclinical human studies

11  were not adequate to justify human clinical trials and that

12  there were 17 deficiencies in total that did not justify

13  clinical trials.

14         So when Mr. Ferrone talked about these preclinical

15  human studies as some sort of milestone, it's not a milestone

16  when they have been going on for ten years.  It's not a

17  milestone when they make no progress toward regulatory

18  approval for this drug, which he knew was the key to this

19  company's success.

20         It's not a milestone when he says that those

21  preclinical human studies speak to the advancement in the

22  regulatory approval process.  They had -- they represented no

23  advancement toward the regulatory approval process.  The only

24  advancement that could be made in the regulatory approval

25  process was resolving these deficiencies that the FDA

1    identified, and he knew they had not been resolved.

2            The third milestone on this page, receipt of MHRA

3    manufacturing license approval in Europe for SF-1019 for a

4    lab unrelated to Immunosyn.

5            Again, folks, preclinical human studies had been

6    going on for ten years.  He knew that.  He knew that

7    represented no milestone.  He knew that represented old news,

8    not new news.

9            And he also knew that if you had preclinical human

10   studies, you had to have some manufacturing of this drug in

11   order to administer it to these patients in these preclinical

12   human studies.

13           So he knew that manufacturing had been going on for

14   ten years, too.  That was not a milestone.  That was old news

15   that represented nothing toward regulatory approval of this

16   drug so that it could be sold and marketed in the United

17   States.  And that was the key toward getting this company to

18   do anything for investors.

19           They weren't running a science fair here, ladies

20   and gentlemen.  This was not one big science project.  This

21   was a business.  The business of Immunosyn was to make money.

22   And the way that Mr. Ferrone and investors would make money

23   was if regulatory approval was granted.

24           That's all that mattered here.  Was regulatory

25   approval granted?  Were they making progress toward

1    regulatory approval?  And the answer clearly is no.  Not only

2    were they stopped in their tracks by the FDA clinical hold,

3    but they were set back and delayed because the FDA wanted

4    Argyll to do 17 different things, including toxicity studies

5    and identifying the product and all sorts of other things

6    that Immunosyn and Argyll -- Argyll was technically the

7    company responsible for regulatory approval -- no progress

8    whatsoever.  He knew it.  Investors didn't.

9              You also may have heard Mr. Ferrone say how these

10   preclinical human studies that he touted so often

11   demonstrated that the drug was safe and effective.  The only

12   thing that counted for this company was whether the FDA

13   thought that they had been demonstrated to be safe and

14   effective.

15             And the FDA, which Mr. Ferrone knew and which

16   Immunosyn and Mr. Ferrone repeatedly said to investors, the

17   FDA required human clinical trials to establish safety and

18   efficacy.

19             And like it or not for Mr. Ferrone, it was the

20   FDA's view and the view of other government regulators that

21   counted for this company.  These preclinical human studies

22   counted for nothing toward what was important for this

23   company.  Mr. Ferrone knew it.  He knew these were not

24   milestones toward what counted in this company.  And he

25   wanted to create the misleading and false impression that

1    these milestones were for regulatory approval, and he knew

2    they were not.

3              And we saw this document, ladies and gentlemen,

4    come into evidence.  This was Trial Exhibit 250.  And this

5    pretty much summed it up as to Mr. Ferrone's philosophy and

6    why Mr. Ferrone made the statements that he did, why he

7    didn't disclose the clinical holds, why he covered up the

8    truth, why he told lie after lie after lie.

9              "A new public company has a honeymoon period with

10   the street, but it is not long.  That is especially true if

11   the street has word that certain events are expected to occur

12   in a given time or order that do not."

13             That's what Mr. Ferrone thought.  And because of

14   that philosophy, Mr. Ferrone made statements like we see on

15   the screen.

16             This was the statement he made in one of these

17   interviews he conducted.  This time the *CEOCFO News*.  This

18   was in Trial Exhibit 303, also in Trial Exhibit 109.  It was

19   reprinted, which was that investor relations packet with the

20   "Dear Investor" letter.

21             Here is what Mr. Ferrone said in response to the

22   questions in this *CEOCFO* interview.  "Where are you in the

23   process of getting it to people?" he was asked.

24             He answered, "Regulatory approval processes for

25   SF-1019 have been initiated by Argyll Biotechnologies, LLC,

1    in several countries.  Additionally in both the U.S. and

2    Europe preparations for clinical trials was underway."

3            Same nonsense.  Same nondisclosure of what

4    importantly was going on, on this subject.

5            Why did he say these things?  Because he knew if

6    they disclosed that an IND had been filed, then the street

7    investors would expect that they would get the IND approved.

8    If he said when it was filed, investors would expect that

9    clinical trials could go forward within a reasonable period

10   of time.  So he didn't want to disclose that.

11           If it was disclosed by him and Immunosyn that the

12   FDA had responded to this application with these

13   17 deficiencies, then investors would have expected that

14   Argyll would resolve those deficiencies within a reasonable

15   period of time.  And he knew that Argyll hadn't.  So he

16   didn't want to disclose that, because if he disclosed these

17   important events, he knew that investors and the stock market

18   would expect that certain things would occur to resolve these

19   problems, to lift these obstacles.  So he wanted to conceal

20   that information.

21           So that's why, when he was asked questions directly

22   speaking to the regulatory approval process, he lied, he told

23   half-truths, and he misled investors.

24           We thought it would be helpful to you in your

25   deliberations if we put up a timeline that showed when

1    Mr. Ferrone knew certain things and when certain disclosures

2    were made by him.  So we have on this timeline information

3    about the four times in evidence in this case during a period

4    of time where we have clear evidence that Mr. Ferrone was

5    told about a clinical hold issued by the FDA.

6            He didn't learn it from the SEC, as he claimed

7    yesterday and as they claimed in that misleading 10-Q filed

8    in December 2009.  He didn't learn it from the SEC when we

9    questioned him under oath.  He knew it long before that.  And

10   the evidence in this case established those facts.

11           Before February 2007 -- you heard this from

12   Mr. Fougner, who testified by deposition -- he had a

13   communication with Mr. Ferrone in which he communicated with

14   Mr. Ferrone about the clinical hold.  That was in

15   February 2007, before Mr. Ferrone joined Immunosyn in an

16   official capacity.

17           Right after Mr. Ferrone joined the company as CEO

18   on October 15th, 2007, we had the communication between him

19   and Mr. Ollendorff, Trial Exhibit 291, on October 21st, 2007.

20           Mr. Ollendorff told him, in no uncertain terms, we

21   are on clinical hold for a bunch of reasons.

22           Shortly thereafter, on November 2nd, 2007,

23   Mr. Ollendorff communicated with Mr. Ferrone again, Trial

24   Exhibit 294, mentioning the clinical hold.  Mr. Ollendorff

25   communicated with Mr. Ferrone again in June of 2008, telling

1    Mr. Ferrone, the product, SF-1019, is currently on clinical

2    hold due to the need for additional toxicity studies.

3           We heard some statements from Mr. Ferrone about how

4    all this information was too technical for him.  He couldn't

5    understand the science.  He didn't have a science background.

6           Members of the jury, there is nothing complicated

7    about these words "clinical hold."  You don't need to be a

8    scientist to understand them.  You don't need to be an

9    expert.  "Hold" means hold.  Things are on hold until you

10   resolve the deficiencies.  That's not complicated, especially

11   for a man of Mr. Ferrone's sophistication, a man with the

12   background he had, a lawyer 20 years in the financial

13   services industry.  This is not complicated stuff.  This is

14   simple, and he knew it.

15          Every dot on here represented an opportunity for

16   Mr. Ferrone to disclose the clinical hold, to tell investors

17   that the deficiencies that the FDA had identified had not

18   been resolved, that there was no progress being made on

19   things like toxicity studies.

20          These are all public statements that Mr. Ferrone

21   made year after year, month after month, day after day, week

22   after week.  Every one of these statements contain one

23   misleading statement, one false statement or another, and

24   every one of them represented an opportunity for Mr. Ferrone

25   to come clean with investors about the regulatory approval

1    process and where Argyll was at and the lack of progress.

2    And he took these opportunities not to do that but to tell

3    lie after lie after lie.

4    And then the Web site video, that was up for years.

5    Another ten-minute presentation full of lies, full of

6    nonsense, full of nondisclosure.  Another opportunity that he

7    took to mislead investors.

8    I talked earlier about how Mr. Ferrone had a clear

9    financial motive to lie to investors, to try to keep the

10    stock price up.

11    Keep in mind, ladies and gentlemen, that while

12    Mr. Ferrone may have had some belief that this drug worked,

13    which is not the issue in this case, keep in mind that the

14    sum total of stock that Mr. Ferrone bought in this company

15    was before he became CEO, and it was a grand total of $145.

16    He could have bought stock in this company showing that he

17    really believed in the company, showing that he thought that

18    the prospects were great for regulatory approval.  He didn't.

19    He didn't sell any.  He didn't buy any.  He didn't buy any.

20    He didn't lose any money.  He didn't lose hundreds

21    of thousands of dollars like some investors did, like

22    Mr. Sacks did, like Dr. Melling did, the doctor from Utah.

23    He talked about how, although he was involved in this drug,

24    how him and his family, before they knew anything about the

25    clinical hold, which Dr. Melling later found out, how they

1    lost over $100,000 in this company.

2           Those people lost real money.  Mr. Ferrone, he

3    never got the big payday he was expecting.  He didn't lose

4    any money like investors did, ladies and gentlemen.  If he

5    thought this was such a great company, he would have bought

6    stock to demonstrate that.  He didn't.  That says a lot.

7           Ladies and gentlemen, here are the two clinical

8    holds that were issued in response to IND applications for

9    SF-1019.

10          The first one was effective January 2007.  The

11   second one was effective December 2008 in response to

12   Dr. Melling's application.

13          Full clinical hold.  Nothing complicated about

14   that.  Clear as the day is long.  Clinical trials were on

15   hold.  All information that he never disclosed until the SEC

16   confronted him in September of 2009 when we asked him to

17   testify under oath.

18          These are the deficiencies that the FDA identified

19   in issuing the first of the clinical holds.  "Before

20   initiating studies in humans, the product should be

21   characterized with respect to strength, identity, purity, and

22   potency."

23          And we heard several witnesses talk about what this

24   meant.  Dr. Willeford, he was the scientist from Mississippi

25   State.  Dr. Kanter, he was one of the last witnesses.  He

1    came in from Buffalo.  They both talked about how Argyll

2    didn't even know what this drug was.  They didn't know

3    exactly what was in it.  What was the active compound?  What

4    was the inactive compound?

5         They didn't know whether it would be stable if it

6    stayed on the shelf.  You may recall Dr. Willeford talking

7    about stability in the context of aspirin.  There were

8    fundamental issues that the FDA identified that Argyll made

9    no progress on and Mr. Ferrone knew it.

10        General toxicity, toxicology studies in two

11   species.  You may remember this came up repeatedly in e-mails

12   involving Mr. Ferrone.  He knew all about these toxicology

13   studies.  He may have thought some progress was being made on

14   them before he became CEO, but in Trial Exhibit 291 -- that's

15   that e-mail between Mr. Ollendorff and Mr. Ferrone -- it

16   shows Mr. Ferrone found out, without a doubt, right after he

17   became CEO, before he started making one statement after the

18   other, after the other saying how great everything was with

19   this company, he knew that those toxicology studies, which

20   are referred to as LD50 studies, hadn't been done.  And then

21   as time went on, as month after month passed, he knew no

22   progress was made and they weren't done.

23        And there is the e-mail exchange that I just

24   referred to, Trial Exhibit 291.  Mr. Ollendorff said to

25   Mr. Ferrone, "Quite honestly, I don't even know what LD50

1    tests are.  I can give you a better update verbally, but we

2    are on FDA clinical hold for a bunch of reasons.  One of the

3    main issues is the toxicity and dosage."

4          And then in Trial Exhibit 291, we saw Mr. Ferrone's

5    response.  LD50 tests are lethal dosage tests.  So

6    Mr. Ferrone, even not being a scientist, he was explaining to

7    Mr. Ollendorff what these tests meant.  He showed in this

8    e-mail he had more than enough understanding of the issues to

9    know how significant this was.

10         And he continued, "As I mentioned earlier, I was

11   told it was done and submitted.  I guess I heard wrong.  So

12   going forward, yes, it is absolutely time for a pipeline

13   report."

14         He knew that these toxicology studies weren't done.

15   He may have thought before he became CEO that some progress

16   was being made, found out he was wrong.  Rather than disclose

17   that fact, he made lie after lie after lie.

18         The FDA said in these clinical hold letters, "Until

19   you have submitted the required information and we notify you

20   that you may initiate the trials, you may not legally conduct

21   clinical studies under this IND."

22         Nothing complicated about that either.

23         And we heard evidence he didn't see the clinical

24   hold letters.  He didn't ask for them, and he said he didn't

25   want them.  So that's irrelevant in this case.  He knew about

1   the clinical hold, and he knew what it meant.  And it's not

2   complicated.

3         These are the certifications that Mr. Ferrone

4   signed in the 10-Ks.  He certified to investors, certified to

5   the SEC, certified to brokers, certified to the world that,

6   based on his knowledge, the 10-Ks "did not contain any untrue

7   statement of a material fact or omit to state any material

8   fact necessary to make the statements made in light of the

9   circumstances under which the statements were made, not

10  misleading with respect to the period covered by this

11  report."

12        This was from Trial Exhibit -- this excerpt Trial

13  Exhibit 296, the 2008 10-K for Immunosyn filed in March of

14  2009.

15        He knew that these 10-Ks didn't even disclose that

16  an IND had been filed back in 2006.  It was never disclosed

17  until after the SEC confronted him in testimony in late 2009.

18  It was never disclosed in these 10-Ks.

19        He knew that these 10-Ks didn't disclose the

20  clinical hold.  In fact, it was worse than that.  The 10-Ks

21  talked about as some sort of possibility -- hypothetical

22  possibility -- and we will get to this language later -- that

23  in the course of the regulatory approval process, the FDA may

24  respond with a clinical hold.  Didn't disclose that the FDA

25  had responded with a clinical hold with respect to this

1    company.  A total lie, and he knew it.  Not a possibility.

2    Not a hypothetical.  A fact.  A certainty that he knew.

3            He knew that these 10-Ks repeatedly talked about

4    all of these risks and uncertainties, the risks and

5    uncertainties that clinical trials could be delayed if there

6    was some governmental or regulatory action, the risk that

7    delays of clinical trials would occur, the uncertainty about

8    whether that would occur, and the great impact that that

9    would have on this company.

10           And he knew that these risks and uncertainties were

11   not those.  They were certainties.  He knew it and it wasn't

12   disclosed.  He knew his certifications of these 10-Ks were

13   false and misleading, just like the rest of the documents,

14   just like the rest of his presentations about this company.

15           He also knew, ladies and gentlemen, that it was his

16   responsibility to communicate with shareholders in this

17   company about what was really going on with this company.  It

18   wasn't the science teams.  It wasn't Mr. Miceli.  Not even an

19   officer of this company.  He didn't sign anything.  Didn't

20   review the 10-Ks, as far as the evidence shows.  Didn't

21   review other statements.

22           Mr. Ferrone said publicly, "It is also our

23   responsibility to communicate with Argyll Biotechnologies, to

24   monitor their progress, and to update our stakeholders as

25   milestone accomplishments occur along the way."

1          It was his responsibility.  He was the CEO.  He
2     signed the certifications.  He was the only full-time
3     employee of Immunosyn.  It was his responsibility, not
4     anybody else's.  And he knew it.

5          He also knew everything he needed to know about the
6     second IND, Dr. Melling's IND.

7          We saw this document a number of times during the
8     course of this case, Trial Exhibit 254, this December 8th,
9     2008, e-mail from Mr. Ollendorff to Mr. Ferrone, telling him
10    that the anticipated response from the FDA was a no.
11    Mr. Ferrone knew what that meant.  Nothing complicated about
12    it.

13         You heard him testify.  He understood what that
14    meant.  And if he didn't understand what things meant from
15    this e-mail, then he got another one from Dr. Melling, which
16    we saw from February 2009.  This was Trial Exhibit 123.
17    Dr. Melling told Mr. Ferrone, "SF-1019 is dead, and it will
18    take a couple of million dollars and several months and new
19    management (Argyll) to resurrect it."

20         And what happened?  A month later Mr. Ferrone
21    signed and certified the 2008 10-K for Immunosyn in March of
22    2009.  And he said, "If the submitting doctor" -- referring
23    to Dr. Melling -- "is successful in gaining approval for his
24    clinical trial, Argyll Biotech intends to supply SF-1019 at
25    no cost to the physician."

1    Mr. Ferrone knew there was no possibility in any
2    foreseeable future, in any universe that he was familiar with
3    that the FDA was going to approve Dr. Melling's IND
4    application based on what Mr. Ollendorff told him clearly,
5    based on what Dr. Melling told him clearly, based on the fact
6    that he knew that SF-1019 had been on clinical hold back in
7    December 2006.  He knew there was no possibility that the FDA
8    was going to approve this clinical trial by the time he
9    signed and certified this 10-K.  He knew this was a false,
10   misleading statement, just like every other presentation,
11   just like every other statement he made.

12   We saw e-mails about Mr. Ferrone's philosophy
13   regarding disclosure.  And here are some examples.  This is
14   from Trial Exhibit 250.  "We all know the market is
15   perception-driven," he said.  "Buy on rumor.  Sell on news."

16   So what did he do?  He tried to create rumor about
17   this company, not to disclose actual news that was important
18   to investors.

19   He also wrote, "I realize our goal here is a
20   short-term one, to get as many interested eyes on the stock
21   as possible."  That's from Trial Exhibit 92.

22   Later he wrote with regard to the NASDAQ that they
23   were trying to get on, "Note that the $5 stock price is the
24   benchmark" for getting on the NASDAQ.  That's Trial
25   Exhibit 82.

1    In Trial Exhibit 66 he wrote, "We want the stock

2    price of Immunosyn to stay up or go up further in order to

3    limit the amount of shares Immunosyn uses to amortize the

4    debt."

5    These e-mails provide further evidence that

6    Mr. Ferrone wanted the stock price to stay up.  He wanted to

7    get as many eyes on this stock as possible so money could

8    come into the company and he could eventually get his big

9    payday.

10    Now, I am going to talk to you now about some of

11    the things that the SEC has to prove, talk to you about how

12    we have proved them.  When you go back to the jury room, you

13    are going to get instructions from Judge Gilbert.  You are

14    going to have them with you.  Judge Gilbert will instruct

15    you.

16    And one of the things that Judge Gilbert is going

17    to instruct you -- and this has come up in the trial

18    before -- that the SEC has the burden of proof in this case,

19    but that the burden of proof is the preponderance of the

20    evidence.

21    What does that mean?  Well, it means that if you

22    put all the evidence in this case on some sort of scale and

23    you weighed it and you thought that there was some evidence

24    that favored Mr. Ferrone, but you thought that there was

25    evidence that also favored the SEC, if you put it on a scale

1    and you weighed it, even if that scale tilted ever so

2    slightly in favor of the SEC, even if you thought that the

3    evidence ever so slightly is in favor of the SEC, weighs more

4    than the evidence that Mr. Ferrone provides, then you can

5    find in our favor on any particular subject matter.

6              Now, we think that the evidence has proved that we

7    would not only meet the burden of a little bit more, but we

8    think it's an overwhelming case of fraud by this defendant.

9    But the standard is that we only have to prove it by a

10   preponderance of the evidence.

11             You are also going to find -- and I will talk about

12   this a little more -- one of the things that the SEC has to

13   prove for its claims are false and misleading statements.

14   And I am going to go over with you a number of false and

15   misleading statements that we say Mr. Ferrone made, and I

16   have alluded to them earlier in the presentation so far.

17             But you are going to be instructed that you don't

18   have to find that every single statement that we say was

19   false or misleading actually was.  Even if you disagree with

20   us on one or two -- and we don't think you should, but even

21   if you do, we don't have to prove more than one that

22   happened.  And there is other elements as well and we will

23   see.  But if we satisfied all the things we have to prove

24   even as to one statement, we win on those claims about false

25   and misleading statements, and you can check a box in the

1   jury verdict form in our favor.

2          You are going to see, ladies and gentlemen, that

3   there are three claims in this case that you are going to

4   have to decide.

5          The first claim is what's called Claim I.  And as

6   you will see in the jury instructions that Judge Gilbert will

7   give you, for Claim I we have to prove some things by the

8   preponderance of the evidence.

9          One of the things the SEC will have to prove is

10  that Mr. Ferrone did one or more of the following fraudulent

11  acts:  Employed a device, scheme, or artifice to defraud;

12  made an untrue statement of a material fact or omitted to

13  state a material fact necessary in order to make a statement

14  made, in light of the circumstances under which it was made,

15  not misleading; or engaged in any act, practice, or course of

16  business which operated or would operate as a fraud or deceit

17  upon any person.

18         So I would like to explain to you what the evidence

19  shows that shows we have proved this part of our case.

20         I am going to talk with you about the statements

21  that we say Mr. Ferrone made that were false and misleading.

22         Mr. Ferrone falsely and misleadingly stated that

23  preparations for clinical trials are underway in both the

24  U.S. and Europe.  We already talked about this.  There were

25  no preparations for clinical trials underway in either the

1   U.S. or Europe.  In the U.S. there couldn't be any

2   preparations because of the clinical hold.  Mr. Ferrone knew

3   that.

4          You heard no evidence from Mr. Ferrone or any other

5   witness that there were any preparations underway for

6   clinical trials in either the U.S. or Europe.

7          In Europe there was not even an application filed

8   for clinical trials.  And Mr. Ferrone knew even if one had

9   been, which he didn't, that it wouldn't have been successful

10  because of what was happening with the FDA.  He knew that the

11  standards in Europe were similar to the standards in the

12  United States.

13         This was a false and misleading statement.

14  Mr. Ferrone knew it.

15         Examples of documents containing this false and

16  misleading statement are the January 2008 *CEOCFO* interview,

17  Trial Exhibit 303, and the February 2008 press release

18  regarding those wound-healing photographs, Trial Exhibit 305.

19  You saw the statement in almost every public statement that

20  Mr. Ferrone made.  So you can find other examples, many

21  others, as well.

22         Another false statement that Mr. Ferrone made, a

23  false and misleading statement.  He said falsely and

24  misleadingly that Immunosyn's immediate focus was on

25  preparing for the achievement of successful clinical trials.

1    He said this in the *CEOCFO* interview, Trial Exhibit 303.

2    This was totally false and misleading.

3           How could Immunosyn's immediate focus be on

4    preparing for successful clinical trials when the drug was on

5    clinical hold and when Argyll hadn't resolved any of these

6    deficiencies?

7           How could the focus be on successful clinical

8    trials in Europe when Argyll hadn't even filed an

9    application?  And even if they had, it wouldn't have been

10   successful, as Mr. Ferrone knew, because of what was going on

11   in the United States.

12          Another false and misleading statement that

13   Mr. Ferrone made.  Mr. Ferrone falsely and misleadingly

14   stated that applications were underway with the FDA for

15   clinical trial approval of SF-1019.

16          He said this in the video presentation that was on

17   Immunosyn's Web site for several years.  He said that in the

18   transcript of the presentation that was filed as an

19   attachment to a Form 8-K in Trial Exhibit 292.

20          Applications were not underway with the FDA.  An

21   application had been filed in December 2006, and the FDA had

22   responded with a full clinical hold.  Argyll had not resolved

23   any of the many deficiencies that the FDA identified.

24          Then there was a second IND application filed in

25   November 2008.

1             And in December 2008, the FDA responded with a

2 clinical hold. And none of those deficiencies identified in

3 that clinical hold were resolved either.

4             That was what was going on, not applications were

5 underway. Another false and misleading statement by

6 Mr. Ferrone.

7             Mr. Ferrone falsely and misleadingly stated that,

8 "Argyll anticipated that it would commence clinical trials

9 and studies of SF-1019 and prepare and submit all filings

10 required for such clinical trials and studies of SF-1019 for

11 treatment of CIDP, diabetic neuropathy, and diabetic ulcers,

12 both in the United States and in other countries that are

13 targeted for distribution and sale of the product."

14             They will prepare and submit filings for clinical

15 trials for these conditions? No, ladies and gentlemen.

16 Argyll had submitted an application for clinical trials for

17 some of these conditions in December 2006, and the FDA

18 responded with a clinical hold.

19             These statements that were in the 10-Ks -- the 2007

20 10-K, Trial Exhibit 279; the 2008 10-K, Trial Exhibit 296 --

21 you can look at all of the pages of those 10-Ks. Nothing in

22 those 10-Ks will say that Argyll actually had filed an IND.

23 No. It said they will file -- it will file an IND, will file

24 an application for clinical trials at some point in the

25 future. False and misleading.

1    I referred to this earlier.  Mr. Ferrone falsely

2    and misleadingly stated that if the FDA or its foreign

3    equivalent raises questions about an IND within a certain

4    period of time after its submission, that regulatory body --

5    I think the word "body" is missing, but that regulatory body

6    may impose a clinical hold.  That's what the 10-Ks said.  A

7    total lie.  A total falsehood.  This was not some

8    possibility.  This was a reality, a certainty, and

9    Mr. Ferrone knew it.

10    They referred to some of these risk factors, these

11    risks and uncertainties before.  Here is an example.

12    Mr. Ferrone falsely and misleadingly stated in the "Risk

13    Factor" section of the Form 10-Ks that clinical trials may be

14    delayed or affected by many factors, including government or

15    regulatory delays.  And any delay in the commencement or

16    completion of trials will adversely affect Immunosyn's

17    ability to generate any revenues.

18    This was not a risk and uncertainty.  This was a

19    certainty.  And it was not disclosed.  It was falsely and

20    misleadingly portrayed by Mr. Ferrone as some sort of risk or

21    uncertainty that could occur in the future.  No.  It had

22    already happened, and Mr. Ferrone didn't disclose it.

23    Instead he made false and misleading statements.

24    Mr. Ferrone falsely and misleadingly stated in the

25    10-K "Risk Factor" section that SF-1019 has not been approved

1    for any human use.  Argyll has not received regulatory

2    approval of SF-1019's use in clinical trials.  Regulatory

3    authorities have the ability to shut down any trials due to

4    safety, efficacy, or other concerns.  And any such action by

5    the regulatory authorities or any delay of a clinical trial

6    could materially and adversely affect the company's exclusive

7    license from Argyll.

8                 Not a risk.  Not an uncertainty, a certainty.  By

9    rejecting this IND, by putting it on clinical hold -- two

10   INDs, the FDA had effectively shut down clinical trials for

11   reasons related to safety and efficacy of a drug.  That's

12   what the clinical letter hold said.  That's what was

13   communicated to Mr. Ferrone.

14               We heard some testimony about, well, the IND is

15   still on file with the FDA.  That doesn't mean it was

16   rejected.  Nonsense.  The clinical hold meant it was

17   rejected.  The failure by Argyll to address these

18   deficiencies month after month after month, that meant it was

19   rejected.  And it meant these statements about these risks

20   and uncertainties were lies, half-truths, misleading

21   statements.

22               Mr. Ferrone falsely and misleadingly stated in the

23   10-Ks that Immunosyn anticipated the process of Argyll

24   seeking regulatory approval from the FDA and foreign

25   regulatory authorities to last between three and five years.

1    Keep in mind, ladies and gentlemen, this was a
2    description, three and five years, for the whole regulatory
3    approval process.  Clinical trials were just a part.
4    Clinical trials, by the time of the 2008 10-K filed in
5    March 2009, as Mr. Ferrone knew, just the clinical trials
6    portion, just to begin them had been delayed by two years.

7    And Argyll had made no progress toward starting
8    them, no progress in resolving the deficiencies that the FDA
9    had identified.

10    And just to start the clinical trials had been
11    delayed by two years.  And that delay kept growing and
12    growing and growing.

13    And then they had to do the clinical trials, and
14    then other steps had to be done.

15    So this three- and five-year period, it had already
16    been delayed by over two years.  And there was no forecast in
17    Mr. Ferrone's mind or in anybody's mind at Argyll that those
18    delays were going to be resolved any time soon.  He knew it.
19    Investors didn't.

20    This was a lie, a false statement, a half-truth.

21    Mr. Ferrone falsely and misleadingly stated that
22    Argyll had achieved a number of milestones, including
23    preclinical human studies.  Here are some examples of where
24    that kind of statement was made, the "Dear Investor" letter,
25    Trial Exhibit 109; the Flaherty conference, Trial Exhibit 76.

1      Sure, there were some statements in the 10-K that

2   clinical trials had not begun.  But what was an investor to

3   understand from these statements made about these milestones

4   regarding preclinical human studies and all the great

5   successes?

6      The only thing an investor could conclude from that

7   is that when clinical trials were to start, the FDA would not

8   have a problem with them starting and that they would go

9   smoothly because, according to Argyll and Mr. Ferrone, these

10  preclinical studies had demonstrated the safety and efficacy

11  of the drug.

12     But that's what clinical trials were for.  And the

13  FDA had told Argyll, as Mr. Ferrone knew, that safety and

14  efficacy wasn't proven to the FDA's satisfaction to start

15  these clinical trials.

16     There were no milestones.  This was a lie.  This

17  was a false statement, a misleading statement.

18     Mr. Ferrone falsely and misleadingly stated in

19  Immunosyn's March 2009 10-K that if the submitting doctor was

20  successful in gaining approval for its clinical trial, Argyll

21  intended to supply SF-1019 at no cost to the physician for

22  use in the trial.

23     I already discussed how this statement was false

24  and misleading, how Mr. Ferrone knew that SF-1019 was dead in

25  the view of Dr. Melling, and that there was no approval and,

1    in fact, a clinical hold.

2            So when you go back to the jury room at the end of

3    the day, you are going to have to fill out a verdict form,

4    and you are going to have to check whether you find in favor

5    of the SEC or Mr. Ferrone on certain claims.

6            And as I said, we have to prove certain things in

7    order for you to find in our favor.  One of the things we

8    have to prove is false and misleading statements.  Check.  We

9    have proved it in this case.

10           Mr. Ferrone also engaged in a scheme to defraud and

11   in acts, practices, and a course of business which operated

12   as a fraud and deceit by making repeated false and misleading

13   statements that Immunosyn was continually achieving important

14   milestones toward regulatory approval and human clinical

15   trials.

16           As Ms. Bautista said in her opening statement, to

17   say that Argyll hadn't started clinical trials or that the

18   FDA had not yet approved them is not the same as what

19   Mr. Ferrone said, which was repeatedly saying that there were

20   milestones toward regulatory approval, that progress was

21   being made, that the safety and efficacy of this drug had

22   been demonstrated, which suggested that clinical trials would

23   be a breeze; that there were no problems, no roadblocks.

24           As Ms. Bautista explained, it's like if you apply

25   to a college and the college says, we are not accepting you

1    because you have to do all these things -- you have to take

2    more tests, you have to complete more courses, you have to

3    get this standard or that standard met -- and then you don't

4    do any of it, it's not the same to just say, well, I haven't

5    been admitted yet.

6          When you don't disclose all those things -- when

7    you have been set back by the fact that the college has told

8    you, you have to do all these things and you haven't done

9    them is not the same, and it's misleading to create the

10   impression otherwise, that you are making progress, that you

11   are on the verge of something great, that you are on the

12   verge of clinical trials, that clinical trials will be a

13   breeze because the drug has already been demonstrated to be

14   safe and effective.

15         This was a scheme to defraud by Mr. Ferrone by

16   making these repeated false and misleading statements.

17         So the SEC has proven that Mr. Ferrone engaged in a

18   scheme to defraud.  We have proven that he engaged in acts,

19   practices, and a course of business which operated as a fraud

20   and deceit.  Ladies and gentlemen, you can put a check by

21   that element we have to prove.

22         As part of Claim I, another thing that we are going

23   to have to prove is materiality, which is a fancy word for

24   importance.

25         We are going to have to prove that the lies and the

1    misleading statements and the half-truths that Mr. Ferrone

2    made would have been important to an investor.  The term you

3    will find in the jury instructions say "reasonable investor,"

4    which means, more or less, an average investor, a

5    hypothetical average investor who was thinking about or who

6    did buy or sell Immunosyn stock.  From their perspective,

7    would this have been important?  Would this have affected

8    substantially their decision to invest based on what's called

9    the total mix of information, which is basically all the

10   information that Mr. Ferrone had put out about this company?

11   We proved that as well.

12            For example, Mr. Ferrone said in Immunosyn's

13   Form 10-Ks that government action that shut down clinical

14   trials would adversely affect Immunosyn's license with

15   Argyll.  A clear statement that this was material.  This was

16   important.  This was important stuff about government actions

17   that affected clinical trials.

18            Mr. Ferrone described the process of FDA review as

19   "essential."  This is Trial Exhibit 27.1.  This is the e-mail

20   edits that Mr. Ferrone made that they put in red to that

21   press release regarding Becker, and he marked it up in the

22   attachment to Exhibit 27.1.  And his edit was to describe the

23   FDA review process as "essential."  He knew it was essential

24   to his company.  Anything that had anything to do with this

25   review process was essential.

1     Mr. Ferrone said in Immunosyn's Form 10Ks that any
2     delay in the commencement or completion of clinical trials
3     would adversely affect Immunosyn's ability to generate
4     revenues.  Another clear statement that this was important
5     stuff.
6     Mr. Ferrone testified the other day, in one of the
7     most significant parts of his testimony, that when he was
8     just an investor in this stock and not the CEO, when he had
9     these shares in August of 2006, when he was just an investor,
10    he was very interested in every detail he could find out
11    about regulatory status.  That's reflected in his e-mails
12    with Dr. Ericsson and Dr. Haufrecht way back in January and
13    February of 2007, Trial Exhibit 276.
14    Mr. Ferrone testified that one of the reasons he
15    was engaging in that correspondence with them was because, as
16    a shareholder, it was obvious to him that he would be
17    interested in that type of information.  Every detail about
18    the regulatory approval process for this company for this
19    drug was important.  Mr. Ferrone knew it.
20    He also testified yesterday that he knew the entire
21    success of this company depended upon regulatory approval.
22    That's not news to anybody.  He admitted it.  That's exactly
23    what Immunosyn said over and over and over.  That's what
24    every investor understood.
25    For example, Mr. Sacks testified that this

1    information would be important to him.

2            Here is an e-mail that we saw, I believe, yesterday

3    where Mr. Ferrone demonstrated in writing that he knew that

4    clinical trials were important.  This is Trial Exhibit 74.

5    This is what Mr. Ferrone wrote.

6            "Mr. Remenick had pinpointed an important, if not

7    the critical, issue.  Safety and efficacy may have been

8    demonstrated in clinical studies but not yet in clinical

9    trials."

10           By "clinical studies," Mr. Ferrone was referring to

11   these preclinical human studies that he talked about over and

12   over and over.  He knew the difference between clinical

13   trials and clinical studies.  He knew that clinical trials

14   was what was important to this company, not these preclinical

15   human studies.

16           He knew this issue was important.  He said it in

17   Trial Exhibit 74 in writing.

18           Dr. Willeford and others testified about the

19   importance of these issues.  Dr. Willeford, the doctor from

20   Mississippi State; Dr. Melling, the doctor from Utah; Todd

21   Ollendorff, who we heard from right before Mr. Ferrone in

22   terms of live witnesses; Dr. Kanter, the doctor from Buffalo,

23   who came in toward the end of the trial; Dr. Becker, who

24   testified in the deposition that was read, they all talked

25   about the failure to identify the product as an important

1    deficiency that the FDA identified and that Argyll didn't

2    resolve; the failure to show stability of the product,

3    another deficiency that the FDA had identified and that

4    Argyll never resolved; the failure to do toxicology studies

5    to the FDA's satisfaction.  All these witnesses talked about

6    how important, how significant these issues were and how they

7    were never resolved.

8         Mr. Sacks, the first witness who testified, who

9    lost $300,000, testified about the importance of FDA approval

10   in his investment decision.

11        Dr. Melling, both an investor and a doctor who

12   ultimately submitted an IND, he and his family lost money.

13   He didn't know about the clinical hold when he and his family

14   invested.  He testified about how important the clinical hold

15   was when he found out about it later.

16        There is a mountain of evidence that shows how

17   important these issues were.  You can check the box for

18   materiality.

19        We also have to prove, as you will be instructed,

20   under Claim I, that Mr. Ferrone acted with *scienter*.  This is

21   a fancy word for needing to act with an intent to defraud.

22   And we can prove intent to defraud by showing that

23   Mr. Ferrone acted either knowingly or recklessly.

24        What does "recklessly" mean?  Well, you will see in

25   the jury instructions that it means that Mr. Ferrone had to

1  act with an extreme departure from the standards of ordinary

2  care so that he would have been aware of a risk that was so

3  obvious that he must have been aware of it.

4  So, in other words, if you take what you think a

5  reasonable CEO in his position would have done and you

6  conclude that his conduct was so extremely different from

7  what that reasonable CEO would have done, and you find that

8  that conduct was with respect to a risk that it was so

9  obvious that he must have been aware from it, then we have

10  proved recklessness.

11  And we have proved reckless, and we proved

12  knowledge as well.

13  Mr. Ferrone knew important information that

14  investors did not, and he didn't disclose it.  He knew about

15  the clinical hold.  He knew about the IND filing, the first

16  one, and when it was filed.  Never disclosed.  He knew about

17  the deficiencies that the FDA identified.  Never disclosed.

18  He knew about the failure to resolve those deficiencies.

19  Never disclosed.  He knew about the delays that grew and grew

20  and grew as a result of the clinical hold and Argyll's

21  failure to resolve these deficiencies.  He knew all these

22  facts, and he didn't disclose them.  He knew.  We have proved

23  that.

24  Other conduct by Mr. Ferrone proved that he was not

25  truthful.  For example, we saw e-mails regarding these

1    preclinical human study press releases that Mr. Ferrone
2    talked about repeatedly.  And we saw that just days before
3    this press release went out about Dr. Ericsson's SF-1019
4    study results that Mr. Ferrone expressed many doubts about
5    these studies, many doubts about them.  He was very
6    concerned, he said.  And this is Trial Exhibit 54, where he
7    expressed those doubts.  Very concerned.  Very concerned
8    about neurological scores.  Very concerned that a big
9    pharmaceutical company could cut these up in a big way, could
10   criticize these in a big way.  They could be criticized in a
11   big way.

12           He had also been told very recently by
13   Mr. Ollendorff in Trial Exhibit 291 that Dr. Ericsson was not
14   qualified with respect to the IND.  He knew all these things.

15           Then what happened, folks?  Days later this press
16   release was issued.  He was told all these things in late
17   October.

18           And then, in early November, this press release
19   went out.  And then Mr. Ferrone talked about this study
20   repeatedly, over and over.  All the things that he was very
21   concerned about ended up in that press release.

22           And then he talked about them.  Mr. Ferrone talked
23   about them repeatedly, how great this study was, how it
24   proved safety and efficacy.

25           We also saw in the evidence regarding this

1   wound-healing study that he talked about and that a press

2   release was released about and in which Mr. Ferrone was

3   quoted.

4           And we saw -- this was in Trial Exhibit 16.1 --

5   where Dr. Ericsson had told Mr. Ferrone that this wound

6   healing, that's a joke of the industry.  And what did

7   Mr. Ferrone do with this subject matter that was the joke of

8   the industry?  Publish this false and misleading press

9   release with these pictures of the before and after wound

10  healing, all signifying, according to Mr. Ferrone, that

11  progress was being made toward regulatory approval.

12          That's what he said in, for example, the Flaherty

13  conference, Trial Exhibit 76.  You will see that in the

14  transcript.  He talks about all these press releases

15  regarding these preclinical studies.  And he said all these

16  speak to the regulatory approval process.  All of these speak

17  to these milestones one after the other.  He linked it to the

18  regulatory approval process.

19          He knew that these studies, in terms of the

20  regulatory approval process, meant nothing.

21          As I talked about before, he had a strong financial

22  motive to mislead investors to try to keep his hopes of a big

23  payday alive.  Salary, the big bonus that could have resulted

24  in millions and millions of dollars for him, the stock

25  holdings he had that could have gone up if the stock price

1    stayed up.  He had a motive to lie, and he did lie.

2              He had *scienter*.  He acted knowingly, and he acted

3    recklessly.

4              If we needed more evidence about how Mr. Ferrone

5    knew that his campaign of lies, his assault of lies and his

6    marketing plan was having the effect of misleading people, we

7    have it, because he was told by the Blaine Group in the

8    reports that the Blaine Group sent him that, as a result of

9    all these releases, people were saying to the Blaine Group,

10   when are these clinical trials starting?  We think they are

11   going to start.  So this is an example from Trial

12   Exhibit 138, a Blaine Group report that went to Mr. Ferrone.

13             The Blaine Group report reported to Mr. Ferrone

14   that a man by the name of Joseph Russo was asking.  His wife,

15   Susan, had multiple sclerosis, and he wanted to learn more

16   about the clinical trials for SF-1019.  The Blaine Group

17   reported to Mr. Ferrone that people like Mr. Russo were

18   asking these questions because of all this information that

19   was being put out by Mr. Ferrone.

20             Another example that we saw.  This was from another

21   Blaine Group report, Trial Exhibit 140.  Mr. Ferrone was told

22   by the Blaine Group that this individual, Dale E.

23   Christernsen wanted more information on when clinical trials

24   would start in the U.S. for SF-1019.  He had MS and had it

25   for 22 years.

1    Based on all this information that Mr. Ferrone was

2    putting out, Mr. Ferrone was told by the Blaine Group that

3    people thought clinical trials were starting.  That's the

4    impression -- or about to start.  That's the impression

5    Mr. Ferrone wanted to leave.  That's the impression it did

6    leave, and he knew it.

7    He acted knowingly.  He acted with a reckless

8    regard for the truth.  We established *scienter*.

9    For Claim I we also have to prove that

10   Mr. Ferrone's conduct occurred in connection with the

11   purchase or sale of a security.  And we saw evidence of this

12   yesterday through Mr. Kustusch and the exhibits that he

13   prepared that are admitted into evidence, all the activity in

14   Immunosyn's stock during the period in which Mr. Ferrone was

15   making all these misleading -- false and misleading

16   statements.  Day after day, people buying shares, people

17   selling shares.

18   We don't have to prove, as you will find in the

19   jury instructions -- the SEC doesn't have to prove reliance,

20   which means we don't have to show that a particular investor

21   read what Mr. Ferrone wrote and then went out and bought in

22   reliance on what Mr. Ferrone said.  That's not what we have

23   to prove.  That's not what you will be instructed regarding

24   in connection with the purchase or sale of security.

25   Rather, you will be instructed that Mr. Ferrone's

1     conduct satisfies this element if his conduct touched upon

2     the purchase or sale of security.  Any connection, you will

3     be instructed, between Mr. Ferrone's conduct and the purchase

4     or sale of a security satisfies this element, and we have

5     shown that.  Repeated activity in the stock during the period

6     Mr. Ferrone was making those statements -- those public

7     statements.

8              Mr. Ferrone, among other things, directed investors

9     to the Web site, directed investors to the SEC's public

10    filings.  There is a clear connection between his conduct and

11    the purchase or sale of securities.

12             The final thing we have to prove for Claim I is

13    that Mr. Ferrone used or caused to be used the mails or the

14    means and instrumentalities of interstate commerce, including

15    a facility of a national securities exchange.

16             Mr. Ferrone's and Immunosyn's 10-Ks and 10-Qs and

17    8-Ks filed electronically with the SEC in Washington

18    satisfies this element.  Immunosyn's releases distributed by

19    a wire service and other ways, including being filed with the

20    SEC and distributed in press releases, satisfies this

21    element.

22             Mr. Ferrone's presentations in New York, Las Vegas,

23    Utah, and other places also satisfies this element.

24             We have proved this element.  I don't think you

25    will hear Mr. Ferrone really try to claim we didn't.

1    Now let's move on to Claim II. And some of these

2    overlap, so we are not going to have to cover some of these

3    additional claims in as much detail.

4    Claim II is that Mr. Ferrone provided false

5    certifications in Immunosyn's SEC filings. This is a claim

6    devoted to those certifications that he filed. So this

7    includes the 10-Ks for 2007 and 2008, Trial Exhibits 297 and

8    296; and 10-Qs, such as Trial Exhibit 283. That's the

9    December 2009 10-Q, in which Mr. Ferrone claimed that he

10   found out about the clinical hold on Dr. Melling's IND from

11   the SEC when we questioned him in September of 2009. A total

12   and utter falsehood.

13   He knew about that clinical hold long before. He

14   knew it clearly when Dr. Melling told him SF-1019 was dead.

15   He knew it clearly when Mr. Ollendorff told him that there

16   was an anticipated "no" response. He knew it clearly from

17   the history of the prior IND, which would have been on

18   clinical hold for years. And no deficiencies had been

19   resolved.

20   And the 10-Ks, we talked about all the false and

21   misleading statements in those, all the misportrayal of all

22   of these events, these delays, uncertainties, and

23   possibilities when they were certainties.

24   So we proved he also had final approval of all

25   Immunosyn filings. That's what Mr. Ollendorff said. That's

1   what Mr. Ferrone said.

2          So he filed or caused to be filed these

3   certifications, because he had final approval of these

4   filings.  And the certifications were false and misleading.

5   He knew they were false or they omitted information that made

6   statements misleading, as I talked about earlier, with

7   respect to Claim I.  You can put a check by those elements we

8   have to prove.

9          Now we are on to the last claim, Claim III.

10         To prove this charge, we must prove that Immunosyn

11  filed annual, quarterly, or current reports with the SEC that

12  contained a materially misleading statement or omission, that

13  Ferrone generally was aware or knew that his actions were

14  part of an overall course of conduct that was improper or

15  illegal, and that Mr. Ferrone substantially assisted

16  Immunosyn's filing of a materially misleading report.

17         We talked earlier, so I won't talk about it in any

18  detail further.  All the false and misleading statements in

19  the 10-Ks, 10-Qs -- this is Trial Exhibit 283, the

20  December 2009 one -- and all these 8-Ks, which contained the

21  press releases, examples of those, Trial Exhibits 278, 303,

22  and 305.  Many more 8-Ks that you can look at when the

23  evidence goes back with you into the jury room.  And I have

24  described all the ways in which these were false and

25  misleading.

1      Mr. Ferrone was generally aware or knew that his

2      actions were part of an overall course of conduct that was

3      improper or illegal.  Again, I have explained how he knew

4      that these press releases that he signed, the other public

5      statements that he made were false and misleading.

6      He launched this assault on investors day after

7      day, week after week, month after month to try to create this

8      misimpression about the regulatory status of this drug.  That

9      was a course of conduct that was improper or illegal, and he

10     did that, among other things, through these SEC filings.

11     We have to show that Mr. Ferrone substantially

12     assisted Immunosyn's materially false and misleading filings.

13     We did that.

14     The evidence showed that Mr. Ferrone substantially

15     assisted with Immunosyn's filings by signing and certifying

16     them, by reviewing and editing them, and by giving final

17     approval to those filings.

18     So we proved this claim as well.

19     We have proved all of our claims in this case, and

20     you should put a check for the SEC when you fill out the

21     verdict form as to those three claims.

22     Ladies and gentlemen, when Mr. Ferrone signed up to

23     be CEO of a public company, he took on the responsibility to

24     tell investors complete, truthful, and accurate information.

25     He took on the responsibility not to lie to them and not to

1    mislead them.

2            The investors, like Mr. Sacks, Dr. Melling, and

3    others, they were entitled to know the truth.  It's at the

4    core of our financial markets.  These securities laws, which

5    you are going to decide on, they exist to protect investors.

6    And one of the ways they do that is by requiring public

7    companies to provide complete and truthful and accurate

8    information.  And CEOs of public companies in particular have

9    to tell the truth, the whole truth, when they speak to the

10   investing public.  That's why they have to sign these

11   certifications.

12           The evidence you heard in this case establishes

13   overwhelmingly, by far more than the preponderance of the

14   evidence, that as CEO of Immunosyn, Mr. Ferrone repeatedly

15   made inaccurate and misleading statements to investors.

16           He painted a rosy picture of Immunosyn's prospects

17   with respect to regulatory approval while withholding and

18   concealing the ugly reality about regulatory approval, the

19   ugly reality about the clinical holds and about Argyll's lack

20   of progress in resolving them.

21           His conduct violated his fundamental duty to

22   investors to tell the truth and did not conceal information

23   that made statements misleading.  He violated the law.  We

24   ask you to hold him accountable and find in our favor on all

25   three of our claims.

1751

```
 1           I am going to let Mr. Ferrone's lawyers speak now.

 2    I will be back after Mr. Ferrone's lawyers speak to you with

 3    a rebuttal.

 4           I thank you for your service.  I thank you for your

 5    attention.  I thank you for your time.

 6           Thank you, your Honor.

 7           THE COURT:  Thank you, Mr. Phillips.

 8           I would like to take a ten-minute comfort break

 9    here.  I don't think we need as long as we usually take

10    because this isn't as taxing as listening to the evidence,

11    but I would like to take a ten-minute break.  Let you guys go

12    back to the jury room.  And then we will come back and hear

13    from the defense in this case.

14           I will remind you, we are almost there, but we are

15    still not over the hump.  You have only heard one side's

16    closing argument, not the other, and you haven't heard my

17    instructions with respect to the law, which will come after

18    this.  So please don't start deliberating and discussing the

19    case, but that will come soon.

20           Thanks a lot.

21           THE CLERK:  Court stands in recess.

22           (Jury out at 11:06 a.m.)

23           THE COURT:  Okay.  See you in ten.

24           MR. RUBENSTEIN:  Thank you.

25           (A brief recess was taken at 11:06 a.m.)
```

closing argument - defendant

1752

1     (In open court, in the presence and hearing of the jury:)

2          THE COURT:  Okay.  Sorry that took a little bit

3     longer.  We had what can be described as a technology glitch.

4     So that wasn't a lawyer/judge conference, but I think we are

5     unglitched.

6          So, Mr. Rotert, whenever you are ready.

7          MR. ROTERT:  Thank you, Your Honor.

8          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

9          MR. ROTERT:  May it please the Court, ladies and

10    gentlemen for the government, ladies and gentlemen of the

11    jury.

12         I don't know if it seemed this way to you, but it

13    seemed to me as I listened to the lawyer for the government

14    this morning that there was lot of anger in there, a lot of

15    raising his voice.  And I don't know.  Maybe that anger is why

16    he has an aversion to smiling faces.  It seemed like the

17    presence of a smiling face in a brochure was challenging.  And

18    I don't think anger is a good way to approach the issue.  I

19    think we should approach it with some logic and some clear

20    thinking.  But, most important, we should approach it by

21    looking at the evidence and making a rational decision on what

22    the evidence shows.

23         I think it's really important to understand at the

24    very outset of my remarks how the SEC has defined the issue

25    that's going to be resolved by you.  And they ask you to put a

closing argument - defendant

1753

1   check in the box next to them, and I want you to understand

2   what they say you have to conclude in order to put that check

3   there.

4          They maintain that Steve Ferrone is a liar.  I had

5   the ambition when I started to listen to the remarks this

6   morning of counting the number of times that they called Steve

7   a liar, and I lost track.  And they maintain that he lied

8   intentionally in order to get money.  This isn't a claim by

9   them that he was reckless.  This isn't a claim that he

10  accidentally created a problem.  They say that he had a

11  motive.  Motives are things that people form when they decide

12  intentionally to choose to do something that is wrong.  So

13  they have drawn that line right here for us to discuss.

14         They maintain that the evidence in this case shows

15  that Steve Ferrone had made this conscious decision to scheme.

16  Twice this morning you were told by the government lawyer that

17  the evidence in this case is reflective of a scheme to

18  defraud.  That's a plan.  That's something that you think up

19  and execute according to a plan.  And, they say, the reason

20  that he had this plan, this scheme, was because he wanted to

21  get a big bonus.

22         Now, we are going to take a walk through the

23  evidence.  We are going to find out whether or not that has

24  any support in the evidence, and then we're going to talk

25  about whether it could possibly make any logical sense in your

closing argument - defendant

1754

1  mind.  Because to call a person in open court under

2  circumstances like this, over and over and over again, a liar

3  and a fraudster, those are pretty harsh and hurtful words.

4  And if you're going to put that kind of stuff up there, if

5  you're going to say that that's what this person was about, it

6  seems to me that there ought to be a lot of evidence to

7  support it.

8          You also have been told some things that I want to

9  examine a little bit more closely today.  You have been told

10 that when the FDA put this clinical hold on this developmental

11 drug SF-1019 that they put the brakes on it.  And the reason

12 you remember -- you were told that is because they put a cute

13 little red stop sign up every time they said that because they

14 wanted to tell you, oh, my gosh, SF-1019 was dead.  It was a

15 goner.  There was no future for SF-1019.  We're going to take

16 a look at that.

17         They said, you know, this was a safety issue.  They

18 told you in the opening statement and again today, oh, this is

19 all about this not being a safe drug.  We're going to take a

20 look at that issue as well today.

21         Now, I want to tell you at the outset what is the

22 crux of the SEC's theory.  When you take everything that's

23 been said over the course of two weeks and a lot of talk by

24 lawyers and you boil it all down to a simple proposition, what

25 is the SEC's primary theory of its case?  I'll tell you.

closing argument - defendant

1    Their primary theory is that there are two words that you have

2    to put together and write down and put into a release or a

3    filing, and those two words are "clinical hold."  And they're

4    magic words, because if you tell the average person "clinical

5    hold," they have understanding.  They understand everything

6    that's happened by the FDA.  On the other hand, if you tell

7    people in writing what the practical effect of a clinical hold

8    is, you're a fraudster.  You're a liar.  You have a motive to

9    cheat.  That's a pretty interesting concept.

10          They maintain and have maintained at every point of

11   these proceedings that the problem that recurs in every 10-K,

12   every 8-K, every 10-Q, every press release, the real problem

13   is that the two words "clinical hold" did not appear in the

14   text and that that's what Mr. Ferrone did to execute his

15   scheme to defraud.  He failed to use the magic words.

16          Now, what does the evidence show you?  The

17   testimonies of Drs. Willeford and Melling and the evidence

18   that you heard and received through the documents, it shows

19   you this:  If the FDA receives one of these new drug

20   applications and it believes or concludes that that

21   application doesn't contain adequate or sufficient scientific

22   information, then the FDA notifies the applicant who put that

23   submission in to them and asks them to provide more scientific

24   information.  That is what a clinical hold does.  It says,

25   okay, we got what you sent us.  We have questions we want you

closing argument - defendant

1756

1    to answer.  And as we are going to see, that essential

2    proposition was known by everybody who looked at any of these

3    materials.

4           But I want to go back to the idea that the SEC has

5    been peddling all through these last two weeks, that these two

6    magic words "clinical hold" must appear in order to help the

7    average investor understand what was going on.

8           Now, the first point we're going to talk about is are

9    those really magic words?  No witness in this case ever

10   testified that the words "clinical hold" have to be in a

11   filing in order to have an investor understand what the FDA

12   did.  No document or exhibit in this case shows that anyone

13   ever cautioned, directed or suggested to Steve Ferrone that

14   the words, specific words "clinical hold" must be used in

15   order to make an adequate disclosure to investors.  The first

16   time that Mr. Ferrone was given the understanding that that

17   appeared to be a set of magic words that had to appear was in

18   September of 2009 when the SEC called him in and said that's

19   their view.  And today it's their view.  They believe that

20   those two words must be there in order for Mr. Ferrone to have

21   been acting responsibly; but as near as I can determine,

22   they're the only people who hold to that opinion.  And they're

23   entitled to their opinion, but Mr. Ferrone is being called a

24   liar for not using those two words.

25          Now, in all of the people and characters and

closing argument - defendant

1757

1 documents that prevailed across your line of vision this last

2 couple of weeks, I would submit to you that one person was

3 most qualified to speak to this topic. She didn't actually

4 come in here in her human form. She's not divine, but she

5 wasn't here with us. But there was a transcript read of the

6 testimony under oath that was taken from a person named

7 Dr. Karen Becker. Dr. Karen Becker has a doctorate in

8 pharmacology from the University of Maryland. And she is so

9 knowledgeable about how the FDA works and what it does and

10 what it wants that she makes a living consulting to major

11 pharmaceutical companies. She helps the biggest companies,

12 the people you see on the shelves at Walgreens or any of your

13 other prescriptions, those companies hire Dr. Becker to help

14 them get through this FDA process. So she knows what she's

15 talking about.

16         And she was asked about the magic words. And she was

17 asked in preparing her response to Mr. McClain -- and by the

18 way, she had been given the clinical hold letter. We're going

19 to see this in a minute.

20         "Do you recall making a conscious decision regarding

21    whether or not the clinical hold should be mentioned as part

22    of the description of the work you were performing?

23         "A.  I don't recall.  I would just add, and I don't

24    know if this is helpful, I wouldn't normally use a phrase

25    like that because it wouldn't be understood by anyone other

closing argument - defendant

1758

1     than a professional who works in the FDA world."

2          The only thing I can disagree about with Karen Becker

3     on this is it was extremely helpful for her to say that

4     because it is the truth.  It wasn't even something that some

5     smart lawyer went and elicited from her.  She just decided,

6     you know, I should mention that the term "clinical hold" is

7     not something that would be that meaningful to somebody who

8     isn't in the FDA world.

9          Now, earlier today, counsel for the government said

10    at very high volume that Mr. Ferrone surely would have known

11    what "clinical hold" meant because he's well-educated.  And he

12    is.  He went to Northwestern.  Better than I could.  Went to

13    law school, graduated.  He's got a law degree.  And so I --

14    you are asked to believe that on that basis it's apparent that

15    Mr. Ferrone would have known what a clinical hold meant.

16    Well, that's kind of hard for me to accept, and the reason is

17    that Dr. Melling in Utah went to medical school, which is a

18    heck of a lot more relevant to the issue of FDA and

19    pharmaceuticals.  And I asked Dr. Melling when he was on the

20    stand when he was under oath, Doctor, before the term was

21    brought to your attention when you were working with Todd

22    Ollendorf, did you know what clinical hold meant?  He said no.

23    Well, wait a minute.  If you can go to med school and then

24    come out and have your own clinic and treat patients for all

25    these years and prescribe how many knows -- who knows how many

closing argument - defendant

1   prescriptions, and you don't know what the word "clinical

2   hold" really means in all of its glory, is it really fair to

3   say that Mr. Ferrone would?  No.  And Dr. Becker kind of slam

4   dunks this notion that these are magic words.

5          Now, the next thing that you were told is that this

6   red stop sign should come up in your mind when you think about

7   an FDA clinical hold.  This is like you got rejected by

8   Harvard, my friend.  You can't go to school here because you

9   don't have the credentials, this thing, you are kidding

10  yourself.  Well, that's kind of a not true statement or

11  assertion by the government because, in fact, it wasn't

12  rejected in the sense that the FDA said, get this stuff out of

13  here; we do not want to hear anything about this SF-1019; what

14  are you guys smoking over there?  That's not at all what the

15  evidence is.

16         Dr. Ken Willeford testified that he communicated with

17  the FDA about the new drug application that he and

18  Dr. Ericsson together had their names on and submitted.

19  That's what we've always referred to in this trial as the

20  first clinical hold.  So Ericsson is the doctor who does the

21  bulk of the research, and Willeford is the doctor who signs on

22  as a sponsor because he's excited about SF-1019.  And when the

23  FDA says, you're on hold, Willeford says, I contacted the FDA

24  and they, quote, made very clear, closed quote, that the hold

25  was not a rejection of SF-1019.  In fact, said Dr. Willeford,

closing argument - defendant

1760

1  I spoke with Dr. Katz.  You may want to get this.  It's

2  K-a-t-z.  Dr. Katz is the person who actually signs the

3  clinical hold letter.  And Dr. Katz told Dr. Willeford that

4  the FDA, quote, encouraged further pursuit, closed quote, of

5  the IND.

6          Remember Dr. Kanter?  Dr. Kanter was another really

7  smart guy.  And he was an equine doctor.  He specializes in

8  horses, love to go to the track with Dr. Kanter.  But he also

9  does a lot of research in toxicology, and that's his

10 expertise.  And he does toxicology for also major

11 pharmaceutical companies, the biggest of the big.  So this is

12 a guy who knows what he's doing.  And this is a guy who lives

13 in this world of going to the FDA and trying to get approvals.

14         Dr. Kanter said in a letter to Mr. McClain, and he's

15 talking about the FDA's clinical hold letter.  He's, unlike

16 Mr. Ferrone, actually got a copy of this letter.  And he's

17 reading what this letter says.  And Dr. Kanter says, "This was

18 a carefully prepared and thought out piece of work by FDA, not

19 a -- and then he ital icizes this -- not a

20 throw-it-back-in-your-face response, as frequently happens."

21 That make its clear that if the FDA thinks you've got a stinky

22 product, they just slam dunk it.  They just say, get this

23 thing out of here.  That's not what happened here.  The FDA

24 said, look, you want to pursue this, you want to keep going

25 with this, we're going to carefully think about what you need

closing argument - defendant

1761

1   to do to get SF-1019 approved.

2           So this proposition that you are asked to buy and

3   that the government has repeatedly tried to get you to buy is

4   that Mr. Ferrone knew that SF-1019 was going nowhere.  How

5   could he have known that?  Dr. Kanter didn't know that.

6   Dr. Willeford didn't know that.  They were talking to the FDA.

7   Dr. Kanter referred to the FDA's clinical hold letter as a

8   roadmap.  It's like so you guys at Argyll don't miss the boat

9   on what we want you to do, here's the roadmap.  Go to point A;

10  do this; go to point B.  They clearly were trying to foster

11  success.

12          Another one:  Dr. Melling.  Dr. Melling supplied his

13  own physician-sponsored IND.  That's the second IND, and he

14  sent it into the FDA.  And what did the FDA do?  Well, they

15  put it on clinical hold.  And Dr. Melling said, I knew I was

16  going to get on clinical hold because I got a tougher

17  toxicology reviewer than we had hoped to get, and I knew that

18  there were things they would want me to be doing.  But he

19  communicates with the -- with the FDA.  And let me say that

20  Dr. Melling is an earnest, goodhearted guy.  He wants to

21  develop SF-1019 because he has so many MS patients.  Bless his

22  heart.  Okay.  That's good.

23          So he's communicating with the FDA.  And the FDA

24  says, look, with all due respect, Dr. Melling, the only option

25  for you is to work with Argyll on their IND.  This is a couple

closing argument - defendant

1   of years later.  The FDA has not torn up the Argyll IND or

2   used it as scratch paper because they think it's garbage.

3   They're telling Dr. Melling, get with those guys and let's

4   move this thing.  Let's work it.  Your only option is to work

5   with them to address their deficiencies.

6           All right.  Next -- oh, and -- well, I'll keep going.

7           Next, you are being given a distorted understanding

8   that for some reason the underlying science of SF-1019 was

9   bogus and that this was just a lot of snake oil.  And I just

10  think that all of that gets based on Dr. Melling's e-mail.

11  And I want to look at this e-mail because it gets referred to

12  as much as anything in this case.  Let me set the stage.

13          Dr. Melling is now upset with Argyll, and he thinks

14  he has a right to be.  He doesn't think that Argyll is coming

15  through with the support for this IND that they should.  And

16  he's not upset with Steve Ferrone, but he is upset with Jim

17  Miceli and these people that are running Argyll.  So he's in a

18  grouchy mood.  And some guy -- some Australian doctor, not

19  some guy -- some Australian doctor has reached out to

20  Dr. Melling to say, you know, can we talk about SF-1019.  And

21  Dr. Melling does a cordial thing.  He doesn't just write back

22  and say, fine.  He says, I'm going to forward this to Steve

23  Ferrone, and maybe Steve could do something with this fella.

24  And then he says, look, this guy called me, but I don't have

25  anything good to say about Argyll.  And then he says, if you

closing argument - defendant

1    have anything you want me to tell him, I'm happy to do that.

2            And now the sentence that's been repeated over and

3    over again.  Can we pull this up?  It says, "From my

4    perspective right now, SF-1019 is dead, and it will take a

5    couple of million dollars and several months and new

6    management (Argyll) to resurrect it."

7            Now, you keep hearing from the government lawyers

8    that Mitch Melling is saying, oh, this SF-1019 is in the

9    ditch.  It's just a nonstarter as a product.  Well, that's not

10   true.  What he is saying is, as long as these guys at Argyll

11   of whom I have a very dim opinion, as long as these guys are

12   managing this thing with SF-1019, it ain't going to go

13   anywhere.  And one of the major reasons is it's going to take

14   a couple of million dollars to fix the issues that the FDA has

15   identified.  And I'm going to come back to that last point,

16   but right now I want to move to one more thing.

17           This case does not ask you to decide whether or not

18   the IND that they submitted from Argyll was a good one or a

19   bad one.  That's not the issue.  But I'll give you a hint.  It

20   wasn't a good one.  It wasn't a good IND.  And if Johnson &

21   Johnson had filed it or if Pfizer or somebody bigger than

22   that, we talked about this with Dr. Kanter.  And let me go

23   back to one thing I forgot to say.  I knew there was something

24   I forgot to say.

25           I asked Mitch Melling when he was on the stand if he

closing argument - defendant

1   meant that the word "dead" there was a reference to the future

2   of SF-1019 as a drug or if it was a reference to Argyll's

3   potential as a sponsor, and he said it was not the drug, it

4   was the Argyll, okay.  I just wanted to make sure you

5   understood that I asked the man the question.  I didn't come

6   up here and tell you that that's what was true unless I had

7   heard him say what was true from the witness stand.

8         Okay.  Now I can go back to where I was.  Dr. Kanter

9   was a guy that has done a lot of these INDs.  And I asked him

10   this question.  I said, Doctor, it's kind of an acquired skill

11   to be able to do one of these right, isn't it?  He said,

12   that's right.  He said, you know, if you haven't done this

13   before, there's no school.  There's no course at college that

14   tells you how to do these FDA IND things.  You got to have

15   some experience.  Well, I'm sure that at some level the people

16   at the FDA could see from the first glance at the IND that

17   Dr. Ericsson put in that he was a little naive.  He was a

18   little bit in over his head.  There's no question about that

19   fact.  But, you see, that can't be translated or misused into

20   thinking that Mr. Ferrone would have had the intuitive ability

21   to evaluate the quality of this IND or to know, well, my

22   company is overstating how good we are because actually it

23   turns out Ericsson is kind of an arrogant guy and nobody likes

24   working with him.

25         So, look, the fact of the matter is that respected

closing argument - defendant

1    physicians and scientists were touting SF-1019.  And there

2    really is an Angus Dalgleish over in Wales.  There really is a

3    Dr. Maizels.  There's a Dr. Morales in Mexico who is using it,

4    Dr. Melling in Utah was using it.  Dr. Ericsson in Texas was

5    using it.  People in Africa and Europe were using it, people

6    in England and Germany.  This is not a fiction or a figment of

7    some frauding schemester's imagination.  This was a real

8    thing.

9            And earlier today, the lawyer for the government

10   stood right where I'm standing, and he told you that one of

11   the lies that Mr. Ferrone told was that preclinical human

12   studies had been done.  Well, there is ample evidence in this

13   case.  Dr. Ericsson did preclinical human studies.

14   Dr. Morales did preclinical human studies.  The documents

15   reflecting those studies are in evidence.  I don't know how

16   you can be told that that's a lie by Mr. Ferrone in the face

17   of the exhibits that the SEC put before you in this case.

18           So we have an essential question.  The essential

19   question is not how good an IND could Dr. Ericsson produce.

20   The essential question is not could others have done a better

21   job of bringing a potentially wonderful drug to market.

22   Here's the essential question:  What was Steve Ferrone's state

23   of mind?  And the government tells you that his state of mind

24   was that of a crook, a liar, someone who would happily trade

25   other people's losses for his gains, a bad guy.  That's what

closing argument - defendant

1766

1    they say his state of mind was.

2         So what we're going to do is we're going to look at

3    the surrounding circumstances so that we can imagine how

4    anybody in his position would have behaved given the

5    information and material and experiences available to him.

6         Now, first of all, Steve Ferrone has never been

7    saying, oh, I didn't know that there was a clinical hold.  You

8    saw e-mail from Todd Ollendorf to Steve Ferrone in 2007 saying

9    we're on full clinical hold.  You saw a number of documents

10   where Mr. Ferrone was involved in correspondence where people

11   were using the magic words "clinical hold."  By the way, Todd

12   Ollendorf was not writing to him and saying, holy bleep, we

13   are on clinical hold.  In fact, let's look at what Todd

14   Ollendorf was saying.

15        This is a trial exhibit where Todd Ollendorf writes

16   down here -- can we pull this up?  Is that possible?  Yeah.

17   He says -- well, wait a second.  It's from Todd Ollendorf.  We

18   want to establish that.  But I want to -- can we -- we're not

19   pulling this up the way I want to.  This is my fault.  He says

20   up here, we're on clinical hold, all right.  In fact -- now,

21   you can do it, Kevin.  Thank you.

22        "In fact, we are much further along than this with

23   the FDA as Karen's verbiage suggests.  We are on clinical

24   hold."

25        And I asked Ollendorf, were you trying to suggest

closing argument - defendant

1   that, in fact, this was a positive thing, we were further

2   along?  Every other document you see portrays this as, look,

3   the good news is the FDA has asked us questions and given us

4   an understanding of what we need to do to answer, okay.  So

5   that means that if we can hit the mark on those questions,

6   we're making progress.  That's a -- that's what this kind of

7   text is signaling to him.  It's not holy cow, Steve, we have

8   huge problems; we are on clinical hold.  No, the Ollendorf

9   e-mail says we're much further along.

10          But that's not all.  You've heard about Doug McClain,

11  Sr. and his son Doug McClain, Jr.  You heard their testimony,

12  again, as with Dr. Becker, not with their personal appearance

13  but through sworn testimony.

14          Now, you know but I'm going to remind you that Doug

15  McClain, Sr. is the guy who kind of hits upon SF-1019.  He's

16  in Utah where there's a tragic incidence of MS.  And he starts

17  to pick up stories about this.  And so he starts to explore.

18  And there was a part of the testimony, I don't know if you

19  recall it, where he talks about he goes overseas, and he meets

20  with this doctor.  There's been a BBC documentary, and he's

21  going to get the guy out of Africa because he's going all over

22  the place.  He's the one who hits on this SF-1019.  He's the

23  one who becomes a chief science officer at Argyll.  And you

24  actually did see him because he's the sort of portly fellow

25  that was with Steve Ferrone on the video that you saw who

closing argument - defendant

1768

 1   talks about the drug.  He knows about the clinical hold.  And

 2   then his son, Doug, Jr., is an officer of Immunosyn like

 3   Steve, signs documents like Steve, but he's also a major

 4   shareholder at Argyll.  So he kind of straddles both of these

 5   companies.

 6            So these two fellas are asked about the clinical

 7   hold, and I want to just take a look at what their responses

 8   are.  First, this is Doug McClain, Sr. and he's asked:

 9            "What did you understand the significance of the

10     clinical hold to be when it was issued and when you first

11     learned about it?"

12            He says:

13            "Well, that the FDA's working with you in the

14     approval process because they don't just say clinical hold.

15     They say these are the discrepancies so you can work on

16     them."

17            Next slide; next question to Mr. McClain:

18            "Did you ever discuss specifically with Mr. Ferrone

19     that the FDA response to the IND application from Willeford

20     and Ericsson had prohibited Argyll from going forward with

21     clinical trials?"

22            And he says:

23            "I recall just discussing the discrepancies that we

24     were working on.

25            "And by 'discrepancies,' do you mean the issues that

closing argument - defendant

1769

1    the FDA had raised?

2        "Yes."

3        So Mr. McClain is telling you under oath he is

4    telling you that he does not go to Steve Ferrone when he finds

5    out about this clinical hold and said, those are the magic

6    words, man.  We got a big problem now.  He says, oh, these are

7    discrepancies they told us we can work on to resolve.

8        Doug McClain, Jr. also testified:

9        "When you first learned about the FDA's response to

10   the IND, you didn't understand that that IND had failed or

11   been rejected, had you?

12       "No.

13       "In fact, sir, you understood that the IND was still

14   active even after it was put on hold, correct?

15       "I believe that, yes.

16       "What the hold did, it just meant that clinical

17   trials could not begin until some questions were answered

18   that the FDA had raised?

19       "Correct."

20       These are the people that are working with

21   Mr. Ferrone.  These are the mindsets of the individuals with

22   whom he's communicating.

23       Another thing that is apparent to Mr. Ferrone when he

24   gets there.  There's been suggestions that the people involved

25   in the science side of this may not have been top flight.

closing argument - defendant

1    And, in fact, it's not a suggestion.  Mr. Ollendorf had the

2    comment in an e-mail that Dr. Ericsson was unqualified.

3            Well, the first thing is that Mr. Ferrone said that

4    as he explored that issue, he learned that what Mr. Ollendorf

5    was referencing was that Dr. Ericsson was not popular with

6    people that he worked with and that he was viewed as a tough

7    guy to deal with, a little arrogant and so forth.  Now, I'm

8    not going to get into the debate about whether Todd Ollendorf

9    is competent to say whether a physician is qualified to do

10   pharmaceutical research.  I mean, Dr. Ericsson is an M.D.  He

11   does have his own institute of biological research.  He didn't

12   come in with yesterday's mail.  He's a guy that has some

13   substance to him.  That doesn't mean -- there's a lot of

14   people that have great credentials, and then you meet them and

15   they're a mile wide and an inch deep.  That's not to say that

16   he's just the greatest, but the perception of Mr. Ferrone has

17   to be, I can't sit in the lab and look at this guy dissect

18   mice.  I got to take somebody's word for it.  He's got an M.D.

19           Okay.  So the credentials of the people surrounding

20   Mr. Ferrone are Dr. Willeford who is a doctor, a Ph.D., who is

21   a faculty member at Mississippi State University.

22   Dr. Willeford said that he went and mingled around with the

23   same scientist that mingled around with Steve Ferrone, and he

24   said, they had excellent credentials.  Better than mine.

25           Willeford was really a nice guy, and he was a very

closing argument - defendant

1    humble guy.  He said, oh, yeah, they had credentials much

2    better than mine.

3            Dr. Hazlewood, who was a curious fellow and who had

4    an interesting career but who was clearly done with his

5    career, he was on the video.  And he said, look, I taught with

6    Ericsson at Baylor for decades, and I consider him to be,

7    quote, extremely competent, reliable and credible.  Now, I'm

8    guessing Dr. Hazlewood isn't the man he once was.  Neither am

9    I.  But the fact is there was a time when Baylor University

10   thought he and Ericsson were sharp enough to teach

11   undergraduates.  That's not an easy job to get, ladies and

12   gentlemen.  That's a credential, and those are the things that

13   are known by Mr. Ferrone.

14           Next thing that the SEC tells you that just doesn't

15   hold water, they tell you that there were safety concerns.

16   They sort of leave this implication sitting out there that

17   this stuff was dangerous and that there was this unseemly

18   effort to rush it through without regard to what it might do

19   to human beings.  There's no support for that.  I want you to

20   get that idea right out of your mind.  And the reason there is

21   no support for it is that Dr. Kanter whom the SEC summoned as

22   a witness sat on that witness stand and testified in the way

23   that professionals would, quote, I found no toxicities that

24   were probably drug related.  Now, the "probably" in there is

25   because he clearly indicated that he didn't do the full

closing argument - defendant

1772

1 toxicology workup that he would do if he were paid to do it

2 because it costs about $360,000.  But he did look at the work

3 that had been done by these folks at Iso-Tex, and he said, I

4 found no basis to think that there was any threat to humans

5 from SF-1019.  Dr. Willeford said that he had worked with this

6 drug and worked in the toxicology research.  He had no qualms

7 or concerns.  Remember him talking about if mice had

8 salmonella and you shot him with this drug and 90 percent

9 would get better?  But he had no concerns.  There's no concern

10 on your part that this was not a safe drug or that Immunosyn

11 was trying to put unsafe material in the market.

12          What was the problem?  If all of these apparently

13 smart people had this apparently promising drug, why didn't

14 things work out better?  I think every one of you knows and I

15 think every one of you has seen the evidence on this from day

16 one:  Money.  You have to have some money in order to bring a

17 new drug to market.  It's just that simple.  The average

18 investor would want to know whether or not this company could

19 fund the research and development needed.  That was the

20 central issue, and on that issue we are going to look at what

21 Mr. Ferrone disclosed.  But the notion that this IND was not

22 working because of the competence of the people or because

23 there was no intent or interest on Mr. Ferrone's part for it

24 to succeed is just malarkey.  It was all about money as things

25 often are.

closing argument - defendant

1773

1    Dr. Willeford, when asked what it would take to
2    overcome the 17 deficiencies in the FDA's clinical hold letter
3    said, quote, they just had to give us some money.
4    Dr. Melling wrote that it was dead unless they could
5    come up with millions of dollars and a better sponsor than
6    Argyll.
7    And we are going to see that the disclosures about
8    that issue that Mr. Ferrone signed off on were accurate, they
9    were frequent and they were pretty discouraging to anybody who
10   was looking at this company.
11   Now, the question, as I said, is about Mr. Ferrone's
12   state of mind.  And one of the things that I would love for
13   you to do is to look at the correspondence that he writes.
14   Because you can be sure that when Mr. Ferrone wrote the
15   e-mails that are in evidence in this case, it never occurred
16   to him that some day he would be sitting in front of you and
17   seeing everything he wrote -- not yet -- put up on one of
18   these screens, and we're going to get back to that in a
19   second.
20   But my point is this:  When a guy like me gets up and
21   talks and I've had all night to prepare, I should put things
22   together in a reasonably good way.  But if you overheard me
23   talking to Mr. Rubenstein as we're walking down the street, it
24   might not be quite so cogent, and it might not be quite so
25   clean.

closing argument - defendant

1      The point is this:  When you want to look into the

2  insight into a person, look at how they write and work when

3  they don't think that they're being watched, when they don't

4  think that their every sentence is going to be scrutinized and

5  made yellow and put up on a screen.  Because when you look at

6  Mr. Ferrone's correspondence in this case, you are going to

7  see that he's responsible, that he is diplomatic, that he is

8  energetic.  There has never been a document put on the screen

9  that was authored by Mr. Ferrone that anybody can show was a

10 lie or was a deception, that he intended to deceive.  Nobody

11 came in here and said, Steve told me this was true, and I

12 found out it was false, or vice versa.

13     Let's take a look now at Mr. Ferrone.  This is Trial

14 Exhibit 101.  It's one example, and there's a lot, and I'm

15 going to give you some numbers later because I would like you

16 to take a look at them.  It doesn't matter what he's talking

17 about because what he's -- well, it does matter what he's

18 talking about.  What he's talking about is his viewpoint about

19 how to run this business.  And he's writing to Mr. Ollendorf

20 after receiving a communication from one of the intellectual

21 property lawyers, the lawyer that works on things like patents

22 and who owns the rights to say this and that.

23     And he writes back to the lawyer, "Jim, your points

24 are well stated.  Thank you."  And he writes to Mr. Ollendorf,

25 "Todd, I believe this best brings to light the need for strict

closing argument - defendant

1   accuracy and professional review of all marketing materials."

2   He didn't write that so that a jury could someday see it.  He

3   didn't write that to influence your thinking at litigation.

4   He wrote it because it's what he earnestly felt at the time,

5   and it's a reflection of the attitude and philosophy that this

6   man took to his job every day.

7          And I want to talk about how Mr. Ferrone approached

8   the task of making these filings.  If there's anything that I

9   hope has come through this case, it is that when a company

10  that sells stock says anything, it has to tell the SEC what it

11  said, and it has to file these 8-Ks.  You give an interview

12  that's previously scripted that everybody worked on, you've

13  got to tell the SEC.  And you also periodically have to send

14  in to them information about your money and your company and

15  what's going on.  And those are what we call these 10-Qs and

16  10-Ks and all of these little serial numbers.

17         And the way that this would work was that there was a

18  process.  In fact, that's the word that Mr. Ollendorf used.

19         Let's talk about Mr. Ollendorf for a second.

20  Mr. Ollendorf was the one witness in this case who actually

21  had fairly consistent interactions with Mr. Ferrone.

22  Dr. Willeford, Dr. Kanter, most of these witnesses that came

23  through here, Mr. Sacks I think thought Mr. Ferrone was one of

24  the lawyers at counsel table.  It was remarkable to me how few

25  people, considering that the SEC says this man was such a

closing argument - defendant

1776

1   liar, how few people came in who actually interacted with him,

2   but in any event, Mr. Ollendorf did.  And Mr. Ollendorf was

3   the liaison.  He was the guy who was a consultant or an

4   independent contractor, but he was hired by Argyll to be

5   dealing with Immunosyn.

6          So he and Mr. Ferrone communicate, as you know, quite

7   extensively.  And Mr. Ollendorf made clear how it would go.

8   It's time to file something.  Now, maybe that something is the

9   annual report.  Maybe it's the quarterly report.  Maybe it's a

10  press release, but it's time to file something with the SEC.

11  What's going to happen?  Mr. Ollendorf is going to prepare the

12  first draft.  He's going to be at a word processor.  He is

13  going to be creating a document.

14         As we have seen and as logic would tell you, I mean,

15  I wanted to just show you what a 10-K looks like, and I wish

16  it hadn't been copied on two sides because it would even look

17  bigger.  But the fact is these are extensive, dense, lots of

18  text, lots of information, lots of financial analysis.  This

19  is a major piece of work.  And it really wouldn't make sense

20  that every time you've got to file these, since you got to

21  file them all the time, if you sat down and started from

22  scratch.  So what they did was they would take previous

23  filings and then edit and update with new information.  And

24  that's why you'll see the same phrases and the same text

25  repeating itself from time after time.  There's nothing wrong

closing argument - defendant

1     with that.  It's a way to save some energy.

2          So Mr. Ollendorf gets that first draft together.

3     Then he might submit it to Mr. Ferrone, or he might submit it

4     to the subject matter experts.  But in any event, there was

5     going to be a dissemination of this thing to a lot of people.

6     And that dissemination was meant to require people to look at

7     it, to see if they believe that it was correct, to comment on

8     what needed to be done if not correct and to bring it back so

9     that a document could be assembled for final approval by

10    Mr. Ferrone.

11         And there were subject matter experts who were being

12    sent by Mr. Ollendorf these filing materials.  There were

13    scientists.  You saw indications that these materials were

14    being sent to Dr. Willeford or Dr. Ericsson.  There were

15    accountants, because as I'm not sure you could see but you

16    will when you look at these documents, there's a lot of

17    financial information in them.  Spreadsheets and net profits,

18    net losses, all sorts of revenue information.  So people that

19    know how to keep track of that stuff needed to look at it.

20    And then it was sent to attorneys who had fields of expertise,

21    an intellectual property attorney, a securities attorney.

22         And I want to talk to you for one second about an

23    issue that the judge is going to address in the instructions

24    and that I think you should know about.

25         Mr. Ferrone is not asserting or telling you that he

closing argument - defendant

1   ever went in and sat down and said to a lawyer, I want your

2   advice about signing this document.  That's not what

3   Mr. Ferrone is saying.  Yesterday Mr. Phillips went to some

4   effort to get Mr. Ferrone to agree with his previous sworn

5   statement, which he, of course, agrees with because he was

6   being truthful, and he said, did you ever go in and sit down

7   and talk to this Sarah Hewitt, this securities lawyer, and

8   talk to her about whether to file this stuff?  He said no.

9   That was never the point.

10          Here's the point.  Remember what I said?  You have to

11  evaluate this man's state of mind as of the time he becomes

12  and functions as the CEO.  What does he see?  What does he

13  hear?  What does he read?  What does he know?

14          It is relevant to his state of mind to know, as Todd

15  Ollendorf testified, that every time an assertion was made in

16  a pleading about science, a scientist was asked to sign off on

17  it.  That was Ollendorf's testimony.  It is relevant to know

18  that every time one of these filings was made with the SEC, it

19  was sent for review by a lawyer who knows SEC material.  That

20  is something that Mr. Ferrone knew.  It's something that's

21  reflected by the documents, and it's absolutely a

22  consideration as you think about what's his state of mind,

23  what is he seeing, what does he know, what does he have in

24  front of him.

25          So Mr. Ollendorf said, as I indicated, there was

closing argument - defendant

1779

 1    always a signer.  And I asked Mr. Ollendorf about his

 2    experience working with Mr. Ferrone in the process of getting

 3    these documents approved.  And he said, well, Mr. Ferrone

 4    asked tons of questions.  He was a stickler for compliance.

 5    Mr. Ferrone demanded backup for anything that we asserted.

 6    Mr. Ferrone actually -- I said to Mr. Ollendorf, did he become

 7    annoying after a while with all of his demands for

 8    information?  And he said yeah, he did.  He got to be

 9    annoying.  He wanted everything to be checked, everything to

10    be confirmed and verified.

11         But Mr. Ferrone in these pleadings do not come from a

12    clean slate.  As I indicated, before Mr. Ferrone becomes CEO,

13    there are already filings with the Securities and Exchange

14    Commission about Immunosyn.  Mr. Ferrone was cross-examined

15    about those filings even though he wasn't the CEO at the time.

16         So it certainly is appropriate for us to take a look

17    at those filings right now, and I want to start with what's

18    called -- and I asked Mr. Sacks about whom we're going to talk

19    later, I asked Mr. Sacks, did you ever look at the prospectus

20    for Immunosyn?  He said, of course, no.  But there's a

21    document that's called a prospectus, or it's also known as a

22    registration statement, or because this is the SEC, it's got

23    to be given some really charming name.  It's a Form SB-2.  But

24    it's the document that sort of announces the birth of a new

25    company.  It describes what this company is.  It's something

closing argument - defendant

1780

1    that you can go online and see, if you heard about a company,

2    you want to go find out what it's about, go to their

3    prospectus and see how the company describes itself.

4        Now, Steve Ferrone had no role in preparing this

5    document.  I want to talk about who did have a role because it

6    was another one of those people who didn't appear in person

7    but whose testimony has been preserved, their sworn testimony.

8    It's a man named Fougner, F-o-u-g-n-e-r.  He was with Argyll

9    and functioned as the general counsel, which is the lawyer for

10   the company.  And he's being asked about this filing, which is

11   this prospectus that we're going to take a look at.

12       And he's asked, what's your role?

13       And he says:

14       Well, my connection was this was a work in progress

15    when I arrived and he had seen lot of this language.

16       He said:

17       I worked with outside counsel, as well as internally

18    with Argyll executives in some places to improve the quality

19    of the drafting and also make substantive revisions that I

20    thought were appropriate.

21       That's a pretty good summary right there of the

22   process that Steve Ferrone talked about following later and

23   Todd Ollendorf talked about.

24       "Okay.  And the outside firm that you worked with was

25    a firm whose name you're not sure of?

1    "No, I remember the attorney.  But from recollection,

2   I don't remember the name of the firm.

3    "Okay.  And who was the lawyer?

4    "Her name was Sarah Hewitt."

5    Take a look at that name because you're going to see

6   it on documents.  The first time we heard that name, the SEC

7   was questioning Todd Ollendorf.  And they said, Mr. Ollendorf,

8   is this the clinical hold letter that the FDA issued, this

9   significant letter?  And he said, yeah.  And they said,

10  Mr. Ollendorf, what did you do with this significant letter

11  after you received it?  And he said, well, I sent it to Sarah

12  Hewitt.  So the lawyer who works at the firm who does the

13  outside counsel securities work knows about the clinical hold.

14   Okay.  Let's keep going.

15   Okay.  And they asked Mr. Fougner:

16   "Had you worked with Ms. Hewitt throughout the course

17  of your work with Argyll?

18   "Yes, I did."  She's got a background with this

19  company.

20   "Okay.  And you understood that Ms. Hewitt -- or

21  whatever firm she was with at the time -- were outside

22  counsel to Argyll and the public company?

23   "Yes.

24   "And that they had some expertise with respect to

25  securities filings.  Was that your understanding?

closing argument - defendant

1        "Yes."

2        So that process predates Steve, and the text of these

3    filings in many instances predates Steve.

4        Now we're going to look at this prospectus.  This is

5    the cover.  This is our lovely and lyrical title Form SB-2 --

6    never mind.  It's the prospectus.  Let's go to the next page.

7        Here's the kind of stuff that they start to say about

8    Immunosyn from the very get go, before Steve is even hired.

9    They say, look, SF-1019 has not been approved for human use in

10   any jurisdiction.  Argyll Biotech is preparing to conduct

11   clinical trials, develop manufacturing protocols, and, if

12   possible, apply for regulatory approval of SF-1019's use.

13       Next, they talk about risk factors.  Ladies and

14   gentlemen, there's no way that in the time I've got I can give

15   you a full flavor for what these risk factors look like.

16   Please pull out these filings, these 10-Ks and these 10-Qs,

17   and read what people are told when they're thinking about

18   investing in Immunosyn.

19       If you're going to invest in Immunosyn, my friend,

20   "Investing in our securities involves a high degree of risk.

21   Before making an investment decision, you should carefully

22   consider the risk factors set forth, as well as the other

23   information we include...although every effort has been to

24   anticipate possible risks, unforeseen conditions and

25   unexpected events may arise," and we might not have hit

closing argument - defendant

1783

1    everything.

2         Next, here's one of my favorites.  "Immunosyn and

3    Argyll Biotech have no experience in completing development,

4    obtaining regulatory approval or marketing a novel

5    biopharmaceutical product, and to be successful, both

6    organizations will need qualified personnel to complete

7    development, successfully complete trials and launch SF-1019

8    in the marketplace."

9         Mr. Sacks, who bought some of these shares and is now

10   upset about it, never read any of this, didn't have any idea

11   this thing even existed.

12        Next, "SF-1019 has not been approved for any human

13   use, nor for treatment of any particular disease, and such

14   approval may never be obtained."  Look for that language

15   throughout the course of the filings that are made by

16   Immunosyn.

17        The company is entirely dependent on Argyll Biotech's

18   sole experimental drug which hasn't been tested in any

19   clinical trials.  We don't have a patent on that drug.  We

20   haven't applied for regulatory approval of its use.  We can't

21   guarantee it will ever get approved for the uses that we want

22   to get it approved for.  No clinical trials have been

23   conducted anywhere, and following the beginning of clinical

24   trials, completion and evaluation of those trials may not

25   occur or a long time may take place before we could ever get

closing argument - defendant

1    this thing to market.

2          Next, "The safety and efficacy profiles for SF-1019

3    that emerge from controlled clinical trials may be

4    substantially less favorable than in prior uncontrolled

5    observations of the SF-1019 precursors which may materially

6    and adversely affect our business."

7          You get told a lot that, oh, there were these studies

8    over there and they were thinking about it would be

9    efficacious on this or that, and there was never any success

10   in that regard.  Well, people were told that from the

11   beginning.  They said, look, we've got some preliminary

12   results, but we don't know after full clinical trial if it's

13   all going to hold together.

14         Next.  Forward looking statements.  This basically

15   says -- and I want you to go look at this.  It was on the

16   screen briefly during an SEC examination.  They took it down

17   right away, so I want you to go back and take a look at it.

18   It says, look, we are talking about things that we expect or

19   we anticipate or we believe.  We predict or they may happen,

20   but, you know, who could predict the future?  We can't be sure

21   of our future capital needs.  We can't be sure about Argyll's

22   ability to complete development of SF-1019.  We can't be sure

23   that the FDA and other procedures for approval are going to

24   work for us.  This is all at the outset of the company.  This

25   is the first time somebody is told that this company even

closing argument - defendant

1785

1    exists.  These are the pleasant things that are said about

2    this company.

3         Now, I talked earlier about the fact that the

4    functional equivalent of saying clinical hold that would be

5    understood by Karen Becker, the doctor of pharmacology.  For a

6    layperson the functional equivalent would be, look, we sent in

7    an application.  It didn't take.  They wrote back and said, we

8    need more information.  And that's exactly what was disclosed

9    very shortly after Mr. Ferrone became the CEO of Immunosyn.

10        So on November 6, 2007, this is three weeks, give or

11   take, after Mr. Ferrone assumes his title as CEO, a press

12   release is issued.  And I want to go through this very

13   carefully.  First of all -- one more before it.  This guy.

14   This is a very obscure little corner of a much larger

15   document.  It's Trial Exhibit 233.  My purpose in showing this

16   to you is Dr. Willeford is sending to Dr. Becker, the expert

17   on FDA, the clinical hold letter, and he's doing that on

18   October 23rd.  So Dr. Becker knows that this clinical hold

19   letter exists, this nuclear explosive fact that Mr. Ferrone is

20   supposed to have concealed in his desperate attempt to become

21   a rich man, she knows that this letter exists.

22        Okay.  Next slide.  So she writes back to

23   Mr. McClain.  And she says, knowing that Immunosyn is a public

24   company, no mistake that she knows about the clinical hold.

25   No mistake she knows about the fact that it's a public

closing argument - defendant

1   company.  She writes back and says, well, Doug, "you can say

2   that we have been retained to provide the company with

3   clinical and regulatory consulting services in support of the

4   marketing authorization process by U.S. FDA."  She goes on to

5   write, "Presently the company is responding to a request from

6   FDA for additional information in support of an

7   Investigational New Drug Application."

8           In the English language that you and I use to

9   communicate, ladies and gentlemen, Dr. Becker has just said

10  that the company is responding to a clinical hold.  She

11  doesn't use that jargon.  She doesn't use that technical

12  phrase because she wants to actually help people understand

13  what happened.

14          And what happened was that the company got a request

15  from the FDA for additional information in support of an IND

16  that they had filed, and what do you suppose Mr. Ferrone did

17  with that suggestion by Dr. Becker?  Because if the SEC's

18  theory has any weight to it at all, he looks at that and

19  thinks, holy cow, my bonus.  I can't let this go out.  I can't

20  let the world see this information.  This will kill me.  Well,

21  of course, nothing of the kind happened.

22          Trial Exhibit 266 is an Argyll Biotechnologies press

23  release that was filed in an 8-K that Mr. Ferrone approved.

24  And this says presently -- make it come up in yellow.  Thank

25  you, sir.  Argyll Biotechnologies responding to a request from

closing argument - defendant

1    the FDA, verbatim, precisely the same language.  Mr. Ferrone

2    has been accused of being a liar nearly 100 times, and that

3    disclosure was made five weeks after he becomes CEO.

4            Let's go to the next slide.  This is Dr. Becker

5    testifying again under oath.  She says:

6            "Now, Doctor, I know you were asked about the term

7    'clinical hold' and if you had a recollection of why that

8    was included or not included in your language, and I think

9    you testified that that term is kind of a term of art that

10   lay people might not understand.  Is that accurate?"

11           She says:

12           "Yes.

13           "It's a technical term that has a legal or regulatory

14   meaning but not necessarily a meaning that is in the lay

15   vernacular.

16           "Correct.

17           "And when you drafted this language in your e-mail in

18   response to Mr. McClain's request, there was nothing in that

19   language that you believed to be inaccurate, was there?

20           "No.

21           And that same language that we saw in the press

22   release, again, that description regarding the status of the

23   IND process was accurate, to the best of your knowledge?

24           "Yes."

25           What do you make of that?  Dr. Becker thought that

closing argument - defendant

1788

1    the more efficient and effective way to communicate to a human

2    being what a clinical hold really meant was to use the

3    language that Mr. Ferrone put into that press release.

4            Let's go to another slide.  Let's talk about the next

5    10-K filing.  This is the first filing of an annual report

6    after Steve Ferrone becomes the CEO.  You'll see this is filed

7    September -- effective -- I'm sorry.  My bad.  This is a 10-Q

8    filing.  It's for a period ending in September 30th of 2007.

9    So it actually is filed after Mr. Ferrone becomes CEO, but it

10   relates to business experiences before he takes that job.

11           Let's go to the next slide.

12           Remember when I said that the real issue the investor

13   would want to know about this stuff was whether this company

14   had the money to bring this drug to market and how long it

15   would take?

16           "The company requires substantial future sources of

17   capital in order to meet such anticipated expenditures and to

18   continue its operations during the period Argyll Biotech seeks

19   regulatory approval from the FDA and foreign regulatory

20   authorities.  The company currently anticipates this process

21   to be between three and five years and the amount of funds

22   required to be between 14 million and $24,000,000."

23           So here's a brand new start-up company that's never

24   brought a drug to market that has exactly two employees, and

25   they are telling you, hey, kids, you give us $24,000,000 in

closing argument - defendant

1789

1    five years, and we'll get the job done.  That's the kind of

2    encouragement that Mr. Ferrone was spreading in the market to

3    make his bonus bigger, according to the SEC.

4         More.  This is the 10-K.  This is the annual

5    statement that I was referencing earlier.  This was filed in

6    the spring of probably about March of 2008.  Mr. Ferrone is

7    now the CEO.  And it's gone through the process.  It's gone

8    out to the subject matter experts.  It's gone to

9    Mr. Ollendorf.  It's gone to Mr. Ferrone.  And here's what we

10   get.  Investors are told "SF-1019 has not been approved for

11   any human use, nor for treatment of any particular disease and

12   such approval may never be obtained."

13        "Argyll Biotech has not received regulatory approval

14   of SF-1019's use in clinical trials...no clinical trials have

15   been conducted anywhere."

16        So there can be no mistake.  Nobody can sit there and

17   wonder, I wonder how those Argyll clinical trials are going,

18   because there is a filing on the website of the government

19   that says, in fact, no such trials have taken place.

20        And, of course, we have some more risk factors.  One

21   of my favorites here is at the yearend, we have lost about

22   $828,000, and we had as far as our working capital $733,000

23   below the water line, and that isn't enough for us to keep

24   going for the next 12 months.  We might not last the year.  We

25   got this huge deficit.  And, by the way, Argyll doesn't

closing argument - defendant

1    anticipate any revenues in the foreseeable future even though

2    it continues to incur significant losses.  It's, like, not

3    only do I not have money, I continue to burn through money.

4           Okay.  Whoops, go back one more.  I want to just look

5    for -- well, if they don't get financing, it would have a

6    material adverse effect.  Let's go to the next one.

7           Oh, I'm sorry.  I'm sorry.  I wanted to just point

8    out, we now have an indication that not only is Immunosyn not

9    expected to survive because it's not a going concern, Argyll

10   is now also on the rocks.  And it requires substantial

11   additional financing before it can do anything.

12          Next.  Clinical trials would be expensive and time

13   consuming.  Their outcome is uncertain and anything that

14   delays them would probably affect negatively Argyll's ability

15   to fund the clinical trials, and that, of course, would pretty

16   much make a mess of Immunosyn's operations and revenues.

17          And here's one of my favorites that also I think the

18   SEC would like you not to be aware of.  It says, "The proceeds

19   received by Argyll from the sale of the common stock issued by

20   Immunosyn in payment for the exclusive license are anticipated

21   to pay only a minor part of those expenses," and it's almost

22   certain that those proceeds won't be an amount -- sufficient

23   to cover the entire amount.  In addition, we can't say such

24   that license fees will be used to pay for the clinical trials.

25   So the notion that we wanted to pump the price of this stock

closing argument - defendant

1791

1   so that we could fund the research and development of Argyll,

2   which was put up in opening statement but I didn't hear lately

3   in any event doesn't hold water, or at least investors are

4   told they shouldn't expect that.

5          Next.  "Our independent auditor has issued a going

6   concern opinion."  I don't know if any of you have experience

7   in the business world where they say going concern.  I didn't

8   know this until at some point in my life when I said, is this

9   a going concern, and the guy almost had a heart attack.  A

10  going concern, son, that's a bad thing.  You don't want to be

11  that.  When an auditor says there's a going concern letter, it

12  means I'm telling people, I don't think you can make it, pal.

13  If I give you a going concern in your audited financials, it's

14  like saying there's a big spot on your lung.  You have some

15  serious problems, my friend.  And this keeps showing up in

16  every Q and every K that this company files.

17         Okay.  Let's talk a little bit about some of the

18  other things that were filed that the SEC says were

19  misleading.  First of all, let's establish that all of these

20  things were following the same process of drafting, review by

21  experts and so forth.  Over and over again, the SEC has been

22  critical of Mr. Ferrone about the language of documents where

23  their own exhibits demonstrate that that language came from

24  these subject matter experts.

25         Let's take a look.  We were told all about this

closing argument - defendant

1    release, this press release that talked about this

2    compassionate use study that had been done.

3            Now, first of all -- we're on the next one, buddy.

4    Go back.  What did I miss?

5            Okay.  Let's start about this compassionate use

6    thing.  First of all, Dr. Hazlewood, bless his heart, he

7    issues this letter in August of 2006, and he says that the

8    Institute of Biological Research, there's so many -- one of

9    the screwiest things about this case is this Institutional

10   Review Board, which is an IRB.  Well, who had it?  BRI.  So

11   it's like the BRI-IRB.  It's like a dumb game.  To make it

12   even more confusing, we now have the IBR, which is the

13   Institute For Biological Research.

14           So let's talk about real people.  Dr. Ericsson, who

15   does research in SF-1019, operates under an entity called the

16   Institute For Biological Research, okay.  In 2006, he decides

17   that he's going to do two things.  One, he's going to seek an

18   IND application with the Food and Drug Administration, our

19   famous first IND.

20           But the second thing that he decides to do is he's

21   going to seek what he calls a compassionate use waiver that

22   would allow him to administer this SF-1019 in a controlled,

23   small study to people.  So that's something that I don't think

24   has been made clear to you, and I want to kind of split the

25   atom on that.  There's two things going with Dr. Ericsson.

closing argument - defendant

1   The big IND, we've talked a lot about that, but the second is

2   this Institute of Biological Research doing this limited

3   study.  And these two guys used to hang out together at

4   Baylor.  Dr. Hazlewood is now in charge of an Institutional

5   Review Board.  And there's no dispute in this case that one of

6   the things the FDA says is when you're doing these studies,

7   have an Institutional Review Board watch what you're doing.

8   So they had to have an Institutional Review Board.

9   Dr. Hazlewood is the guy that's going to provide it.  And he

10  says, I understand you're going to do this compassionate use

11  of SF-1019, a new biological modifier.

12          Okay.  This request is approved.  So Ericsson is

13  telling people, I've got approval to do this study.  The

14  problem is that we get into some complications as far as well,

15  who approved it?  And Ericsson -- and let me just say one

16  other thing.  There's some red herrings, some bad stuff that's

17  floating around in this case that I want to clear up.  One of

18  the things that I think the SEC keeps leading you to believe

19  is that it was a lie for Mr. Ferrone to talk about how this

20  study had been conducted because it was conducted while there

21  was a clinical hold in effect.  And, in fact, when

22  Dr. Hazlewood was sitting in front of that blue screen and he

23  was testifying, they asked him, he says, oh, well, they

24  shouldn't have been doing this test if there was a clinical

25  hold in effect.  Well, here's the news.  The test was done

1  before the FDA issued the clinical hold.  So there was no

2  problem with that.  Doing the test, it was approved by this

3  Institutional Review Board, and it was conducted before the

4  clinical hold came down, okay.  So let's get that mess cleaned

5  up.

6          Now, what happens then is this test gets done, and

7  there's talk about doing a press release to announce the

8  results.  Okay.  And Mr. Ericsson, Dr. Ericsson, and

9  Mr. Ferrone, start to get into correspondence.  And really all

10 that Mr. Ferrone is trying to find out is who says we could do

11 that test that we're announcing?  Was it the IRB?  Was it the

12 FDA?  Was it a national -- what is it?  So we get this

13 exchange of correspondence.

14         Steve, Mr. Ferrone, writes a lot of questions.  The

15 notion that Mr. Ferrone isn't trying to get information from

16 his experts just doesn't hold water.  So he's writing all

17 these questions, and one of them he is writing down here.

18 He's asking Dr. Ericsson, was the compassionate use waiver,

19 that's CUW, was that approved by the Texas State Institutional

20 Review Board or the national FDA Institutional Review Board?

21 Well, I didn't know this before this case, ladies and

22 gentlemen, but there's actually no such thing as the national

23 FDA Institutional Review Board, and apparently Mr. Ferrone

24 didn't either, and I bet you didn't either.

25         So Dr. Willeford writes back with a markedly

closing argument - defendant

1    unresponsive answer.  He says, well, that's correct.  It's

2    like, do you want to go to lunch, or do you want to go to the

3    movies?  Sure.  No.  I want, which is it?  And so he asked the

4    question and nobody has given him the answer.

5           So Steve comes back and asks the question again.  And

6    he cuts and pastes the same e-mail, and he says, was the CUW

7    approved by the Texas state thing or was it a national FDA

8    IRB?  And he says, well, the letter for compassionate use is a

9    joint effort of the IRB/FDA.  That's an incorrect statement.

10   There's no way that Steve Ferrone would have known that that's

11   an incorrect statement.  He's not in the pharmacology or the

12   drug approval business.  He doesn't know Institutional Review

13   Boards.  And, more importantly, a credentialed guy who owns an

14   institutional research department has told him it's a joint

15   effort.  And now Mr. Ferrone is being criticized because of

16   the inaccuracy of that press release.

17          Let's go to another one that involves something

18   called MHRA.  MHRA is an acronym for some kind of regulatory

19   body over in Europe, okay.  There was a press release issued

20   over  -- on Mr. Ferrone's watch that said that MHRA, this

21   regulatory body, had given approval for SF-1019 for

22   manufacture.  It actually is not correct that the approval was

23   specific to SF-1019.  It was a generic approval.  Well, then

24   how could this mistake have been made?  Let's find out.

25          Do you remember the name Tony Haines?  It didn't come

closing argument - defendant

1796

1    up very much.  Tony Haines is a consultant who is in Europe

2    who is the Karen Becker of Europe.  He's supposed to help with

3    European regulatory approvals.  And Dr. Kanter, a witness for

4    the SEC, was very familiar with Tony Haines.  And I asked

5    Dr. Kanter, what did you think of Tony Haines?  Top flight.

6    Solid guy.  Good scientist.  Knows his stuff.  Okay.

7          Tony Haines sends an e-mail to Todd Ollendorf, and he

8    says, here's a draft press release.  And he writes this text,

9    that today they executed a manufacturing technical agreement

10    for the manufacture of SF-1019 and the authorization for the

11    manufacture of SF-1019 for the use in humans of

12    investigational medicinal products.  Well, that text finds its

13    way into a press release.  The SEC maintains apparently that

14    Mr. Ferrone knew Tony Haines was wrong about what the European

15    regulators did but decided to lie about it anyway to increase

16    his bonus.  That's the logic.

17          Okay.  There's something called the wound study.  And

18    we saw these unpleasant, frankly, pictures that depicted a

19    wound, and it is what it is.  But we have to understand again

20    Mr. Haines -- it would be the next one.

21          Mr. Haines gets involved.  And he doesn't -- he isn't

22    sending this to Mr. Ferrone.  He's sending it to Todd

23    Ollendorf, and then it finds its way to Mr. Ferrone as a part

24    of this process, okay.  But he says, hey, guys, here's a

25    proposed press release, and it includes comments from Gus,

closing argument - defendant

1797

1  which is Angus Dalgleish, this European physician, and we'll

2  need further input from you guys.  And then he writes this --

3  and I'm not going to do another one of these comparisons.  I'm

4  going to ask in your notes to go look at Exhibit 154 --

5  because that's the press release about this Europe, or this

6  wound study thing -- and then look at this Exhibit 119.  And

7  lay them down side by side, and you will see that Tony Haines

8  essentially drafts this press release.  And the SEC's theory

9  is that Mr. Ferrone knew more than Tony Haines did about

10 European regulatory affairs and decided to let it go out as a

11 lie because he wanted to increase his bonus.  That is the

12 logic.

13        Let's look at the issue about the website.  Heard a

14 lot about the website.  I want to try to get through this in

15 relatively good order.

16        Here's Dr. Willeford, okay.  Nice guy.  Dr. Willeford

17 is getting an e-mail from Todd Ollendorf, and Todd says, "Will

18 you please review the content on Immunosyn Corporation's

19 website for me at your earliest convenience?"  Okay.  Fair

20 request.

21        And then when Willeford comes back, he says, look, I

22 was out of town.  I didn't get to this yet.  So Todd writes to

23 him again and says well, please be picky.  Remember that I am

24 pulling this information from many various sources so if you

25 have an issue or potential issue, I really do want to hear it.

closing argument - defendant

1798

1      Here's what Willeford writes back.  On the disease

2  awareness page of the Immunosyn website, potential diseases,

3  when you talk about focusing on orphan drug diseases via FDA

4  but we're on full clinical hold.  He says, "What was stated is

5  factual, but it may be a better idea to soften the verbiage."

6  And he says, "We currently hope to obtain trial approval for

7  CIPD and RSD."

8      Mr. Ferrone is now being blistered by the government

9  because he adopts language that Mr. Willeford suggested.  And

10  Mr. Ferrone is being called a crook because he doesn't use the

11  words "clinical hold" even though Dr. Willeford didn't choose

12  to use the words "clinical hold" when he put that language in

13  there.  That's the logic that the government has put before

14  you today.

15      That's all for that one.

16      Let's talk about Utah.  Apparently for people like

17  Mr. Sacks, if you live in Utah, you know all about the

18  Osmonds.  Be that as it may, there were a lot of people in

19  Utah, and they had an intense and understandable interest in

20  SF-1019 because MS is awful, and there's too much of it there.

21  Okay.  This whole thing with Utah is, to me, an example of

22  what can you do to satisfy the government?

23      Melling and these Argyll people go and meet with the

24  lieutenant governor of Utah.  They get a letter from the

25  attorney general of Utah saying, you know what?  If you guys

closing argument - defendant

1    want to come in and only manufacture and apply SF-1019 within

2    the jurisdictional boundaries of Utah, we think you can do it

3    because it isn't a federal issue.  They don't come up with

4    this from thin air.  They get this from the highest levels of

5    Utah government.

6           Okay.  The FDA doesn't share that opinion.  The FDA

7    says, well, if you administer it with a syringe that was built

8    in Nevada, it's federal and it's our business, so don't you

9    dare do it.

10           First of all, we heard a lot about this for reasons

11   that escape me because Mr. Ferrone played no role in any of

12   that stuff that was going on in Utah.  Remember they brought

13   Mr. Norton, the weatherman, back from his previous role as CEO

14   and propped him up as the CEO for Utah and didn't involve

15   Steve in any of those dealings.  But what was done in Utah

16   later became the subject of statements made by the company,

17   and Steve, who had no personal knowledge of course, had to

18   react and trust that the information given to him about what

19   happened in Utah was accurate.  But now he's being flawed

20   because that story doesn't match up with the way the FDA

21   remembers it even though there's no showing that Mr. Ferrone

22   would have had any basis to know anything better about the

23   Utah experience.

24           The whole issue with Utah and Dr. Melling and

25   Dr. Melling's estrangement from Argyll, Mr. Ferrone is not

closing argument - defendant

1   contemporaneously aware.  He isn't aware on a real-time basis

2   that that stuff is going on.  Dr. Melling writes to him later,

3   and says, you know, I'm not even talking about Argyll because

4   if you don't have anything nice to say, don't say it.  But

5   there is no correspondence in which Melling is saying look,

6   Mr. Ferrone, here's my problem; here's my issue.  And it gets

7   to the fact that Melling doesn't even tell Mr. Ferrone that

8   the FDA has issued this second clinical hold letter.

9           By the way, you were told earlier that -- Dr. Melling

10  did tell Mr. Ferrone that, and the basis on which that was

11  premised, according to the counsel for the government, is

12  because of the SF-1019-is-dead letter.  You were told that the

13  SF-101-is-dead e-mail was the equivalent of telling

14  Mr. Ferrone it's on clinical hold.  I don't think that's fair.

15  Be that as it may, the question is what was the access to

16  information?

17          You know, very little has been said by the government

18  in either of their presentations about Jim Miceli.  His name

19  never came up in the opening statement and came up only

20  occasionally, if at all, in their closing argument.  It's time

21  to talk about Mr. Miceli.  Mr. Miceli owned Argyll.  And

22  because Argyll owned a majority of the shares of Immunosyn

23  stock, Mr. Miceli had control over the Argyll Immunosyn

24  situation.  He had an iron fist and a cold heart, and it's

25  demonstrated by the evidence.  It's demonstrated by the

closing argument - defendant

1    exhibits.  Let's take a look at one example.

2         Here's Mr. Ferrone asking something that's fairly

3    reasonable.  I have to make payroll.  And this is

4    Mr. Scrooge's response.  If Immunosyn doesn't make payroll, it

5    has no money.  It can't violate any law.  This is not an

6    Argyll problem.  Let them eat cake.  Mr. Miceli is not

7    apparently a very good guy, but apparently he was the guy in

8    charge.  And that's not apparently.  That's proven.

9         Let's talk about Mr. Fougner, the original general

10   counsel of this company when it started out.  What did he say

11   about this?

12        "Mr. Fougner, I'm asking your personal view based on

13    your interactions and observations with Mr. Ferrone.

14        "I think Mr. Ferrone suffered to some extent from the

15    same handicap that I did, both of us being at least one step

16    removed from the parties that were most actively engaged in

17    this part of the project.  That was my impression."

18        Now, he's gone before much of the relevant stuff

19   happens with Mr. Ferrone, but that impression is still worth

20   listening to.

21        Dr. Melling told you that Miceli reprimanded -- that

22   was his word -- he reprimanded Dr. Miceli because Dr. Miceli

23   had the nerve to communicate independently with Mr. Ferrone.

24        Todd Ollendorf told you that it was his belief that

25   Argyll and Mr. Miceli were withholding information from

closing argument - defendant

1802

1  Mr. Ferrone.

2        Dr. Willeford told you that he was lectured by

3  Mr. Miceli about the fact that Immunosyn was a completely

4  different entity from Argyll, and it was a public entity, that

5  there was a reason why the two had been split, and that what

6  was known at Argyll, was, quote, their confidential and

7  proprietary information, closed quote.

8        Mr. Miceli was not very worried about assuring the

9  success of Immunosyn or Mr. Ferrone's management of Immunosyn.

10  He was not very concerned about being forthcoming with

11  information.  And other people, whether inadvertently or

12  otherwise, contributed to this.  Dr. Melling got the FDA's

13  clinical hold letter and didn't open it.  Put it up on a

14  shelf.  Didn't read it to find out what they even thought, how

15  close he came.

16        Next -- and I want to keep moving because I've been

17  the beneficiary of your attention for a long time, and I

18  appreciate that.  I really do.  There's a lot to talk about,

19  and I'm trying to make it as efficient as I can.

20        I got to talk about compensation and money.  I don't

21  like it when people come in with stuff that apparently is only

22  there to try and inflame any kind of prejudice that you may

23  have.  I don't know why we heard about this Bentley being the

24  company car.  That was never shown to be in any relationship

25  to Mr. Ferrone, and as soon as I got up on examination with

closing argument - defendant

1803

1  Dr. Melling, I said, did he have anything to do with that?

2  No.  There were all these lavish parties with huge liquor

3  bills.  Did Mr. Ferrone have anything to do with that?  No.

4  There was a corporate jet that came to get Dr. Melling to take

5  him to Los Angeles so he could go to Malaysia.  Did

6  Mr. Ferrone have anything to do with that?  No.  And they knew

7  when they asked those questions that Mr. Ferrone had nothing

8  to do with that.

9          And I want you to consider just for a moment why they

10  would prove those facts up.  Because they don't want you to

11  like Mr. Ferrone.  They want you to think that he's a bad guy,

12  that he's a greedy man, that he is a pecuniary pig.  That's

13  the kind of portrayal that they want to make here.  They take

14  a bonus figure on a company that reports every year, we are

15  hemorrhaging money.  We have no money.  We have no profits.

16  Yet the lawyers for the United States ask Mr. Ferrone, well

17  based on this agreement, if Immunosyn made $30 billion, then

18  you would make $30 million, wouldn't you?  Well, if I won the

19  lottery, I would quit tomorrow.  There's a lot of things that

20  you could talk about that really aren't worth talking about

21  because they're not in the realm of the real, and it's a waste

22  of your time to talk about these things, and it's an

23  unfortunate event when those things are used to make a person

24  seem greedy because he's got a job with an employment

25  contract.

closing argument - defendant

1      Did Mr. Ferrone think that SF-1019 could be a

2  successful venture that would make him a happy man?  You bet

3  he did.  So did Dr. Melling.  Dr. Melling is sitting out there

4  in Utah, and he's getting involved in SF-1019 for good

5  reasons.  He wants to help his patients, but he's still got a

6  family to feed.  He's still got a future to provide for.  He's

7  putting money into it because he thought it had great promise.

8  So did Mr. Ferrone.  It isn't a crime for Dr. Melling to

9  invest in it and neither is it for Mr. Ferrone.

10      Ultimately it's a question of logic, I think.  The

11  idea that the SEC is peddling is that as part of a scheme, and

12  that's their word, scheme that Mr. Ferrone develops, he

13  thinks, what can I do to pump up the price of this stock?

14  Because if the price of this stock goes up, I could make more

15  money.  Well, the first thing I'm going to do is get my

16  auditors to say we're going out of business.  The second thing

17  I'm going to do is report that we have never done a new drug

18  in our lives and don't really know for sure that we ever

19  could.  The third thing I'm going to do is say that there's no

20  clinical trials going on anywhere in the world.  The fourth

21  thing I'm going to do is say that the company that's

22  responsible for doing the R&D on this has no money, continues

23  to burn money and might not make it through the year.  That's

24  the logic that the SEC asks you to believe and accept in your

25  minds.

closing argument - defendant

1805

1        Talk about Mr. Sacks real quickly.  You were told

2   today that Mr. Sacks proved a very essential element of the

3   SEC's case, and that essential element was that it was

4   important that the clinical hold be used, those magic words,

5   be used in a public filing.  How on God's green earth could

6   that be true?  Mr. Sacks cheerfully admitted that he has never

7   read a public filing in his life.  In his life as an investor,

8   he has never once read a public filing with the SEC.  That was

9   some of the most illogical and absurd testimony in this case.

10  He has never done any research.  He has never listened to or

11  accepted any analytics.  He said, quote, he was making a stock

12  play, closed quote.  He's a speculator.  He's a guy who's got

13  70 units in Las Vegas.  He collects his rent, and he invests

14  in whatever his buddy Bob Potter tells him is a good

15  investment.

16        And don't be thinking that Bob Potter got misled by

17  any public filings either.  He's a guy that was hanging around

18  with the Osmonds and going to these meetings.  The notion that

19  the SEC has done a plausible job of proving to you that any

20  investors out there felt misled is just bizarre.  You get this

21  chart that shows thousands of shares traded.  They bring in

22  one guy from Utah, or Nevada rather, from Las Vegas, and he's

23  never read any of the stuff that is supposed to be misleading.

24  That is not evidence.

25        Let's talk about recklessness.  I got two things --

Case: 1:11-cv-05223 Document #: 268 Filed: 05/02/16 Page 124 of 186 PageID #:5929
closing argument - defendant
1806

1    three things to say about recklessness, and I'm sure you're

2    glad it's only three.

3            First reckless thing, you can't be reckless in a

4    scheme.  You may be reckless in executing a scheme, but the

5    notion that a person with a reckless state of mind develops a

6    scheme to defraud is internally illogical, okay.  If you are

7    scheming, it's because you know what you're doing.  You're

8    making a choice.  You're electing to mislead.  You're electing

9    to leave language out that you think should be in.  This talk

10   about recklessness is a halfway hedge.  It's the SEC's way of

11   saying, look, even if we did call him a liar 150 times and

12   even if you do find that that was overstated and that the

13   evidence didn't support it, give us a break, would you?  Say

14   that he was --

15           MR. PHILLIPS:  I object, Your Honor.  I mean, that's

16   not what the law -- he's misstating the law.  Recklessness

17   does support a scheme.  That's what Your Honor's instructions

18   will say.

19           THE COURT:  Hold on for a second.

20           I don't think he's talking about the law.  I think

21   he's making an argument here.  So I'm going to overrule the

22   objection.

23           MR. ROTERT:  May I proceed, Your Honor?

24           THE COURT:  Mm-hmm.

25           I mean, ladies and gentlemen, I will just instruct

closing argument - defendant

1807

1    you on the law.

2           MR. ROTERT:  I don't want you to believe I'm

3    misstating the law.  So these are instructions -- let me say

4    this.  Only one person in this room is entitled or empowered

5    to talk about what the law says, and that's Judge Gilbert.  I

6    have that -- no power to do that.  I have no desire to do

7    that.  But as Judge Gilbert has made clear, he does issue

8    written instructions, which is a wonderful thing, and I want

9    you to know what those written instructions say.

10          When we talk about reckless, it's got to be an

11   extreme departure from the standards of ordinary care and a

12   risk that is either known to a defendant or is so obvious that

13   he must be aware of it.

14          Go to the next one.

15          It is not enough to show that Mr. Ferrone acted

16   accidentally or made a mistake or engaged in negligent

17   conduct.  It's got to be proof that he acted with a mental

18   state embracing intent to deceive.  That is a choice,

19   manipulate or defraud, okay.  That's all.

20          Now, if you will do me one kind service.  I want you

21   to write something down.  Trial Exhibit No. 19, Trial Exhibit

22   No. 24, Trial Exhibit No. 27.1, Trial Exhibit No. 57, Trial

23   Exhibit No. 77, and I'll stop there.  If you're sitting back

24   there and you're wondering for a nanosecond whether or not

25   Mr. Ferrone was reckless, you go look at those exhibits.  You

closing argument - defendant

1808

1     look at the way the man writes, the questions he asks, the

2     pursuits that he engages in.  You go evaluate him when he was

3     writing when he didn't realize it would later be scrutinized.

4           Certifications, real quick.  Every one of these

5     certifications that the SEC constantly brings before you says

6     that based on my knowledge, I'm certifying this to be true.

7     This is -- if Mr. Ferrone knew something different and it had

8     been proven that he knew something different than what he

9     signed, those counts would make some sense, but you cannot

10    think on this evidence that Mr. Ferrone had knowledge that

11    anything in those statements was false because everybody that

12    was working with him told me -- told him to the contrary.

13          Mr. Ollendorf, as I said, had the most interaction

14    and the most direct dealings with Mr. Ferrone.  I might have

15    expected that the SEC would have the courage of their

16    convictions if they're going to call a man a liar and that

17    they would ask Mr. Ollendorf about the times that Mr. Ferrone

18    lied to him, or that they would ask Mr. Ollendorf about the

19    times that he urged Mr. Ferrone to put the words "clinical

20    hold" in the documents, and Mr. Ferrone refused.  I would have

21    thought that there would be proof through the person with the

22    best position to know that Mr. Ferrone was the bad guy that

23    he's been portrayed to be.

24          Mr. Ferrone -- excuse me -- Mr. Ollendorf had said

25    instead, testified, that Mr. Ferrone is, quote, conscientious

closing argument - defendant

1    on regulatory issues, closed quote.  He said that Mr. Ferrone

2    in his experience never withheld any information from any of

3    the subject matter experts or attorneys.  And he said in

4    response to my question that Mr. Ferrone, in his view, tried

5    to be as truthful and as accurate as possible in making public

6    disclosures, the person other than the defendant himself in

7    the best position to know.

8            Ladies and gentlemen, "clinical hold" is a valuable

9    term.  It means something to the FDA.  It means something to

10   the pharmaceutical industry.  But at the end of the day, it's

11   jargon.  You are asked to condemn a person as a fraudster

12   because he, instead of using jargon, talked in plain English

13   about what was happening.  You are asked to believe that

14   Mr. Ferrone thought that by concealing the fact of a clinical

15   hold in revealing the massive financial problems that affected

16   his company, he was going to trick people into buying more

17   stock.  There isn't any proof of that.  And, more importantly,

18   your logic tells you, you shouldn't expect proof of it because

19   it's kind of a silly idea.

20           The best thing about this case is that Mr. Ferrone

21   testified, and so you had a chance.  And so did the SEC.  They

22   had a chance to confront him and ask him the hard questions.

23   They asked him if there were smiling faces on pages.  They

24   asked him whether text said what it said.  They had him read

25   long text of paragraphs.  But when it came time to asking him

closing argument - defendant

1  about the gut issues in this case, it was Mr. Rubenstein who

2  did that.  And you heard Mr. Ferrone's answers.  He didn't

3  intend to deceive anybody.  He didn't want to deceive anybody.

4  He didn't want to mislead anybody.  He wanted this company and

5  this product to succeed because it would be good for him and

6  because it would be good for people who needed the apparent

7  benefits of the drug.  There isn't any evidence to contradict

8  that because it is the truth.  Please reflect that by checking

9  in favor of Mr. Ferrone, and thank you.

10          THE COURT:  Thank you, Mr. Rotert.

11          We're after 1:00, and I'm not going to prevail on the

12  jury any more.  It is the plaintiff's counsel's right to

13  address you in what we call rebuttal, and that would be

14  responding to Mr. Rotert for the defense if he wants to do so.

15  But I'm afraid if he got up -- you know, first of all, I don't

16  know if he's going to, but if he is going to get up and do

17  that, it's going to take some time, so I think we ought to

18  break for lunch.

19          I would like to take an hour and then come back.  And

20  if you're going to hear from Mr. Phillips at all again or

21  anybody at the SEC table, you'll do that.  I'll give you your

22  jury instructions on the law, and then you will begin to

23  deliberate.

24          So we're almost there, but, again, I admonish you you

25  haven't heard everything because you still may hear once more

1    from the SEC and you will then get my jury instructions that

2    I've -- and then you will get these in hard copy to bring back

3    to the jury room as well as the exhibits that have been

4    admitted into evidence.

5            So no talking about what you've heard, what you're

6    thinking, and no outside research, and I'll see you in an

7    hour.  Call it 2:10.  Okay.

8            Wait, I have lunch for you.  Is everybody going to

9    eat that lunch or are some of you going to go out?  Everybody

10   is going to eat our lunch?  Well, we'll check -- you know, I'm

11   going to ask these guys, but it could be you only need 45

12   minutes, right?

13           JUROR:  Yes.

14           THE COURT:  Some shaking heads.  We'll see if we can

15   get that done.  Okay.  If you want to go out, you know, you

16   can take a walk or something, but I have to make this call as

17   to whether you're coming back in an hour or 45 minutes.  I

18   would love to shoot for 45 minutes if you're ready.

19           How is that with the lawyers?

20           MR. PHILLIPS:  That's fine.  Thank you.

21           MR. ROTERT:  That's fine.

22           THE COURT:  That will get you the instructions and

23   deliberating more quickly.  So let's do that as long as you

24   don't have to run.

25           JUROR:  No problem.

1  THE COURT:  Okay.

2  JUROR:  Are we dismissed?

3  THE COURT:  Do I always dismiss you?  You're

4  dismissed.  I don't know where Brenda is.  You can leave.  Go

5  eat.  Go eat, please.  Refresh yourselves, sustenance.

6  (Jury exits.)

7  THE COURT:  Tell me if 45 minutes is okay.  You want

8  me to tell them an hour still?

9  MR. PHILLIPS:  No, 45 is fine.

10  MR. ROTERT:  Sure.

11  THE COURT:  For both sides?

12  MR. ROTERT:  Sure.

13  THE COURT:  I just figured, what the hell.

14  MR. RUBENSTEIN:  They will basically be breaking

15  again shortly thereafter.

16  THE COURT:  Right.

17  MR. PHILLIPS:  I am going to renew that request that

18  I made about commenting on failure to call witnesses.  I think

19  Mr. Rotert did it with respect to investors.  He said

20  Mr. Sacks was the only one we called.  And he put Sarah

21  Hewitt, you know, at some point front and center in his

22  presentation.  So for the reasons that we talked about before,

23  I think it is appropriate in the rebuttal for me to be able to

24  comment on that.

25  THE COURT:  Comment on the?

1813

1    MR. PHILLIPS:  The failure to call Ms. Hewitt.

2    MR. ROTERT:  Judge, I --

3    THE COURT:  Go ahead.

4    MR. ROTERT:  I didn't make a comment on the failure

5    to call.  I made a comment on -- what I felt was the

6    inadequacy of the person they did call.

7    THE COURT:  Yeah, I will tell you that I heard

8    nothing in the -- I mean, as I was sitting here, I was

9    thinking what your position would be.  I heard nothing in the

10   defendant's closing to me that, consistent with the case law

11   that I referenced before, would say that it's going to be

12   helpful to the jury to say the defendant didn't call the

13   lawyers.  I mean, neither side brought in a lawyer.

14   Go ahead.

15   MR. PHILLIPS:  I mean, based on this last point, with

16   Mr. Sacks, according to the transcript, the rough transcript,

17   he said -- no, I think -- I don't know.  It's not coming up.

18   My recollection of what was said with Mr. Sacks was we put up

19   this big chart with all these investors and that we only

20   called Mr. Sacks, and he was inadequate.  So I did hear that

21   that -- that being commented on our failure to call their

22   investors -- yeah, Mr. Sacks -- it keeps on -- at some point

23   he said Mr. Sacks was the only one we would call.

24   THE COURT:  The case law is pretty clear on this.  A,

25   it's discretionary.  B, this kind of comment should be

1  precluded unless the case presents a significant question on

2  this particular point.  And I don't think the case presents a

3  significant question on the absence of a lawyer coming in to

4  testify in this case the same way that it presents a

5  significant question when a defendant says, you know, the

6  fingerprints are really my brother's, or something like that,

7  or my cousin's, or whatever that is.  I mean, it's just -- I

8  am -- you know, I think there are ways -- there are ways to

9  talk about the significance of the lawyers in the case

10 without, in rebuttal, smacking the defendant for not bringing

11 in the lawyer.  Again, I just don't think it's -- I don't

12 think that that's an issue upon which this case is going to

13 depend in the end.  It becomes something that the jury could

14 speculate about that has no positive or affirmative effect.

15 Why didn't they bring him in?  I mean, that's just not the

16 issue.  There was very little -- I mean, a lawyer could have

17 come in and said, I didn't meet with Ferrone, but the SEC

18 could have brought a lawyer in or deposed a lawyer for that

19 purpose too.

20        So I don't think it's fair in a case where there's a

21 motion to bar advice of counsel, defendant is saying, I didn't

22 rely on advice of counsel.  The lawyer's role in the case is

23 relevant for a particular purpose.  The SEC is free to

24 comment -- I mean, there was stuff that Mr. Rotert said in

25 terms of where the lawyers were.  I'm not going to put words

1815

1    in your mouth, but the words that I'm not going to allow you

2    to say is that the defense should be faulted for not bringing

3    in a lawyer because they can't come back in and say, well, you

4    could have brought him in, too.

5         MR. PHILLIPS:  I understand.  Thank you.

6         THE COURT:  That's my ruling.  We'll shoot -- now

7    it's 1:15.  I'll give you guys 45 minutes too, so let's shoot

8    for 2:00-ish.

9         MR. PHILLIPS:  Thank you.

10      (Lunch recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
   SECURITIES AND EXCHANGE          )
 4 COMMISSION,                      )
                                    )
 5             Plaintiff,           )
                                    )
 6                                  )  Case No. 11 C 5223
                                    )
 7 -vs-                             )  Chicago, Illinois
                                    )  April 27, 2016
 8 STEPHEN D. FERRONE,              )  1:30 p.m.
                                    )
 9             Defendant.           )

10                     Volume 8-B
            TRANSCRIPT OF PROCEEDINGS - Trial
11    BEFORE THE HONORABLE JEFFREY T. GILBERT, and a jury

12

13 APPEARANCES:

14
   For the Plaintiff:     U.S. SECURITIES AND EXCHANGE COMMISSION
15                        BY:  MR. ERIC M. PHILLIPS
                               MS. CHRISTINE S. BAUTISTA
16                             MS. TRACY W. LO
                          175 West Jackson Boulevard, Suite 900
17                        Chicago, Illinois  60604

18
   For the Defendant:     STETLER DUFFY & ROTERT, LTD.
19                        BY:  MR. MARK L. ROTERT
                               MR. COREY B. RUBENSTEIN
20                        10 South LaSalle Street, Suite 2800
                          Chicago, Illinois  60603
21

22 Court Reporter:        CHARLES R. ZANDI, CSR, FCRR
                          Official Court Reporter
23                        219 S. Dearborn Street, Suite 2128
                          Chicago, Illinois  60604
24                        (312) 435-5387
                          charles_zandi@ilnd.uscourts.gov
25
</pre>

1    (Proceedings heard in open court, jury not present:)

2         THE COURT:  Is everybody who needs to being here

3    here?  Please be seated.  Okay.  Two things.  One, I made a

4    slight change to the jury instructions.  At page 31, it

5    references that they should give any writing that they want to

6    communicate to the marshal.  He's really not a marshal.  He's

7    a court security officer.

8         So, I've noted this when I've done this before, and

9    every time, I forgot to change it.  So I just changed it to

10   court security officer.  Okay?  Because he's really not a

11   marshal.

12        Second, but more importantly, though, I went back

13   during the break, and I reread the argument -- Mr. Rotert's

14   argument in closing to which Mr. Phillips objected.  And I

15   actually think he was right, Mr. Rotert.

16        You said, "First reckless thing, you can't be

17   reckless in a scheme.  You may be reckless in executing a

18   scheme, but the notion that a person with a reckless state of

19   mind develops a scheme to defraud is internally illogical.

20   Okay?

21        "If you're scheming, it's because you know what

22   you're doing.  You're making a choice.  You're electing to

23   mislead.  You're electing to leave language out that you think

24   should be in.

25        "This talk about recklessness is a halfway hedge.

1 It's the SEC's way of saying, 'Look, even if we did call him a
2 liar 150 times, and even if you do not find that that was
3 overstated and the evidence didn't support it, give us a
4 break, would you?'"

5       I mean, that's a misstatement of the law.  I think
6 there is intent and knowing, and then there's reckless.  And
7 reckless -- what you are arguing here is that there should
8 be -- there is no difference between -- as I read it, there is
9 no difference between intent and recklessness.  At least it
10 could be taken to say that.

11       You immediately put up on the screen the actual jury
12 instruction.  But I think that the objection was well-founded,
13 and what I mean proposing, subject to hearing from you, is to
14 say that, "I've reconsidered my ruling on Mr. Phillips's
15 objection.  I'm going to sustain the objection, and I'm going
16 to ask you to disregard what Mr. Rotert was saying about
17 recklessness.  And then he immediately showed you the jury
18 instruction.  And I'm going to give you the jury instruction,
19 and that's the instruction as to the law that should control
20 your deliberations."

21       Your response?

22       MR. ROTERT:  Your Honor, respectfully, I think that
23 the fair reading of the comments was that apart from what the
24 instructions say, that the SEC has staked out a position that
25 this was intentional and deliberate conduct, and that for them

1    to talk about the reckless elements was inconsistent with the

2    theory of the case that Mr. Phillips espoused on closing

3    argument.

4         And so I think it was appropriate argument.  I

5    respect the Court's statement.  I object to the proposed

6    statement to the jury for that reason, because I wasn't

7    endeavoring to draw distinctions between two mental states as

8    a matter of law.  I was endeavoring to say, "Why are we

9    talking about reckless?  Because we've been told" -- and of

10   course, scheme was an elective use by Mr. Phillips, because it

11   isn't an element of the statutory offense.

12        THE COURT:  Sure, it is.

13        MR. ROTERT:  Well, in any event, he had staked out

14   the position that that was the only answer to this case, so

15   that's my position, Judge.

16        THE COURT:  Yeah, I hear you.  I disagree with it.  I

17   think that that -- what you've articulated is defendant's view

18   of what the SEC's theory is, for sure, and I get that, and

19   you've argued that to the jury.  But the SEC clearly has -- I

20   mean, there are elements -- there are three parts of 10b-5,

21   and they clearly -- and scheme is part of one of them, and

22   they addressed all of them.

23        But I think the SEC's -- the SEC disagrees with your

24   theory of the case.  And I think this went -- not

25   intentionally, and I can tell the jury -- well, I mean, it

1   will come out the way it comes out.  I'm not accusing you of

2   doing anything intentionally, but I do think that it was -- I

3   do not want there to be something where the jurors either have

4   written that down or remember what you said and disregard the

5   jury instruction.  I think there's a danger of that, because I

6   think that that -- this is inconsistent with the jury

7   instruction.

8           It's very nuanced, but -- and that's why I missed it

9   kind of the first time; and the first time when I -- my ruling

10  was, having heard it and looked at it really quickly on the

11  screen, that it was argument.  But I think it's more than

12  argument.  I think it's a bit of a change from the jury

13  instruction.

14          Anyway, I hear you.  I'm still going to overrule --

15  I'm going to sustain -- I'm going to overrule myself, sustain

16  his objection, and tell the jury that they ought to disregard

17  that, focus on the slide you sent and what I tell them and

18  what they take into the jury room as to what the law is on

19  recklessness.

20          Okay.  With that, I'm done -- or not done, but I'm

21  ready to have the jury come in.

22          And maybe, Kelly, you could connect me up or

23  something.

24     (Jury enters courtroom.)

25          THE COURT:  Okay.  Thanks.  Ladies and gentlemen of

1  the jury, over the break, I had an opportunity to think about

2  a ruling I made, and I'm going to overrule myself.

3       So, there was a point during Mr. Rotert's oral --

4  closing argument to you in which Mr. Phillips objected to

5  certain characterizations that Mr. Rotert was making, and I

6  overruled the objection.  Mr. Rotert immediately went to a

7  slide and showed you what my jury instruction will be on a

8  particular topic.

9       I've decided I'm going to sustain Mr. Phillips's

10  objection, plaintiff's objection; and I'm going to ask you

11  to disregard what immediately came before that slide and

12  instead -- but not disregard what it said on the slide.  And

13  what it said on the slide is going to be consistent with what

14  I've said here.

15       I'm not ascribing any -- I'm not ascribing anything

16  to that.  I'm just saying that as a legal matter, I would like

17  to strike that part of -- those two sentences that Mr. Rotert

18  said, and I'm going to sustain Mr. Phillips's objection

19  because upon reflection I've decided that his legal objection

20  was right.  Okay?

21       But you will -- you should not disregard what was on

22  that slide, and as you will see it -- you'll get the jury

23  instructions.  Okay?

24       I don't think I was going to do anything else, right?

25  Okay.

1          Does the plaintiff have some rebuttal?

2          MR. PHILLIPS:  Yes, your Honor.  Thank you.

3          THE COURT:  Okay.  You can proceed when you're ready.

4          MR. PHILLIPS:  Ladies and gentlemen of the jury, this

5   case is not about two magic words, as Mr. Ferrone's lawyer

6   said.  It's about much more than that; and I explained it

7   during my presentation, and I'll just reiterate what I said.

8          This case is about a series of misleading and false

9   statements that Mr. Ferrone made in which he totally

10  mis-portrayed what was going on with the most important aspect

11  of this company, which was the regulatory status, which was

12  getting this drug successfully through the regulatory approval

13  process.

14         And the reason why it was misleading, why these

15  statements were misleading and false, a series of them, one

16  after the other after the other, is largely because the FDA

17  had imposed this clinical hold.  They identified all of these

18  deficiencies, and Argyll never resolved them.  And Mr. Ferrone

19  and his company never disclosed any of this until we asked him

20  about it under oath.

21         That's what the case is about.  This is not a case

22  about technical, two little words, magic words.  That's not

23  what the evidence showed.  That's not what we argued.

24         And I invite you to take all of those disclosures

25  that Mr. Ferrone made.  There's 18, 20 of them.  I went

rebuttal - plaintiff

1  through them with Mr. Ferrone.  I went through them with

2  Mr. Ollendorff.  Put them side by side.  See all the things

3  that Mr. Ferrone said time after time after time after time,

4  all the questions that were asked of him in these interviews

5  and all the answers he gave, all the speeches he gave, what he

6  said.

7          And ask yourself, does the evidence support this

8  argument that this case is about these two magic words, or

9  does it support what we said, that this is about a scheme and

10 false and misleading statements one after the other after the

11 other after the other that totally mis-portray what was going

12 on with this company?

13         That's what the case is about.  That's what the

14 evidence supports.

15         Mr. Ferrone's counsel urged you to use logic when

16 you're deciding this case, and I agree with that.  And, in

17 fact, Judge Gilbert will give you a jury instruction about

18 using your common sense.  And the good news for you is you can

19 take your common sense with you when you deliberate.  That's

20 what Judge Gilbert will instruct you, and we're all in

21 agreement.  That's what you should do.

22         But what I would ask you is to ask yourselves, is it

23 logical, does it comport with your common sense this portrayal

24 that Mr. Ferrone's lawyers made of him?  Does that jibe with

25 the evidence in this case, that Mr. Ferrone was conscientious,

rebuttal - plaintiff

1   that he asked so many questions, that he was always concerned

2   about being compliant and having everything disclosed?  And

3   then compare that portrayal, use your common sense and your

4   logic, and look at all the statements that he made about this

5   company in which he disclosed nothing about what was really

6   going on, nothing about the clinical holds, nothing about the

7   delay, nothing about the deficiencies.

8           Use your logic and common sense.  Look at his

9   background.  Look at the fact that he's been a lawyer for

10  30 years.  Look at the fact that he was in the financial

11  services industry for 20 years.  There is nobody who has been

12  talked about in this case who was better equipped to know that

13  his statements were false and misleading, not a little bit,

14  but totally false and misleading.

15          He knew it, and it was his responsibility.  There's

16  not -- not only is he the person who has the best background

17  of anybody who's been mentioned in this case to know that his

18  statements were just a total mis-portrayal of what was going

19  on; there's nobody with more responsibility than him.  He's

20  the CEO.  He's the only full-time employee.  He certifies the

21  statements.

22          Is it logical, does it comport with your common sense

23  that when he got these reports from the Blaine Group, from

24  people with MS and from people who had invested saying, "When

25  are the clinical trials starting?  What's going on?  I want to

1    get in the clinical trials," based on all the statements that

2    he put out, that he didn't -- nothing, no light bulb went off

3    in Mr. Ferrone's head, with all of his sophistication, with

4    his knowledge about how important regulatory approval was to

5    this company, no light bulb went on in his head, "Gee, I

6    wonder why all of these people are thinking that clinical

7    trials are about to start.  Gee, I wonder why all of these

8    people are thinking that the regulatory approval process is

9    going so smoothly.  I wonder what it is about all of my

10   statements that leads them to believe that"?

11           That does not fit with your common sense.  It makes

12   no sense.  It's illogical.  So, if you use your common sense,

13   you use your logic, you'll under than the portrayal that was

14   made of Mr. Ferrone does not make any common sense and does

15   not fit with your logic.

16           On the point of logic and common sense, Mr. Ferrone's

17   counsel again made this point about, "Whoa, the clinical hold,

18   that was not a rejection.  That was just some minor

19   discrepancies, and that's not a big deal."  That's totally

20   inconsistent with all the evidence in this case, among other

21   things, Dr. Kanter, the witness from Buffalo.  He said that he

22   understood that the clinical hold letter was a rejection.

23           And of course, we heard evidence in this case, some

24   evidence that people thought that these deficiencies could be

25   overcome.  Of course, you don't know whether they can be

1   overcome until you actually try, which never happened.  But
2   they weren't.  They never were.  Month after month after month
3   went by, and nothing happened with these deficiencies.  They
4   were never resolved.

5         So, of course it's a rejection.  It's a rejection
6   when it happens twice.  It's a rejection when you don't
7   respond.  It's a rejection when you don't resolve the
8   deficiencies.  That's common sense.

9         I think you saw from Mr. Ferrone's lawyer's
10  presentation that a lot of his defense is about blaming
11  others.  If you heard his presentation, you'd think
12  Miss Becker is on trial or Mr. Miceli is on trial.  We heard
13  how bad Mr. Miceli was.  You would think he's on trial.  No,
14  it's Mr. Ferrone who's on trial.  So, don't buy in to this
15  effort to distract you with other people, in this effort to
16  blame other people.  This is about him.  This is about his
17  responsibility, his knowledge, his motive.  Use your common
18  sense in that regard as well.

19        Mr. Ferrone's lawyer talked about this Becker press
20  release and said that Mr. Ferrone thought, oh, based on that,
21  everything was disclosed, nothing to worry about.  First of
22  all, again, Ms. Becker is not on trial.  She wasn't the CEO.
23  She didn't have a financial stake in this company.  She's not
24  a disclosure expert.  What she did was she gave some language
25  for part of one press release out of dozens that this company

1    put out.  And we have evidence that she was involved in one

2    and part of that language.

3         So, it's not about Ms. Becker, but let's look at her

4    language.  And I'd ask Pat to call up Trial Exhibit 266, which

5    Mr. Rotert showed you.  And this is the language that

6    according to the defense makes all of Mr. Ferrone's other

7    disclosures okay.  They're not misleading.  They're not false,

8    and it doesn't make any sense that Mr. Ferrone would do what

9    the SEC is suggesting, based on this one line that Miss Becker

10   provided and that was ultimately used.

11        Well, let's look at what this line doesn't say.  It

12   doesn't say that an IND has actually been filed.  Even if you

13   interpret it to say it had been filed, it doesn't say when it

14   was filed, December 2006.  It doesn't say anything about a

15   clinical hold.  It doesn't say anything about all the

16   deficiencies that were identified.  It doesn't say anything

17   about the failure to resolve all of these deficiencies.

18        This sentence doesn't say very much.  And it occurred

19   in one press release.  We never saw it again, never saw it in

20   the 10-Ks, which didn't discuss anything about an IND even

21   having been filed.

22        And oh, by the way, this technical term "clinical

23   hold" that we heard so much about, these magic words, well, it

24   turned out in the 10-Ks Mr. Ferrone used those magic words in

25   saying that that's a possibility.  But then when it came to

1 disclosure, all of a sudden those magic words were too

2 difficult to use. He didn't think anybody would understand

3 them.

4 Well, Mr. Ferrone thought it was perfectly fine to

5 use them when he was talking about a possibility with some

6 company in the abstract about the process. But when it

7 actually happened, when it was actually meaningful to

8 investors, all of a sudden, it becomes too difficult.

9 So, this one line that doesn't mention clinical hold

10 and gives people very limited information in one press release

11 at one period of time really means very little in this case.

12 Thanks, Pat. You can take that down.

13 I want to talk about Mr. Sacks for a moment,

14 Mr. Ferrone's attorney commented on him. Mr. Sacks, as

15 Mr. Sacks testified, got most of his information, maybe all of

16 it, from his broker. What did Mr. Sacks say about where his

17 broker got the information? He said his broker got the

18 information from Immunosyn and Argyll. And he specifically

19 said that his broker got information from Mr. Ferrone.

20 MR. ROTERT: I object, your Honor. That's not a fair

21 statement of the evidence.

22 THE COURT: You know, at this point, I frankly

23 don't -- I'm not recalling, in the two weeks of trial, so --

24 MR. PHILLIPS: Let me restate it and see if it

25 satisfies. What Mr. Sacks testified is that his broker

1    mentioned Mr. Ferrone.  I said that he got all of his

2    information from Mr. Ferrone.  That's -- what Mr. Sacks said

3    is that his broker mentioned Mr. Ferrone.

4            THE COURT:  Okay.  Well, based -- let me interrupt

5    for a second.  So, based on that, I think I'm going to sustain

6    the objection.  I'll ask you to disregard the statement about

7    getting all of his information, and instead, you can consider

8    the amendment that his broker mentioned Mr. Ferrone in some

9    way.

10            MR. PHILLIPS:  The fact that Mr. Sacks got his

11   information from a broker is something that Mr. Ferrone knew

12   full well was a possibility when he was CEO.  Mr. Ferrone was

13   a broker.  He was in the brokerage industry.  He knows how it

14   works.  Not only do investors read these filings, but brokers

15   do, too, and then they make recommendations to customers, and

16   they buy.

17            In fact, Mr. Ferrone himself made presentations to

18   brokers in Utah with Mr. Osmond, Alan Osmond.  It was

19   Mr. Ferrone who went with Mr. Osmond.  So, when Mr. Rotert

20   says, well, something was wrong with Mr. Potter because he

21   talked to Alan Osmond, it was Mr. Ferrone who made a

22   presentation with Alan Osmond, and that's Trial Exhibit 301.

23   And then it was filed as an 8-K.

24            And of course, that presentation, like everything

25   else, said how great everything was with this company, nothing

1    about a clinical hold, nothing about deficiencies, nothing

2    about a failure to remedy them.

3           And the fact that Mr. Sacks didn't read these

4    documents directly, again, no bearing on your consideration of

5    the case.  We don't have to show that Mr. Sacks relied

6    directly on Mr. Ferrone's statements and that he read them.

7    Reliance is not what we have to prove.

8           And in any event, Mr. Sacks got his information from

9    a broker, and Mr. Ferrone knew how that relationship works.

10   That's why he made more than -- not only that presentation,

11   but a lot of presentations to brokers.  And he was a broker.

12   He knows how this industry works.

13          Mr. Ferrone's lawyer accused us of injecting evidence

14   into this case just to make you mad.  He said it was a waste

15   of time, so I want to address the points he raised.

16          First of all, he said it was a waste of time for me

17   to go through with Mr. Ferrone and ask him what his bonus

18   could have been based on the projections that the company was

19   making at the time.  And I went over with Mr. Ferrone how

20   based on those projections, his bonus, if they got regulatory

21   approval could have been many millions of dollars.

22   Mr. Ferrone's lawyer said that was a waste of time.

23          There's a lot of evidence in this case, ladies and

24   gentlemen, that Mr. Ferrone was in this because he wanted to

25   make a lot of money.  And I'd ask Pat to call up Trial

1    Exhibit 37.

2            This is the e-mail exchange that Mr. Ferrone had back

3    in 2005, where he's talking with Mr. Miceli about all his

4    requests for compensation for being the CEO of a public

5    company.  And it's Mr. Ferrone who's bringing that up, not the

6    SEC.  It's in his e-mail.  He's the one who wants all this

7    lavish compensation.  So, it's not a waste of time.  It's

8    supported by the evidence in the case.  You can see it right

9    here.

10            And he negotiated the employment agreement that he

11   ultimately signed with Immunosyn where he asked for that bonus

12   structure.

13            And the defense brought up during the trial that that

14   revenue projection was not released to investors.  That's not

15   the issue.  The issue is that Mr. Ferrone, when he started as

16   CEO of Immunosyn, knew that the revenue potential existed.

17   And even if it was -- even if those revenue numbers were

18   overstated, even if they were anywhere in the neighborhood of

19   what was being projected and this drug got regulatory

20   approval, he would have made millions and millions of dollars

21   from his bonuses.

22            He had a strong motive to keep this company afloat in

23   terms of keeping the stock price up and getting money into the

24   company so that Argyll could get money potentially to fund

25   regulatory approval.  And that leads to the next issue.

1    You can take that down, Pat.  Thank you.

2    The next issue that Mr. Ferrone's lawyer accused us

3    of raising just so we could make you mad and waste your time,

4    and this was the issue of testimony, I think it was from

5    Dr. Melling, about the lavish dinners that Argyll had and the

6    corporate jets that it used and all the money that it spent on

7    all of these frivolous things.

8    The reason why that's relevant is because it shows

9    that Argyll actually had some money at some point, and they

10   wasted it on things.  They could have used it for regulatory

11   approval, to efforts on regulatory approval, and they didn't.

12   Now, I'm not saying that money wasn't an issue,

13   because I think there was a lot of evidence that money was a

14   problem for Argyll.  But the notion that Mr. Ferrone's lawyers

15   argued that so long as Immunosyn disclosed that Argyll had

16   money problems, that that was the equivalent of disclosing the

17   clinical hold I think is a very strange argument to make.

18   It's not supported by the evidence.

19   And among other things, this evidence about the

20   lavish parties and the jets, it shows that that wasn't the

21   entire story about why Argyll didn't follow through on

22   resolving the deficiencies.  There were other issues.  Money

23   was a part of it.

24   But regardless of what the ultimate reasons were for

25   why Argyll didn't do the things that it needed do to obtain

1   regulatory approval, didn't do the things it needed to do to

2   resolve all of these deficiencies, none of those facts were

3   disclosed by Mr. Ferrone.

4           Finally, I want to address the issue that we're glad

5   that Mr. Rotert brought up, and that was the issue of this

6   SB-2, this registration statement that contained all these

7   same or similar disclosures that were later made.

8           And, Pat, if you could pull that up.  That's Trial

9   Exhibit 248.

10          This document was filed in December 2006, and it had

11  all these same disclosures that later were in the 10-Ks about

12  all these risks and uncertainties that could happen if there

13  was a government or regulatory delay.  It talked about how in

14  the regulatory approval process the FDA may issue a clinical

15  hold.

16          Well, December 2006 was before the FDA ever issued a

17  clinical hold.  It was before there was any delay caused by

18  that clinical hold and the failure to remedy any deficiencies.

19          And Mr. Rotert commented, and we agree, that there's

20  nothing wrong with taking some earlier document as the first

21  starting point to do later documents, nothing wrong with that.

22  What is wrong is when you use the same disclosures over and

23  over and over and don't change them to reflect what's actually

24  going on with this company.

25          So, when this document was filed, there was no

1   clinical hold.  There was no delay.  But in the subsequent

2   documents, when Mr. Ferrone took over, there was a delay

3   caused by a clinical hold.  There was a delay caused by the

4   failure to resolve these deficiencies.  And what Mr. Ferrone

5   was required to do was to make those documents accurate and

6   not misleading.

7           And by just continuing these same disclosures that

8   had always been in place and not disclosing that there were

9   actually delays and saying that there were just risks of them,

10  that was false and misleading.  To say that there may be a

11  clinical hold in some hypothetical sense, which is what the

12  SB-2, the registration statement, said in December 2006, that

13  becomes false and misleading when there actually is a clinical

14  hold and you never disclose it.

15          And that's what this case is about.  The fact is

16  these 10-Ks did not even come close to describing what was

17  actually going on with this company about the most important

18  aspect of this company's business.

19          Again, thank you for your time.  Thank you for your

20  service.  We ask you to give a verdict in favor of the SEC on

21  all of its claims.  Thank you.

22          THE COURT:  Thanks, Mr. Phillips.  I want to ask the

23  lawyers one thing before I give you the instructions.

24    (Proceedings heard at sidebar:)

25          THE COURT:  Does anything have any -- I feel like I'm

rebuttal - plaintiff

1835

1 | in -- I feel like I'm in Milwaukee when I'm looking at the

2 | jury for this. Does anybody have any objection to my standing

3 | at the podium giving the instructions?

4 |        MR. RUBENSTEIN: You're the judge.

5 |        THE COURT: But I don't want to do anything that I'm

6 | not thinking you would feel --

7 |        MR. RUBENSTEIN: I think that's a great idea.

8 |        MS. BAUTISTA: We'll move around where we were during

9 | the trial so we're not as close to you. Or where are you

10 | planning on standing? In the middle? Oh, then we'll stay

11 | where we are.

12 |        THE COURT: Yeah.

13 |   (Proceedings heard in open court, jury present:)

14 |        THE COURT: Okay. Ladies and gentlemen. I asked the

15 | lawyers whether they had any objection to my standing here to

16 | give you the jury instructions. I feel because of the way the

17 | courtroom is situated, I keep saying the last juror is in

18 | Milwaukee; but when I'm talking to you, I feel like I'm in

19 | Milwaukee. So, I just felt this way I would be here. It

20 | reminds me a little bit about talking to a jury at a different

21 | time in my life, so that's good, too.

22 |        Okay. I have the jury instructions for you, and I'm

23 | going to read them to you. Don't be put off by the thickness

24 | of the packet because there's only one on each page. There's

25 | one on each page because that's the way the lawyers and I went

1    about constructing them, and then we put them all together.

2    The pages are numbered in case you get them out of order.

3    Okay?

4            So I'm going to read these.  I'm going to try and

5    read them slowly.  Can you hear me okay?  And then I'll

6    release you to deliberate.  Okay?

7            Members of the jury, you have seen and heard the

8    evidence and the lawyers' arguments.  Now I will instruct you

9    on the law.  You have --

10           And let me just pause for one second.  A lot of these

11   instructions at the beginning are the same or very similar to

12   the instructions that I gave you right before the case.  I'm

13   saying them again because they're important now, but I wanted

14   to give them to you the first time so that they oriented you.

15           But there's other instructions later on about each of

16   the claims, et cetera.  So, there's things in here that you've

17   heard before, and there's things in here that you haven't

18   heard before.  So, try not to glaze over when you hear the

19   things that you have heard before because they're all

20   important.  Okay?

21           You have seen and heard the evidence and the lawyers'

22   arguments.  Now I will instruct you on the law.

23           You have two duties as a juror.  Your first duty is

24   to decide the facts from the evidence in this case.  This is

25   your job and yours alone.  Your second duty is to apply the

1   law that I give you to the facts.

2          You must follow my instructions about the law even if

3   you disagree with them.  Each of the instructions is

4   important, and you must follow all of them.

5          You must perform both of your duties fairly and

6   impartially.

7          Nothing I say now and nothing I said or did during

8   the trial is or was meant to indicate any opinion on my part

9   about what the facts are or what your verdict should be.

10         During this trial, I have asked questions of

11  witnesses, I think on occasion.  Do not assume that because I

12  asked questions I hold any opinion on the matters I asked

13  about or on what the outcome of the case should be.

14         As you know, the plaintiff in this case is the

15  Securities and Exchange Commission, which I will refer to as

16  the SEC.  And the defendant in this case is Stephen Ferrone,

17  who I will refer to as Mr. Ferrone.  The SEC is an agency of

18  the federal government.  Mr. Ferrone is a private citizen.

19  All parties are equal before the law, and all parties in this

20  case are entitled to the same fair consideration.

21         In reaching your verdict, you must consider only the

22  evidence.  The evidence in this case consists of the testimony

23  of the witnesses, the exhibits admitted into evidence, the

24  stipulations already read to you, and the facts that have been

25  judicially noticed.  I don't think I noticed any judicial

1    facts.

2            MR. RUBENSTEIN:  No.

3            THE COURT:  Okay.  So, again, I'm going to read that

4    again, and I'm going to strike that last part.  In reaching

5    your verdict, you must consider only the evidence.  The

6    evidence in this case consists of the testimony of the

7    witnesses, the exhibits admitted in evidence, the stipulations

8    already read to you.

9            In determining whether any fact has been proved, you

10   should consider all of the evidence bearing on the question

11   regardless of who introduced the evidence.

12           Now, when I first instructed you, I told you about

13   the phrases "direct evidence" and "circumstantial evidence."

14   I will say a few words about these phrases to remind you what

15   they mean.

16           Direct evidence is proof that does not require an

17   inference.  An example of direct witness is a witness's

18   testimony about what he or she personally saw, did, or heard.

19   In other words, it's the testimony of someone who claims to

20   have personal knowledge of a fact.  For instance, if a witness

21   were to say, "I was outside yesterday, and I saw it raining,"

22   that would be direct evidence that it was raining yesterday.

23           Circumstantial evidence, on the other hand, is proof

24   of a fact or a series of facts that tends to show that some

25   other fact is true.  For instance, if a witness were to say,

1   "I was standing in the lobby of my apartment building

2   yesterday, and I saw a woman enter the building with a wet

3   umbrella in her hand," that would be circumstantial evidence

4   that it was raining yesterday.

5        And in reaching your verdict, you must consider all

6   the evidence, both direct and circumstantial, in the case.

7   The law makes no distinction between the weight to be given to

8   direct or circumstantial evidence.  It is the responsibility

9   of you, the jury, to decide how much weight to give any

10  evidence in the case.

11       As I just stated, you are to consider only the

12  evidence in this case when reaching your verdict.  However,

13  you should consider the evidence in light of your own

14  observations in life.

15       Further, in weighing the evidence, you should use

16  your common sense.  One of the important ways that you use

17  common sense in everyday life is by drawing inferences.  That

18  is, you often look at one fact and conclude from it that

19  another fact exists.  Here is an example.

20       Imagine that you are driving on the highway and you

21  pass a car that is stopped on the shoulder of the road.  You

22  see that there is a tow truck in front of the car and that the

23  tow truck driver is hooking the car up to the tow truck.  From

24  these facts, you may reasonably infer the car being towed

25  cannot be operated safely at that time.

1   You might draw this reasonable inference even though
2   no one actually told you whether the car can operate safely.
3   That may not be the only inference that can be drawn from the
4   observed scene, but it is one reasonable inference that could
5   be drawn.
6   When reaching your verdict, you are allowed to make
7   such inferences by drawing on your observations in life and
8   using your common sense, but any inference you make must be
9   reasonable and must be based on the evidence in the case.
10  As described previously, the evidence in this case
11  consists of the testimony of the witnesses, the exhibits
12  admitted in evidence, the stipulations already read to you.
13  I'm going to change this. This said, "Also the facts that
14  have been judicially noticed." That's a fact that I take
15  notice of from the bench, but I haven't done that in this
16  case.
17  So, it's the testimony, the exhibits admitted in
18  evidence, and the stipulations that you've -- have been read
19  to you.
20  I want to tell you a few things that are not
21  evidence. And again, this is a bit of a repeat from before.
22  This is not an exhaustive list of all that is not evidence.
23  Rather, at this time, I will only mention three things that
24  are not evidence.
25  First, if I told you to disregard any testimony or

1    exhibits or if I struck any testimony or exhibits from the

2    record, such testimony or exhibits are not evidence and must

3    not be considered.

4          Second, anything that you saw or heard outside the

5    courtroom is not evidence and must be entirely disregarded.

6          Third, nothing said by the lawyers is evidence.  What

7    the lawyers said during opening statements and closing

8    arguments is not evidence.  What the lawyers said when

9    objecting also is not evidence.  And all other comments that

10   the lawyers made during the trial are not evidence.

11         Because these things are not evidence, you must not

12   consider them in reaching your verdict.  As I stated earlier,

13   in reaching your verdict, you must consider only the evidence.

14         Any notes you have taken during the trial are only

15   aids to your memory.  The notes are not evidence.  If you've

16   not taken notes, you should rely on your independent

17   recollection of the evidence and not be unduly influenced by

18   the notes of other jurors.  Notes are not entitled to any

19   greater weight than each juror's own recollection or

20   impression of the evidence.

21         During the course of the trial, I instructed you that

22   I admitted certain evidence for a limited purpose.  You must

23   consider that evidence only for the limited purpose for which

24   I admitted it.  You must not consider it for any other

25   purpose.

1        Certain documents have been admitted into evidence in

2   this case, and they contain portions that are blacked out or

3   redacted.  These redactions occurred because the Court and the

4   parties determined that it was not appropriate to introduce

5   those portions of the documents into evidence.  You must not

6   consider the redacted portions of these documents for any

7   reason.  You should consider the unredacted portions of any

8   redacted documents just as you would any other documentary

9   evidence.

10       You must decide whether the testimony of each of the

11  witnesses is truthful and accurate in part, in whole, or not

12  at all.  You also must decide what weight, if any, you give to

13  the testimony of each witness.

14       In evaluating the testimony of any witness, including

15  any party to the case, you may consider, among other things,

16  the ability and opportunity the witness had to see, here, or

17  know the things that the witness testified about; the

18  witness's memory; any interest, bias, or prejudice the witness

19  may have; the witness's intelligence; the manner of the

20  witness while testifying; the witness's age; and the

21  reasonableness of the witness's testimony in light of all the

22  evidence in the case.

23       During the trial, certain testimony was presented to

24  you by the reading of depositions and the playing of a video

25  deposition.  This deposition testimony is entitled to the same

1  consideration that you would have given it had the witnesses

2  appeared and testified here in court.  That means that

3  deposition testimony should be judged, insofar as possible, in

4  the same way as you would have judged it if the witnesses had

5  been present and testified from the witness stand.

6        You may consider statements given by a party or a

7  witness under oath before trial as evidence of the truth of

8  what he or she said in the earlier statement, as well as in

9  deciding what weight to give his or her testimony.

10        In considering a prior inconsistent statement, you

11  should consider whether it was simply an innocent error or an

12  intentional falsehood and whether it concerns an important

13  fact or an unimportant detail.

14        Evaluating the testimony of witnesses is not just a

15  mathematical exercise.  You are not required to find that a

16  fact does or does not exist just because more witnesses

17  testified that it does or does not exist.  It is your

18  responsibility and yours alone to decide what weight to give

19  each witness's testimony.

20        The law does not require a party to call as a witness

21  every person who might have knowledge of the facts related to

22  this trial.  Similarly, the law does not require a party to

23  present as exhibits all paper and things mentioned during the

24  trial.

25        Now, certain graphs, charts, timelines, and Power

1 Point slides have been shown to you. These visual aids were
2 used for convenience and to help explain the facts of the
3 case. They are not themselves evidence or proof of any facts.
4 Exhibits 205 and 206, however, are in evidence, and those are
5 charts and graphs. So, those are in evidence. But other
6 charts and graphs that you saw on screens and things like that
7 were used as visual aids, but are not in evidence.

8 Okay. I'm going to take a drink, which signals to
9 you I'm moving on to stuff that you haven't necessarily
10 heard before -- a drink of water I should say.

11 This case involves three claims which I soon will
12 describe to you in more detail. You must give separate
13 consideration to each claim in this case.

14 Before I instruct you on the specific claims involved
15 in this case, I want to tell you about the standard of proof
16 that applies to all of the claims. This is a civil case. In
17 a civil case, the plaintiff has the burden of proving its case
18 by what is called a preponderance of the evidence. The
19 preponderance of the evidence standard is satisfied if, after
20 considering all of the evidence in the case, you are persuaded
21 that something is more probably true than not true.

22 When I say that a party must prove, show, or
23 establish something, I am referring to the preponderance of
24 the evidence standard. I also am referring to that standard
25 whenever I use phrases such as "if you find" or "if you

1 decide."

2       As I said, the SEC alleges three claims against

3 Mr. Ferrone.  Mr. Ferrone denies each and every claim against

4 him.  I will now explain to you what the SEC must prove in

5 order to prevail on each of its claims.

6       The first claim is Claim I under Section 10b of the

7 Exchange Act and Rule 10b-5.

8       The SEC's first claim is that -- and the jury

9 instructions are headed that way.  Okay?

10       The SEC's first claim is that Mr. Ferrone violated

11 Section 10b of the Exchange Act and Rule 10b-5 by making

12 untrue statements of material fact and/or omitting to state

13 material facts in connection with the purchase or sale of a

14 security.

15       And again, these instructions are going back to the

16 jury room with you, so --

17       To prove that Mr. Ferrone violated Section 10b and

18 Rule 10b 25, the SEC must prove by a preponderance of the

19 evidence each of the following four elements:

20       First, the SEC must prove that Mr. Ferrone directly

21 or indirectly did one or more of the following fraudulent

22 acts:  Employed a device, scheme, or artifice to defraud; made

23 an untrue statement of a material fact or omitted to state a

24 material fact necessary in order to make a statement made, in

25 light of the circumstances under which it was made, not

1    misleading; or, engaged in any act, practice, or course of
2    business which operated or would operate as a fraud or deceit
3    upon any person.

4         Second, the SEC must prove that Mr. Ferrone acted
5    knowingly or with reckless disregard for the truth.

6         Third, the SEC must prove that Mr. Ferrone's conduct
7    occurred in connection with the purchase or sale of a
8    security.

9         Fourth, the SEC must prove that Mr. Ferrone used or
10   caused to be used the mails or the means and instrumentalities
11   of interstate commerce, including a facility of a national
12   securities exchange.

13        If you find that the SEC has proven each of these
14   four elements by a preponderance of the evidence, then your
15   verdict should be in favor of the SEC on this claim.  If, on
16   the other hand, you find that the SEC has failed to prove any
17   of these elements by a preponderance of the evidence, then
18   your verdict should be in favor of Mr. Ferrone on this claim.

19        I will now explain some of these concepts to you in
20   more detail.  The first element is materially fraudulent acts.
21   A device, scheme, or artifice to defraud is a plan for the
22   accomplishment of any objective.  Fraud is a general term that
23   embraces all ingenious efforts and means that individuals
24   devise to take advantage of others.  As previously described,
25   the law which Mr. Ferrone is alleged to have violated

1 prohibits all kinds of manipulative and deceptive acts.

2 To prove that Mr. Ferrone employed a device, scheme,

3 or artifice to defraud, the SEC may prove that Mr. Ferrone has

4 engaged in conduct that had the principal purpose and effect

5 of creating a false appearance of fact in furtherance of a

6 scheme. It is not enough that a transaction in which

7 Mr. Ferrone was involved had a deceptive purpose and effect.

8 Mr. Ferrone's own conduct that contributed to the transaction

9 or overall scheme must have had a deceptive purpose.

10 A device, scheme, or artifice to defraud element may

11 be satisfied by making material misrepresentations or

12 omissions, as I will describe to you below.

13 The SEC also can prove that Mr. Ferrone committed a

14 fraudulent act by showing that he made an untrue statement of

15 a material fact or omitted to state a material fact necessary

16 in order to make a statement made, in light of the

17 circumstances under which it was made, not misleading.

18 The SEC need not prove that Mr. Ferrone personally

19 made the misrepresentation of a material fact or that he

20 personally omitted a material fact. It is sufficient if the

21 SEC establishes that Mr. Ferrone caused the statement to be

22 made or the fact to be omitted.

23 One of the ways the SEC can prove that Mr. Ferrone

24 caused a statement to be made is by showing that he had

25 ultimate authority over the statement, including its content

1  and whether and how to communicate it.  The SEC must prove
2  that any misrepresentation was untrue at the time that it was
3  made and that any omission made another statement misleading
4  at the time that the omission occurred.

5       The SEC must prove that any misrepresentation or
6  omission involved a fact that was material.  To show that a
7  stated or omitted fact is material, the SEC must prove that
8  there was a substantial likelihood that a reasonable investor
9  would consider the fact important in making an investment
10 decision and would view the fact as having significantly
11 altered the total mix of information made available.

12      You must decide whether something was material based
13 on the circumstances that existed at the time of the statement
14 or omission.

15      The SEC need not prove that Mr. Ferrone made more
16 than one material misstatement or omission.  The SEC also need
17 not prove that any particular purchaser or seller of
18 securities actually relied on any alleged material
19 misrepresentations or omissions made by Ferrone --
20 Mr. Ferrone.

21      I'm going to talk about the second element, which is
22 the state of mind.  I realize these are long.  I know you're
23 paying attention.  And again, as I said, to hear them orally
24 is one thing, and then you'll have them with you as well.

25      As I stated earlier, the second element of this claim

1   requires that the SEC prove Mr. Ferrone acted knowingly or

2   with reckless disregard for the truth.  This is sometimes

3   referred to as the required state of mind or scienter.  It is

4   not enough to show that Mr. Ferrone acted accidentally, merely

5   made a mistake, or engaged in negligent conduct.  Rather, the

6   SEC must prove that Mr. Ferrone acted with a mental state

7   embracing intent to deceive, manipulate, or defraud.

8          To act knowingly means to act intentionally and

9   deliberately, rather than mistakenly or inadvertently.

10         To act with reckless disregard for the truth means

11  to engage in highly unreasonable conduct that involves an

12  extreme departure from the standards of ordinary care and

13  presents a risk that either is known to a defendant or is

14  so obvious that a defendant must be aware of it.

15         A third element, in connection with the purchase or

16  sale of a security.  As I stated earlier, the third element of

17  this claim requires that the SEC prove that Mr. Ferrone's

18  conduct occurred in connection with the sale or purchase of a

19  security.  The so-called "in connection with" requirement is

20  satisfied if you find that there was any connection or

21  relation between the allegedly fraudulent conduct and the sale

22  or purchase of securities.

23         Fraudulent conduct may be in connection with the sale

24  or purchase of securities if you find that the alleged

25  fraudulent conduct touched upon a securities transaction.

1   The final element is interstate commerce. As I
2   stated earlier, the fourth element of this claim requires that
3   the SEC prove that Mr. Ferrone, in connection with the
4   allegedly fraudulent conduct, used or caused to be used the
5   mails or the means and instrumentalities of interstate
6   commerce, including a facility of a national securities
7   exchange.

8   You have heard testimony and seen exhibits concerning
9   whether lawyers received or reviewed Immunosyn's public
10  filings and press releases before they were filed or issued.
11  Mr. Ferrone is not asserting as a defense that he requested,
12  received, or relied upon specific advice provided by lawyers
13  about Immunosyn's public filings or press releases.
14  Therefore, reliance on advice provided by lawyers is not a
15  defense in this case.

16  Evidence that lawyers may have received or reviewed
17  documents was admitted only for the effect, if any, it may
18  have had on Mr. Ferrone's state of mind; that is, whether
19  Mr. Ferrone did or did not knowingly or recklessly cause false
20  statements or omissions of a material fact to be made, as I
21  have just defined those terms for you.

22  The second claim, Claim II, is under Rule 13(a)-14 of
23  the Exchange Act. This is not as long.

24  The SEC's second claim is that Mr. Ferrone violated
25  Rule 13(a)-14 of the Exchange Act. This rule requires the

1  principal executive officer of a public company to provide
2  certain truthful certifications in connection with a company's
3  annual and quarterly reports filed with the SEC.

4          The certifications at issue in this case are
5  contained in some of Immunosyn's annual reports on Forms 10-K
6  and quarterly reports on Forms 10-Q.  The Forms 10-K at issue
7  are those for 2007 and 2008, which were filed in 2008 and
8  2009, respectively.  The Forms 10-Q at issue are those for the
9  third 2007 fiscal quarter, the second and third 2008 fiscal
10 quarters, and the second and third 2009 fiscal quarters.

11         All of these Forms 10-Q and Forms 10-Q were furnished
12 to the SEC with certifications by Mr. Ferrone as president and
13 CEO of Immunosyn.

14         There are two certifications in these Forms 10-K or
15 Forms 10-Q that the SEC alleges were false or misleading.
16 First, Mr. Ferrone certified in these forms that, based on his
17 own knowledge, the reports did not contain any untrue
18 statement of material fact or omit to state a material fact
19 necessary to make the statements made not misleading.

20         Second, Mr. Ferrone certified in these forms that,
21 based on his own knowledge, the financial statements and other
22 financial information included in the reports fairly presented
23 in all material respects Immunosyn's financial condition,
24 results of operation, and cashflows.

25         You should consider each statement in the

1  certifications that the SEC alleges were false or misleading
2  in order to determine whether Mr. Ferrone violated
3  Rule 13(a)-14.  To prove a violation of Rule 13(a)-14 of the
4  Exchange Act, the SEC must prove by a preponderance of the
5  evidence each of the following two elements:

6        First, the SEC must prove that Mr. Ferrone filed or
7  caused to be filed the certification.

8        Second, the SEC must prove that the certification was
9  false or misleading.

10       If you find that the SEC has proven each of these two
11 elements by a preponderance of the evidence, then your verdict
12 should be in favor of the SEC on this claim.  If, on the other
13 hand, you find that the SEC has failed to prove either of
14 these elements by a preponderance of the evidence, then your
15 verdict should be in favor of Mr. Ferrone on this claim.

16       Claim III.  The SEC's third claim is that Mr. Ferrone
17 aided and abetted violations of Section 13(a) of the Exchange
18 Act and Rules 12(b)(20), 13(a)(1), 13(a)(11), and 13(a)(13).
19 These provisions require public reporting companies to file
20 with the SEC annual reports on Forms 10-K, quarterly reports
21 on Forms 10-Q, and current reports on Forms 8-K.  These
22 provisions also require that the reports include statements
23 providing certain information.  Finally, these provisions
24 require that the reports be actually accurate and that the
25 reports not omit material information necessary to make the

1    required statements, in light of the circumstances under which
2    they were made, not misleading.

3           These provisions may be violated by aiding and
4    abetting a company's filing of false annual, quarterly, and
5    current reports with the SEC.

6           To prove that Mr. Ferrone violated Section 13(a) of
7    the Exchange Act and Rules 12(b)(20), 13(a)(1), 13(a)(11), and
8    13(a)(13), the SEC must prove by a preponderance of the
9    evidence each of the following three elements:

10          First, the SEC must prove that Immunosyn filed an
11   annual, quarterly, or current report with the SEC that
12   contained a materially misleading statement or omission.

13          Second, the SEC must prove that Mr. Ferrone generally
14   was aware or knew that his actions were part of an overall
15   course of conduct that was improper or illegal.

16          Third, the SEC must prove that Mr. Ferrone
17   substantially assisted Immunosyn's filings of a materially
18   misleading report -- assisted Immunosyn's filing of a
19   materially misleading report.

20          If you find that the SEC has proven each of these
21   three elements by a preponderance of the evidence, then your
22   verdict should be in favor of the SEC on this claim.  If, on
23   the other hand, you find that the SEC has failed to prove any
24   of these elements by a preponderance of the evidence, then
25   your verdict should be in favor of Mr. Ferrone on this claim.

1    I'm going to now explain some of these concepts in a
2    little bit more detail.

3    I have previously instructed you on what the SEC must
4    show to prove that something is material.  Material has the
5    same meaning with respect to this claim; that is, to show that
6    a stated or omitted fact is material, the SEC must prove that
7    there was a substantial likelihood that a reasonable investor
8    would consider the fact important in making an investment
9    decision and would view the fact as having significantly
10    altered the total mix of information made available.

11    The SEC may prove the second element, that
12    Mr. Ferrone acted with general awareness or knowledge, by
13    showing that Mr. Ferrone's conduct was reckless; that is, the
14    SEC may satisfy its burden by proving that Mr. Ferrone's
15    conduct constituted highly unreasonable omissions or
16    misrepresentations that involved not merely simple or even
17    inexcusable negligence, but rather an extreme departure from
18    the standards of ordinary care, where the danger of misleading
19    buyers or sellers was either known to Mr. Ferrone or so
20    obvious that Mr. Ferrone must have been aware of it.

21    The SEC may prove the third element, that Mr. Ferrone
22    provided substantial assistance, by showing that Mr. Ferrone
23    engaged in affirmative conduct that assisted in Immunosyn's
24    filing of an annual, quarterly, or current report with the SEC
25    that contained a materially misleading statement or omission.

1    The SEC also can prove that Mr. Ferrone provided

2    substantial assistance by showing that he remained silent or

3    inactive with a conscious intent to aid Immunosyn's filing of

4    a materially misleading report.

5        To prove that Mr. Ferrone provided substantial

6    assistance, the SEC must show that his affirmative conduct,

7    silence, or inaction was a substantial causal factor in

8    Immunosyn's filing of a materially misleading report.

9        The SEC need not prove that Mr. Ferrone's assistance

10   was the only cause of the violation.

11       Okay.  Those are the three claims.

12       Upon retiring to the jury room, you must select a

13   presiding juror.  The presiding juror will preside over your

14   deliberations and will be your representative here in court.

15       A verdict form has been prepared for you.  You will

16   take this form to the jury room, and when you have reached

17   unanimous agreement on the verdict, your presiding juror will

18   fill in and date the form, and all of you will sign it.

19       I'm just showing you the verdict form visually here.

20   It's two pages.  The first page has each of the claims, and

21   check lines for each party; and then the signature page has

22   the foreperson's signature and then signatures for all the

23   other jurors.  So --

24       I do not anticipate that you will need to communicate

25   with me.  If you do need to communicate with me while you're

1  deliberating, you must do so in writing.  You'll have -- your
2  books are in there.  If you need paper, Brenda can give it to
3  you.

4          The writing must be signed by the presiding juror or,
5  if he or she is unwilling to do so, by another juror.  The
6  writing should be given to the court security officer who will
7  give it to me.

8          And there will be a court security officer, who's
9  sitting in the first row here, sitting outside your door at
10  all times while you're deliberating to make sure that you're
11  not disturbed.

12          So, the writing should be given to the court security
13  officer, who will give it to me.  I will respond either in
14  writing or by having you return to the courtroom so that I can
15  respond orally.

16          If you do communicate with me, you never should
17  indicate what your numerical division is.  In other words,
18  never tell me, for instance, that you're split 5-3 or some
19  other number.  It's just a question.

20          The verdicts must represent the considered judgment
21  of each juror.  Your verdicts, whether for or against the
22  parties, must be unanimous.  You should make every reasonable
23  effort to reach a verdict.  In doing so, each of you should
24  consult with one another, express your own opinions, and
25  listen to your fellow jurors' opinions.  You should discuss

1  your differences with an open mind.  You should not hesitate
2  to re-examine your own opinions and to change your opinion if
3  you come to believe it is wrong; however, you never should
4  surrender your honest beliefs about the weight or effect of
5  evidence solely because of other jurors' opinions or your
6  desire to reach a unanimous verdict.

7        All of you should give fair and equal consideration
8  to all of the evidence and deliberate with the goal of
9  reaching an agreement that is consistent with the individual
10  judgment of each juror.  You are impartial judges of the
11  facts.

12        That concludes your instructions, ladies and
13  gentlemen, so I am going to release you to deliberate.  I'm
14  just going to take out from here the language -- or the words
15  "judicial notice" that I mentioned here, because we overlooked
16  that; and then I'll give this to the court security officer,
17  and he'll give it to you.

18        It will take a few minutes, I think, for the lawyers
19  and I to get the exhibits together in notebooks for you.  In
20  addition, if you wanted to look at the video at any time,
21  we're going to make arrangements to have a laptop, I think,
22  right, or no?

23        MS. LO:  Yes, we have a laptop, your Honor.

24        THE COURT:  But you'll have the physical exhibits.
25  Okay?  Anything else?

1    THE CLERK:  I'll swear in the CSO.

2    THE COURT:  Pardon?

3    THE CLERK:  I'll swear in the CSO.

4    THE COURT:  Yes.  Sorry I missed that.

5    THE CLERK:  Please raise your right hand.

6    (CSO sworn.)

7    COURT SECURITY OFFICER:  I do.

8    THE COURT:  Okay.  Thank you.

9    COURT SECURITY OFFICER:  All rise.

10   (Jury exits courtroom.)

11   THE COURT:  Okay.  We wait.

12   MR. PHILLIPS:  So, can they stay all night,

13   theoretically, or --

14   THE COURT:  Theoretically.  I've never -- have you

15   ever had a jury stay all night?  I haven't.  I mean, I'm going

16   to let them -- my normal practice is to let them deliberate

17   for as long as they want.  Sometimes we get a note that says

18   they want dinner.  We'll bring in dinner for them.  If they do

19   eat dinner, I give them just a little bit of chance afterwards

20   to see whether or not they're really deliberating or they just

21   wanted to eat.

22   And then I -- and then sometimes I talk to you guys

23   and see what you want, but I have been -- I have submitted a

24   note to them saying, "Do you want to continue to deliberate?"

25   Sometimes they say yes, sometimes no.  Usually they're pretty

1  good about telling us what they want to do.

2       I don't know how long it's going to take them, but I

3  would anticipate that -- I think I told them at the beginning

4  they can deliberate as long as they want.  I didn't tell them

5  that here, but --

6       MR. PHILLIPS:  The Court will communicate with

7  counsel by e-mail, or no?

8       THE COURT:  Yeah, give us how you want to be

9  communicated with, cell phone or -- Brenda should be your

10  contact point.

11       MR. PHILLIPS:  And, Brenda, will you tell us when

12  they've stopped deliberating for the day?

13       THE COURT:  So they can go home.

14       THE CLERK:  Absolutely, I will.  I will.

15       MR. RUBENSTEIN:  And, Judge, I'm sure from our side

16  and I'm guessing from theirs as well, if your Honor wants to

17  communicate with them solely about scheduling, we don't need

18  to appear for that.

19       THE COURT:  Okay.

20       MR. PHILLIPS:  Yes.

21       THE COURT:  But I might get you on the phone and tell

22  you that's what I'm going to do.

23       My practice is I don't do anything privately with

24  them.  I get the note.  I bring it in.  I read it to you.  We

25  decide how we're going to respond.  Obviously, if there's a

1  disagreement, I have to decide it.  But you'll hear if there's

2  any questions that we get.

3          MR. PHILLIPS:  The exhibits are right here.

4          THE COURT:  Okay.  I'm going to ask Joe to -- he's

5  got a list of what he thought was admitted, too, just to kind

6  of check and see if there's any discrepancies.

7          MR. RUBENSTEIN:  And I assume we'll look at each

8  other's as well.

9          THE COURT:  Okay.  And so make sure you give us your

10 contact points so that we know how to contact you.

11   (Bench conference, not reported.)

12         MS. BAUTISTA:  Your Honor, we have a question.  Well,

13 here's the laptop.  The 10-minute video admitted into evidence

14 is copied on the desk top, but we also have an extra CD we put

15 in here just in case.  Is that fine with the Court?

16         THE COURT:  Yeah, sure.

17         MS. BAUTISTA:  Is that fine with the defendant?

18         MR. RUBENSTEIN:  Yes.

19         THE COURT:  Do you want to -- I know this is probably

20 not the time you want to do this.  You made your 50(a) motion.

21 I don't really know what it's based on much.  Do you want to

22 argue it now?  In other words, you said -- probably not,

23 right?

24         MR. RUBENSTEIN:  If your Honor would prefer that we

25 do, but --

1    THE COURT:  You said, "I'm making it on the
2    scienter-based counts."  Was that because you thought there
3    was not enough evidence on the state of mind?  Was it a
4    materiality issue?  What was it?
5    MR. RUBENSTEIN:  It was to both elements, scienter
6    and materiality.  Your Honor has been very attentive
7    throughout the trial.  There have been a lot of conversations
8    about the evidence in this trial.  Your Honor has had the
9    exhibits and the deposition designations for many months.
10   You're well familiar with the case.  I don't think you need a
11   long summary.
12   But the fact of the matter is there's no evidence
13   that Mr. Ferrone made any conscious decision regarding an
14   omission, and this is an omission case.  In my view, it is.
15   There's -- with respect to knowledge, at least.
16   With respect to recklessness and the standard that is
17   so high, and the definition that the jury's been given that
18   recklessness is an extreme departure from the standard of
19   care, which has risks that -- such that essentially, in our
20   view, it amounts to at least a knowledge or evidence so
21   circumstantially supportive of knowledge that the defendant
22   was aware of those risks.  Again, the evidence is lacking to
23   support a rational jury finding beyond a preponderance of the
24   evidence that scienter was present.
25   Mr. Ferrone -- there was not a single witness who

1  testified in any direct fashion as to his scienter or in any
2  fashion that would allow an inference as to that level of
3  scienter.

4         As to materiality, the only direct witnesses, I
5  think, on that issue were Mr. Sacks and Mr. Melling --
6  Dr. Melling.  Mr. Sacks's testimony was conclusory as to that
7  issue.  It should not be credited, given the cross-examination
8  of him with respect to what he found important and what he
9  actually did or didn't do at the time.

10         Dr. Melling, his testimony on the stock trades was,
11  to our view, simply that he did the trades before he was aware
12  of a clinical hold.  He never knew what a clinical hold was
13  before.  He obviously didn't do any stock trades after that.

14         I don't think that established the materiality, given
15  the breadth of disclosures that were made and in particular
16  the disclosures concerning both the regulatory status of the
17  drug, including the lack of clinical trials approval, as well
18  as the financial disclosures, which made it clear that the
19  regulatory process wasn't going to proceed, given the lack of
20  funding.

21         THE COURT:  As to the latter point -- and then I'll
22  hear from you, Mr. Phillips.  But I went through my notes, and
23  putting aside Mr. Sacks, I think Dr. Melling, and I'm looking
24  at my notes, testified unequivocally that -- well, he didn't
25  know about the clinical hold when he purchased, and it would

1 have been material.

2 I think he said when he invested, he did not know the

3 drug was on full clinical hold. It would have affected his

4 investment decision is what he said. And he talked about

5 investing about $116,000 over the course of three

6 transactions.

7 A lot of the focus on the materiality discussion here

8 has been what Sacks said, but Melling was an investor; and he

9 may not have been put on the stand for that purpose, but I can

10 take, obviously, his testimony.

11 So, I think there's enough in the record just with

12 Melling on that to have the jury get the case on materiality.

13 MR. RUBENSTEIN: And, Judge, I would just say --

14 Dr. Melling's credibility's not at issue. I don't know as a

15 matter of law that an investor getting up on the stand and

16 saying, "This would have been important to me," regardless of

17 his credentials is enough on its own to establish materiality.

18 I think the facts and circumstances of all the

19 disclosures in their totality and the total mix of information

20 in this case defeat any claim or conclusory testimony

21 regarding that by any investor.

22 THE COURT: I think that there's a jury question on

23 materiality. I do. I think there's enough evidence on the

24 SEC side in terms of the significance of the fact that the --

25 just looking at the fact that the product was on hold and

1    whether that was material or would have altered the mix of

2    information available to investors as the hold continued and

3    as it started to become apparent, at least potentially, that

4    there was not enough funds to be able to respond to the FDA's

5    17 deficiencies on the '06 IND.  I'm not even thinking about

6    the '08 IND.

7              So, I think there's evidence that is sufficient at

8    least to make it a jury question and not make it a decision as

9    a matter of law on that particular element.

10             Yeah, I mean at page 417 of the trial transcript,

11   Dr. Melling testified -- he was asked, "Question:  And when

12   you invested in Immunosyn, through your family in Immunosyn,

13   did you know that SF-1019 was on full clinical hold?

14             "Answer:  No.

15             "Question:  And would that have affected your

16   decision just knowing that the drug, the only product of the

17   company, was on full clinical hold?"

18             He said, "Yes."

19             So, I mean, I think there's some law.

20             On the other, scienter issue, do you want to respond

21   at all, Mr. Phillips?  I figured we'd just do this now.

22             MR. PHILLIPS:  I'd be happy to have --

23             THE COURT:  It saves you from having all the angst.

24             MR. RUBENSTEIN:  There was no angst, Judge.

25             MR. PHILLIPS:  I'd be happy to have as much argument

1　　as your Honor wants; but I just did a closing argument where I

2　　addressed every single element of every single claim, so if

3　　your Honor's comfortable, I'd just incorporate that argument

4　　into my response.

5　　　　　　　THE COURT:  Okay.  And I think the closing argument,

6　　again, just showed -- the closings to me showed that there is

7　　a legally sufficient evidentiary basis to find for the SEC on

8　　that issue.

9　　　　　　　So, I'm going to deny the motion, let the jury

10　　deliberate, and then we'll see where we are afterwards.

11　　　　　　　MR. RUBENSTEIN:  Yes, sir.

12　　　　　　　THE COURT:  Thank you for that very nice argument

13　　there, Mr. Phillips.  Okay?

14　　　　　　　MR. RUBENSTEIN:  Thank you.

15　　　　　　　MR. PHILLIPS:  Thank you.

16　　　　　　　THE COURT:  I just wanted to address it and move on.

17　　　　　　　MR. ROTERT:  Thank you, Judge.

18　　　　　　　THE COURT:  Thank you.

19　　　　(Bench conference, not reported.)

20　　　　　　　THE COURT:  Does anybody have any particular -- I am

21　　going to file the final jury instructions as the final

22　　instructions.  I can't remember what -- I think the last thing

23　　on the -- I think the last thing on the docket regarding jury

24　　instructions was the SEC's submission.  I don't recall whether

25　　your markup of it -- do you want me to put all of these

1    iterations on there, or are you content with the final one?

2          MR. RUBENSTEIN:  It probably makes sense.  Are we

3    talking about -- which -- all of the jury instructions or

4    just -- yeah.

5          MS. BAUTISTA:  I think we just need what the Court

6    read to the jury today.  We don't need the drafts.

7          THE COURT:  I'll go back, and I'll look at where

8    we've dropped off in terms of filing.  If I think there's

9    something that needs to be there, I'll put that on, too.

10   Nobody objects to my putting an interim on there?

11         MS. BAUTISTA:  No.

12         MR. RUBENSTEIN:  I did see there's a minor typo.

13         MS. LO:  Yeah, "stated."

14         MR. RUBENSTEIN:  I think it was page 8.

15         THE COURT:  We just gave them to them.

16         MR. RUBENSTEIN:  It wasn't material, for lack of a

17   better term.

18         THE COURT:  Sorry.  Was it a comma typo?

19         MR. RUBENSTEIN:  It was "stated" without the first

20   "t."

21         MS. LO:  Yeah, it just said sated.

22         MR. RUBENSTEIN:  Which actually has a different

23   meaning.

24         THE COURT:  Do you have any disagreements as to

25   what's in evidence?

1      MR. RUBENSTEIN:  No.

2      MS. LO:  I don't believe so, no.

3      THE COURT:  Do you have a list of it for him, or no?

4      MS. LO:  Not one compiled list.  We could do a

5  compiled list.

6      MR. RUBENSTEIN:  Kevin?  Sorry.  Do you have a list

7  of everything we've agreed on that's in evidence?

8      THE COURT:  I like to -- although you guys said -- I

9  told you we didn't need indexes, that's true.  I do like to

10  put on the docket the -- memorialize the exhibit numbers that

11  we gave to the jury, just so --

12      MR. RUBENSTEIN:  That's a good idea.

13      THE COURT:  So that everybody knows what they are.

14  So, it doesn't have to be this minute, but I would like you to

15  give us a list, and Joe will double-check it.

16    (Discussion between counsel, not within hearing.)

17      MR. RUBENSTEIN:  Judge, can we e-mail you a final

18  agreed admitted exhibit list later today?

19      THE COURT:  Yeah.  Send it to Joe.

20      MR. RUBENSTEIN:  All right.

21      MS. LO:  All right.

22      MR. RUBENSTEIN:  Judge, do you have anything else for

23  us?

24      THE COURT:  I don't.  I don't.  This is the hard

25  part.  This is the part I don't miss.  I must say that

1  watching you, I missed a lot of that; but this part, I don't

2  miss.  So, I guess good luck to everyone.

3          MR. RUBENSTEIN:  Thank you.

4          MS. LO:  Thank you.

5          MR. PHILLIPS:  Thank you.

6          MR. ROTERT:  Thank you, Judge.

7          THE COURT:  So, good job, and we'll see you.

8          MR. ROTERT:  We'll be in touch.

9          THE COURT:  Um-hum.  Yeah, don't be strangers.

10     (Recess had.)

11     (Court adjourned, to reconvene 4/29/16 at 9:30 a.m.)

12                    CERTIFICATE

13   We certify that the foregoing is a correct transcript from

14  the record of proceedings in the above-entitled matter.

15

16  */s/Frances Ward*                *April 29, 2016*

17  Frances Ward                     Date
    Official Court Reporter

18

19  /s/Kelly M. Fitzgerald           *April 29, 2016*

20  Kelly M. Fitzgerald                      Date
    Official Court Reporter

21

22  /s/Charles R. Zandi              *April 29, 2016*

23  Charles R. Zandi                 Date
    Official Court Reporter

24

25